UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SMITH and ) | |
| MARIA DASILVA, ) | |
|     Plaintiffs ) | |
| ) | **CASE NO. 1:07-CV-12067** |
| vs. ) | |
| ) | |
| DWIGHT JENKINS, CHERRY JENKINS, ) | |
| DOREA SMITH, ROBERT E. KELLEY, ) | |
| RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, ) | |
| EB REAL ESTATE GROUP, INC., ) | |
| DORCHESTER REAL ESTATE, INC., NEW ) | |
| ENGLAND MERCHANTS CORP., UNION ) | |
| CAPITAL MORTGAGE BUSINESS TRUST, ) | |
| MID CITY MORTGAGE, LLC, FREMONT ) | |
| INVESTMENT AND LOAN and MERITAGE ) | |
| MORTGAGE CORPORATION ) | |
|     Defendants ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR
DETERMINATION REGARDING PLAINTIFF ROBERT SMITH'S TESTIMONIAL
CAPACITY AND NEED FOR APPOINTMENT OF GUARDIAN *AD LITEM***

**I.     INTRODUCTION**

The defendants, Union Capital Mortgage Business Trust, EB Real Estate Group, Inc., Robert E. Kelley, RKelley-Law, P.C., Dorchester Real Estate, Inc., New England Merchants Corp., Cherry Jenkins, Dorea Smith and Dwight Jenkins, seek a determination from the Court regarding the testimonial capacity of plaintiff Robert Smith. The defendants' deadline for filing summary judgment motions is December 21, 2009, and the defendants cannot meet that deadline due to the uncertainty about the admissibility of Mr. Smith's testimony. A legal determination regarding Mr. Smith's mental capacity is necessary to clarify Mr. Smith's claims and determine the admissibility of Mr. Smith's statements in this case, including his affidavits, answers to interrogatories, declarations, and sworn deposition testimony. The alternative, multiple cross-motions to strike deposition testimony, affidavits, and interrogatory answers,

1

filed with regard to the summary judgment motions, would raise the same issues of testimonial capacity and require the same type of hearing, but only after the parties had spent thousands of dollars preparing their summary judgment motions. Addressing Mr. Smith's capacity now avoids unnecessary pleading and expense and is in keeping with Fed.R.Civ.P. 1, which stresses the "inexpensive determination of every action."

In addition, Mr. Smith's mental illness requires inquiry into his need for a guardian *ad litem*, pursuant to Fed.R.Civ.P. 17(c). Pursuant to Fed.R.Evid. 706, the court may appoint an appropriate expert to assist the court in evaluating Mr. Smith. The allegations of the complaint, Mr. Smith's testimony in this case, and medical records[1] produced by the plaintiffs all indicate that Mr. Smith may not have sufficient capacity to make decisions on his own behalf regarding this litigation. Without a determination of Mr. Smith's capacity, the defendants cannot be certain of the viability of any judgment that may be rendered in their favor, including summary judgment.

## II.     FACTUAL BACKGROUND

Mr. Smith has asserted that he was the victim of a fraudulent real estate scheme in which he was induced to sign documents resulting in his unknowing procurement of mortgage loans to finance his purchase of two homes. (See Plaintiff's First Amended Complaint, Electronic Filing No. 75). "He suffers from schizophrenia, post-traumatic stress disorder, depression, and/or mild mental retardation. He also has delusions and suffers from a learning disability." (See Plaintiff's First Amended Complaint, para. 17). Mr. Smith's sworn deposition testimony is that his mental illness pre-existed his home purchases at issue, as it

---

[1] Mr. Smith's deposition transcript, November 1, 2006 affidavit, and portions of his medical records are referred to herein as exhibits. The exhibits have not been electronically filed, as they may contain confidential information, and the defendants have contemporaneously filed a Motion for Impoundment under LR 7.2. Upon receipt of an Order of Impoundment, the documents will be delivered to the Court under seal.

arose due to severe head trauma sustained while he was in the U.S. Marine Corps, and that at the time of the home purchases he had decided to stop taking his antipsychotic or antidepressant medications, making him unaware of what he was doing at the home closings. (See excerpts of April 15, 2008 and July 1, 2008 Deposition of Robert Smith, attached hereto as Exhibit "A", pp. 7-8, 17-18).[2] Mr. Smith's attorneys have not moved for the appointment of guardian *ad litem* or taken any other steps to clarify or determine, for the Court, the defendants, or Mr. Smith, the extent of Mr. Smith's mental illness and his capacity to enter into legally binding transactions or to render admissible testimony.

In his deposition, Mr. Smith testified that he was unaware that the documents he signed concerned real estate purchases or that he was borrowing money to make the purchases. (See Exhibit "A", pp. 297-298). Mr. Smith testified that he believed he was entering into some type of investment, although he does not know what the term "investment" means. (See Exhibit "A", pp. 37-38). Neither did he understand the terms "real estate," "property," "credit," "foreclosure," or "mortgage." (See Exhibit "A", pp. 60-64, 103-104, 112-113). Mr. Smith also testified that he did not have an understanding of the business RE/MAX was in when he became involved in the "investments," that he did not understand the term "closing" with respect to the real estate transactions, and that he did not know the transactions involved "property." (See Exhibit "A", pp. 33-38, 42-43, 60-64, 233-237). Mr. Smith stated that he was promised that the individuals and entities who encouraged him to sign papers would "take care of everything," although he had no understanding whatsoever of what was being taken care of. (See Exhibit "A", pp. 236-237). Mr. Smith knew only that he was getting $10,000.00. (See Exhibit "A", pp. 37, 62, 130, 387).

---

[2] As the defendants' motion may trigger a full inquiry into Mr. Smith's mental capacity, a complete copy of Mr. Smith's deposition transcript from both April 15, 2008 and July 1, 2008 is offered under the Motion for Impoundment as Exhibit "A".

Mr. Smith testified that he is illiterate and schizophrenic, and that he was incapable of understanding the transactions alleged in his complaint because of voices in his head. (See Exhibit "A", pp. 7-8, 17-18, 294-298, 307, 317). Mr. Smith testified that he had heard voices since his time in the military thirty years ago, when he suffered severe head trauma, and that he has suffered ill effects since, including drug addiction and chronic homelessness. (See Exhibit "A", pp. 288, 294, 455-456). Mr. Smith stated that he was hearing voices during the transactions, and that his mental illness has worsened since. (See Exhibit "A", pp. 296-297, 317). Among other things, he testified as follows:

Q. So you went and applied for an apartment, right?

A. Yes.

Q. Okay. And did they indicate they were going to do a credit check?

A. Yes.

Q. Okay. And whatever that credit check was, it was good enough for you to get an apartment there, correct?

A. Not really.

Q. Okay. Tell me about the "not really."

A. See, I'm getting confused right now because my voices in my head is talking to me because you keep on saying the same thing over and over and –

MR PLAUT: why don't we –

A. -- I'm getting – I'm getting messed up in my head.

MR. PLAUT: If he's hearing voices in his head we should probably –

Q. Try to just listen to my voice.

MR. PLAUT: Do you want to take a break?

4

>    THE WITNESS:  Yes.
>
>    MR. PLAUT:  Let's take a break.  Thank you.
>
>    (Recess)
>
> Q. Mr. Smith, I may have gotten ahead of myself.  The voices that were keeping you from answering my questions earlier, are those bothering you today?
>
> A. Yes.  They've been bothering since this thing happened, since – well, they got worse.

(See Exhibit "A", pp. 284-285).

Mr. Smith testified that he is affected specifically when he is asked questions, as follows:

> Q. When you say it's worse, do the voices talk to you more often during the day?
>
> A. Yes, because I have to stay in the park.  I walk around days, don't know what I'm doing, don't know if I'm coming or going.  I'm just lost and when you – and when people ask me questions, I don't remember too much because the voices be talking to me.

(See Exhibit "A", p. 288).

Mr. Smith testified that the voices made him paranoid and made him think people were out to get him:

> Q. Now the voices, other than telling you that you're no good, to kill yourself, that you don't know what you're doing, how else do they affect you?
>
> A. With my daily life, that I can't cope.  I can't be in society.  I can't be around people.  I can't be around a crowd of people, I get paranoid.  I still hear voices and I thinking people out to get me and that's one of the reasons that I don't want to give you the address where I stay at.
>
> Q. Did the voices indicate that people were out to get you before September of '05?
>
> A. Yes.

5

> Q. And those were the voices that started up when you were in the military?
>
> A. Yes. Just like I'm saying, it got worser now.

(See Exhibit "A", p. 294).

At his continued deposition on July 1, 2008, Mr. Smith testified that the voices in his head were confusing him during that deposition, that the voices had confused him during his deposition testimony on a prior date, and that the voices had confused him during the entirety of the transactions at issue in this case:

> Q. Were you finished with your answer?
>
> A. Well, now I am but you did – you got me a little bit confused. I told you when I hear the voices I get confused too quick.
>
> Q. Are the voices confusing you today?
>
> A. Yes.
>
> Q. Have the voices confused you in the past?
>
> A. Last time, yes, when I was here last time. I'm more anxious. I'm more hyper.
>
> Q. Do the voices confuse you when you're in a room with business people?
>
> A. A lot of people, yes.
>
> Q. And you were in a room with business people when you signed the documents that we're here about, right?
>
> A. Yes.
>
> Q. And the voices were confusing you then, right?
>
> A. Yes.
>
> Q. And the voices were confusing you when you were with RE/MAX and Century 21?
>
> A. Yes.

\* \* \*

> Q.  Let me get the question out. Whenever you met anybody involved in the deals that were involved in this case, these voices were in your head confusing you, is that fair?
>
> A.  Yes.

(See Exhibit "A", pp. 296-297).

Mr. Smith testified that his mental illness has so affected his memory and cognition that he cannot be certain of what day it is, and that he simply signed things as he was instructed:

> Q.  That's your handwriting with a date 2/8/05?
>
> A.  It look like it.

\* \* \*

> Q.  Okay. Do you know where you were when you signed this document that we've marked as Exhibit 5?
>
> A.  I said I don't know when I signed that.

\* \* \*

> Q.  You signed it on February 8 of '05 because you put the date down, do you remember telling me that a minute ago?
>
> A.  They could have told me any date, I don't know. Whatever they were telling me to do, that's what I did.

\* \* \*

> Q.  So when you put down February 8, 2005, on Exhibit 5, you understood it was the 8th day of February, correct?
>
> A.  Yeah. If that's the date they told me to put down, that's it.

(See Exhibit "A", pp. 302, 304-306).

Mr. Smith agreed that, as his Complaint implies, he had no legal understanding of the transactions he entered into:

> Q. Mr. Smith, would it be fair to say that between the voices and your inability to read and understand English and your absence of knowledge about what any of these documents meant, that you had no legal understanding of what you were signing, is that fair?
>
> MR. MARKOFF: Objection.
>
> A. Yes, sir. I didn't know what I was signing. I just took their word.

(See Exhibit "A", p. 307).

Mr. Smith testified that he currently receives Social Security Disability payments because of his mental illness, that his checks bear the name of a "payee" appointed to assist him in managing his money, and that the terms of his disability payments required the appointment of someone to manage his money. (See Exhibit "A", p. 314). Mr. Smith also testified that his mental illness has compromised his ability to remember events and testify in this case, including an affidavit and a complaint form he submitted to the Massachusetts Attorney General, both of which had been drafted for him by others:

> Q. Now, my notes indicate that the VA doctors in September of 2006 tested you and wrote a report that you had some mental issues; do you recall that?
>
> A. I think so.
>
> Q. And about a month later you signed this long affidavit in this case, which we've marked as Exhibit 1; do you remember doing that?
>
> A. This is from my lawyer. He read it to me.
>
> Q. And he wrote it for you?
>
> A. I think that's the one.
>
> Q. Okay. Well, this affidavit, this was something that you signed when you were hearing these voices, right?
>
> A. Yes.
>
> Q. And they got worse, right?

> A. Yes.
>
> Q. And the voices had prevented you from understanding the other things that you had been signing, correct?
>
> A. Yes.
>
> Q. And the voices prevented you from remembering things clearly, is that fair?
>
> A. Yes.
>
> Q. Part of remembering things clearly would be conversations with people or when you went into offices and signed things, is that fair?
>
> A. Yeah.
>
> * * *
>
> Q. For the documents that were marked as Exhibit 2, did you ask somebody to read the words that are handwritten there where your signature appears down below?
>
> A. Yes. They wrote it out for me.
>
> Q. And did they write it out based on what you told them you thought was true?
>
> A. No. They wrote it out the way they said it. I didn't really tell them – I just wanted – I really didn't tell them.

(See Exhibit "A", pp. 316-318).

It should be noted that Mr. Smith submitted an affidavit that made copious use of terms he testified that he did not understand. (See November 1, 2006 Affidavit of Robert Smith, attached hereto as Exhibit "B", paras. 3, 9, 10, 12-13). Mr. Smith's affidavit repeatedly references issues regarding management of the properties, including a list of promises regarding what the management would entail, and a recollection that Laurice Taylor told him he would be signing a power of attorney regarding the property management. (See Exhibit

"B", para. 9).  The affidavit further states that he was "led to believe that this was a sound investment," even though he could not state how he came to this conclusion and although he testified that he had no understanding of what an "investment" was.  (See Exhibit "B", para. 12; Exhibit "A", pp. 37-38, 461-462).

     Mr. Smith further testified that the complaint he made to the Attorney General was influenced by statements made to him by persons at the Attorney General's office, as someone there suggested to him that he had been involved in a "scam."  (See Exhibit "A", pp. 325-326). Mr. Smith testified that he had experienced a similar problem while in the military thirty years ago, and that he is currently seeking additional relief from the Veterans' Administration because he believes a discharge document from that period was forged.  (See Exhibit "A", pp. 330-331).  Mr. Smith testified that his difficulties from events thirty years prior had been affected by his mental illness, that he had been diagnosed with schizophrenia, and that his mental illness has only worsened:

> Q. Now, were you arrested and imprisoned at some point when you were in the military?
>
> A. Yes.
>
> Q. What was that for?
>
> A. They said I was UA, absent without leave.
>
> Q. Were you?
>
> A. No.
>
> Q. Where were you?
>
> A. I was on base and I was like hurt that time and one of – some – the sergeant said I was on – the captain or the sergeant, one of them, said I was supposed to be on mess duty.  And I go down to the mess hall, they said I was on guard duty and they kept switching me back and forth.  I kept on making formation, but I never did no work.

> So after a year and a half after I almost getting out, then a year before I got out then they say I was UA for them six days. So I said they were out to get me. They forged me – they forged stuff against me.

Q. And you were hearing the voices back then, too?

A. Yes.

Q. Now, currently the doctors have indicated that you have schizophrenia?

A. Yes, sir.

Q. Do you know what that means?

A. They told me voices.

Q. Did they tell you that's been going on since you started to hear the voices back when you were in the military?

A. Yes, but now – but now it's like – it's more – it worser now since this real estate stuff going on and I can't – I can't do nothing. I can't think for myself no more and I'm having a nervous breakdown and stuff. My nerves is not that good.

(Exhibit "A", pp. 331-332).

### III. ARGUMENT

#### A. THIS COURT MUST DETERMINE THE ADMISSIBILITY OF MR. SMITH'S TESTIMONY PRIOR TO THE PARTIES' SUBMISSION OF SUMMARY JUDGMENT MOTIONS.

Because of the approaching December 21, 2009 deadline for filing Summary Judgment Motions in this case, the parties must ascertain whether evidence regarding Mr. Smith, particularly his affidavits, answers to interrogatories, declarations, and deposition testimony, will be admissible. Mr. Smith's allegations in this case suggest that he will claim that in February 2005 he had decided to stop taking his antipsychotic and antidepressant medications, that he was legally incompetent to enter into contractual obligations, and that the transactions he entered into are void *ab initio* or should be voided. Mr. Smith's deposition testimony suggests that he

considers himself currently incapable of entering into legal transactions or rendering competent testimony. If this is the case, his competence should be assessed by the court to determine not only the extent, if any, to which his testimony can be admitted, but whether he is capable of proceeding in this matter without an appointed guardian *ad litem*, and to what extent his condition may allow the transactions he complains of to be voided on his behalf, whether by his current counsel, a guardian *ad litem*, or by some or all of the defendants.

If the facts are as Mr. Smith has testified, his real estate transactions are void or voidable due to his inability to comprehend their nature due to his mental illness. Also, if his condition has worsened since, his current mental illness may be too severe to allow admission of any of his testimony regarding the transactions. In particular, his incomplete and admittedly unclear and unreliable memories of the substance of conversations regarding the transactions may be inadmissible, as well as his memories of the persons he spoke with, the persons present at meetings, and the information that was imparted to him. If this is the case, the evidence relied on by all the parties may be affected with regard to proof of Mr. Smith's claims.

Mr. Smith has not only testified that he considers his memory and testimony unreliable; he has also testified that at least two documents, an affidavit and a complaint form filed with the Massachusetts Attorney General, were drafted by others, and that the content of the statements therein may not represent his actual memory. Mr. Smith testified that the complaint he submitted to the Attorney General was drafted by someone else without his input, and that his recollections of events were influenced by statements made to him when he went to the Attorney General's office seeking help. (See Exhibit "A", pp. 317-318, 325-326). With regard to the transactions at issue, he admittedly signed documents as instructed, even going so far as to say he was instructed as to what date to enter, and in this litigation he admittedly signed an affidavit

drafted by his attorney despite knowing that his memory was unclear.  (Exhibit "A", pp. 305-306, 317).  Mr. Smith admittedly signed the Complaint drafted by someone at the Attorney General's office, despite the fact that "[t]hey wrote it out the way they said it."  (See Exhibit "A", p. 318).

The extreme confusion Mr. Smith has testified to raises issues regarding his testimony that go beyond simply sifting through inconsistent statements.  Mr. Smith currently receives Social Security disability payments due to mental illness, and those payments are made to a person appointed for the purpose of assisting him.  (See Exhibit "A", p. 314).  Mr. Smith's receipt of such benefits due to mental illness indicates impairment, and the fact that he receives payments through a representative payee indicates that the Social Security Administration has already determined that he lacks capability with regard to financial decisions.  See 20 C.F.R. § 416.610 (payments made to representative upon information that beneficiary is "[l]egally incompetent or mentally incapable of managing benefit payments").  If Mr. Smith's disability prevents him from being competent to manage his financial affairs, he may not be capable of prosecuting this case without an appointed guardian *ad litem*, even though he has counsel.

In order to be competent to testify, a witness must have capacity to "observe, remember, and give expression to that which she ha[s] seen, heard, or experienced[.]" Demoulas v. Demoulas, 428 Mass. 555, 565 (1998); see, also, Kowalski v. Gagne, 914 F.2d 299, 307 (1st Cir.1990) (for state law claims, state law supplies rule of decision regarding competence under Fed.R.Evid.601); Scannavino v. Florida Dept. of Corrections, 242 F.R.D. 662, 664-667 (M.D.Fla.2007) (Fed.R.Civ.P. 17(b) requires determination of capacity under law of party's domicile, although federal court has discretion regarding procedures to make determination and appointment of guardian *ad litem* under Fed.R.Civ.P. 17(c)).  Mr. Smith's deposition testimony

raises serious questions regarding his ability to observe the events at issue, his ability to recall those events, and his ability to express himself regarding those recollections. Mr. Smith has testified that he was impaired by voices in his head when relevant events occurred, that his memory of those events is impaired by the voices in his head now, that he is susceptible to suggested memories, that he becomes confused when questioned, that he believes people are out to get him, and that he continues to think about a perceived unfairness and forgery of his signature that he believes occurred prior to his military discharge thirty years ago. This testimony raises serious questions that spark even more concern when combined with the allegations of the First Amended Complaint, which state that Mr. Smith suffers from delusions. (See Plaintiff's First Amended Complaint, para. 17).

Mr. Smith's November 1, 2006 affidavit makes reference to a number of terms that he testified in deposition that he did not understand, and inquiry regarding his affidavit was nearly futile. While attorneys appropriately draft and edit affidavits for their clients to present facts in an advantageous manner, most parties are capable of expressing at least a basic understanding of the vocabulary used in an affidavit they have signed, so that they can be cross-examined in a meaningful way regarding its substance. Mr. Smith's testimony regarding his affidavit was virtually unintelligible, as was much of his testimony:

> Q. And when she said, real estate investment, you had no idea what the term real estate meant; is that right?
>
> A. I don't understand what you're saying.
>
> Q. Have you ever in your lifetime understood what the words real estate mean?
>
> A. In my lifetime?
>
> Q. In your lifetime.

A. Yes. I figured with real estate I assume what it would be.

Q. What did you understand it meant?

A. Real estate.

Q. What is real estate?

A. I don't – real estate of anything. I don't really – she was putting it – she was saying that the real estate of investment.

Q. Is real estate –

A. That's – that's all I know is investment. I thought it was part of an investment.

\* \* \*

Q. Did you understand real estate meant somewhere somebody lived back when you were talking to Laurice Taylor?

A. I was just focused on the investment.

Q. And you didn't know what that meant either, right?

A. No.

(See Exhibit "A", pp. 60-62).

Mr. Smith's affidavit also states, for example, that he was "led to believe" that he was making a "sound investment." (See Exhibit "A", pp. 460-462; Exhibit "B", para. 12). From his deposition testimony it is difficult to believe that Mr. Smith had the capacity to form any opinion regarding the quality of an "investment," or that he had the capacity to draw any intellectual distinction between "sound" and "unsound." Mr. Smith's testimony demonstrates that his affidavit is of dubious value due to his apparent lack of understanding of the memories attributed to him therein.

> **B.     THIS COURT MUST CONSIDER WHETHER IT IS NECESSARY TO APPOINT A GUARDIAN *AD LITEM* FOR MR. SMITH, PURSUANT TO FED.R.CIV.P. 17(C).**

Even if Mr. Smith is considered competent to testify, it appears that he may be incompetent to make decisions regarding the litigation itself, including the relief he is seeking or the claims he wishes to pursue.  See Scannavino, 242 F.R.D. at 664 (person may be competent for one purpose, but incompetent for another); Matter of Moe, 385 Mass. 555, 567-568 (1982) (same, applying Massachusetts law).  Under Fed.R.Civ.P. 17(c), the court is required to appoint a guardian *ad litem* whenever there is evidence that a party is incompetent.  Ferrelli v. River Manor Health Care Ctr., 323 F.3d 196, 201 (2d Cir.2003).  The failure to do so would be an abuse of discretion, and would be grounds for reversal or vacation of any judgment against the plaintiff.  Id.

The Complaint affirmatively states that Mr. Smith is schizophrenic and suffers from delusions.  Mr. Smith has testified regarding his schizophrenia, has admitted to hearing voices throughout the litigation, and has testified to a lack of understanding of the litigation itself. (See Exhibit "A", pp. 285-294, 317, 352-353, 448).  The plaintiff has also produced medical records indicating a diagnosis of schizophrenia.[3]  Under these circumstances, just as the defendants would be at their peril if they attempted to enter into a settlement agreement with Mr. Smith without first inquiring into his need for a guardian *ad litem*, any judgment, including a summary judgment ruling, issued without such an inquiry would also risk reversal or vacation, as the plaintiff might subsequently claim that he was unable to participate in or make rational decisions regarding the prosecution of his claims.

---

[3] As noted, the defendants have submitted a request to file, under seal, portions of Mr. Smith's medical records as Exhibit "C" to this Memorandum.

If Mr. Smith is not competent with regard to managing his financial affairs, or if he is unable to understand the "nature and effect of the litigation" being prosecuted on his behalf, Scannavino, 242 F.R.D. at 664, this litigation cannot proceed until appropriate steps are taken to ensure that his interests are adequately protected. All parties have an interest in learning the extent of Mr. Smith's capabilities and their effects on his legal capacity, whether under Fed.R.Civ.P. 17 or under Fed.R.Evid. 601. Pursuant to Fed.R.Evid. 706(a), the court may appoint an appropriate expert to assist the court in evaluating Mr. Smith.

It also should be noted that in his deposition Mr. Smith expressed distress that a newspaper article had publicized his mental illness, and he testified that the voices in his head had increased as a result of the litigation. (See Exhibit "A", pp. 353, 450). The claims on his behalf in this case seek money damages, but it does not appear that any effort has been made to void the adverse consequences of his involvement in any of the transactions, even though he claims legal incompetence regarding those transactions. It is possible that, with the assistance of a guardian *ad litem*, Mr. Smith's interests in this case can be more accurately identified, addressed, and protected, including the possibility that his responsibilities for the underlying transactions can be voided.

As noted, this Court has broad discretion to evaluate Mr. Smith's competence and to appoint a guardian *ad litem*. N.O. v. Callahan, 110 F.R.D. 637, 648-649 (D.Mass.1986); Huebner v. Ochberg, 87 F.R.D. 449, 456-457 (E.D.Mich.1980), see also Fed.R.Civ.P. 17(c), Fed.R.Evid. 706). He has testified that he was and remains unable to understand the transactions at issue in this case, that he does not understand the litigation currently underway and is confused and distressed regarding the questions asked of him and his role in the lawsuit, and that all of his actions and communications are impaired by his mental illness. Under these

17

circumstances, a hearing should be held to determine both whether he is a capable witness and to determine whether a guardian *ad litem* should be appointed to ensure that his interests are protected.  Under Fed.R.Evid. 706(a), it would be appropriate to appoint an expert to assist the court in evaluating Mr. Smith and determining whether appointment of a guardian *ad litem* is in Mr. Smith's best interest.

Wherefore, for the foregoing reasons, the defendants jointly and respectfully request that this Honorable Court make a determination regarding Mr. Smith's testimonial capacity and need for a guardian *ad litem* in order to clarify issues surrounding Mr. Smith's claims in this case and what evidence, if any, will be admissible for summary judgment purposes.

/s/  Douglas A. Robertson\
Douglas A. Robertson, BBO No. 552315\
Anthony R. Brighton, BBO No. 660193\
Attorneys for Defendant,\
Union Capital Mortgage Business Trust\
MARTIN, MAGNUSON, MCCARTHY & KENNEY\
101 Merrimac Street\
Boston, MA  02114\
(617) 227-3240

/s/ Joseph A. King\
Joseph A. King, Esq.\
Attorney for Defendant,\
E.B. Real Estate Group\
Murphy & Riley, P.C.\
141 Tremont Street\
Boston, MA 02111\
617-423-3700

/s/ Thomas K. McCraw, Jr.\
Thomas K. McCraw, Jr., Esq.\
Attorney for Defendant,\
Dorchester Real Estate, Inc.\
LeClair Ryan, A Professional Corporation\
One International Place, 11th Fl.\
Boston, MA 02110\
857-221-8978

| | |
|---|---|
| /s/ James F. McLaughlin _____ | /s/ Geoffrey A. Domenico _____ |
| James F. McLaughlin, Esq. | Geoffrey A. Domenico, Esq. |
| Attorney for Defendants, | Attorney for Defendants, |
| Robert E. Kelley and RKelley-Law | Dwight Jenkins, Cherry Jenkins and Dorea Smith |
| McLaughlin, McLaughlin & | Piscitelli, Domenico & Murphy, LLC |
|   McLaughlin, P.C. | 171 Washington Street |
| 1135 North Main Street | N. Easton, MA 02356 |
| Brockton, MA 02301 | 508-230-8777 |
| 508-588-4596 | |

/s/ Michael J. Markoff
Michael J. Markoff, Esq.
Attorney for Defendant,
New England Merchants Corp.
184 Jones Road
P.O. Box 212
Falmouth, MA 02541
508-548-5500

### *CERTIFICATE OF SERVICE*

    I, Douglas A. Robertson, attorney for Union Capital Mortgage Business Trust, hereby certify that on the 23rd day of November, 2009, I served a copy of the above document to all counsel of record via electronic filing:

                                                          /s/  Douglas A. Robertson_____
                                                          Douglas A. Robertson, BBO No. 552315
                                                          Anthony R. Brighton, BBO No. 660193
                                                          Attorneys for Defendant,
                                                          Union Capital Mortgage Business Trust
                                                         MARTIN, MAGNUSON, MCCARTHY & KENNEY
                                                          101 Merrimac Street
                                                          Boston, MA  02114
                                                          (617) 227-3240