UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————

| | |
|---|---|
| ROBERT SMITH and MARIA DASILVA, | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| DWIGHT JENKINS, CHERRY JENKINS, | ) |
| DOREA SMITH, ROBERT E. KELLEY, | ) |
| RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, | )   Case No. 1:07-cv-12067-RSG |
| EB REAL ESTATE GROUP, INC., | ) |
| DORCHESTER REAL ESTATE, INC., | ) |
| NEW ENGLAND MERCHANTS CORP, | ) |
| UNION CAPITAL MORTGAGE BUSINESS | ) |
| TRUST, MID CITY MORTGAGE, LLC, | ) |
| FREEMONT INVESTMENT AND LOAN and | ) |
| MERITAGE MORTGAGE CORPORATION, | ) |
| | ) |
| Defendants | ) |

—————————————————————

## SECOND AMENDED COMPLAINT

### PARTIES

1.      Plaintiff Robert Smith ("Smith") is a natural person who lives in Boston,

Massachusetts.

2.      Plaintiff Maria Dasilva ("Dasilva") is a natural person who lives in Braintree,

Massachusetts.

3.      Defendant Attorney Robert E. Kelley, Esq. ("Kelley") is an attorney licensed to

practice law in Massachusetts with a business address of Braintree Hill Office Park, 1 Rockdale

Street Suite 200, Braintree, Massachusetts 02184.

4.      Defendant RKELLEY-LAW, P.C. is, upon information and belief, a professional

corporation through which Attorney Robert E. Kelley does business. (Hereinafter, Kelley and

RKELLEY-LAW, P.C. shall be collectively referred to as "Attorney Kelley").

5.      Defendant Louis G. Bertucci is an attorney who, at all relevant times hereto, was an employee of Attorney Kelley and RKELLEY-LAW, P.C.  Attorney Bertucci has a principal place of business at 1245 Hancock Street, Suite #2, Quincy, Massachusetts.

6.      Defendant EB Real Estate Group, Inc. is a Massachusetts Corporation doing business as RE/MAX Real Estate Specialists at 1532 Dorchester Avenue, Dorchester, Massachusetts ("RE/MAX").

7.      Dorchester Real Estate, Inc. is a Massachusetts corporation doing business as C21 Dorchester Associates at 1544 Dorchester Avenue, Dorchester, MA 02122 ("Century 21").

8.      Defendant Dwight Jenkins ("Jenkins") is a natural person who lives at 50 Stacy Street, Randolph, Massachusetts.  Jenkins does business as a variety of non-incorporated entities including "Liquid Markets", "One World One Link", "One World One Link Car Wholesalers", "One World One Link d/b/a Liquid Markets", and "The Great Western Capital Corporation of the Americas" and "The Portal".  Dwight Jenkins was convicted in federal court several years ago arising out of a bank fraud scheme.

9.      Defendant Dorea Smith ("Smith") is a resident of Norfolk County, Massachusetts.

10.     Defendant Cherry Jenkins is a resident of Dorchester, Suffolk County, Massachusetts.

11.     Defendant New England Merchants Corp ("New England Merchants") is a mortgage brokerage firm with a principal place of business at 1173 Massachusetts Avenue, Arlington Heights, Massachusetts.

12.     Union Capital Mortgage Business Trust d/b/a Union Capital Mortgage ("Union") is a mortgage broker licensed in the Commonwealth of Massachusetts with a principal place of business at 45 Braintree Hill Park, Suite 400, Braintree, Massachusetts 02184.

13.     Defendant Mid City Mortgage, LLC is a mortgage broker with a principal place of business at 15 Joanne Road, Stoughton, Massachusetts 02072.

14.     Defendant Freemont Investment and Loan is a lending institution with a principal place of business at 5404 Cypress Center Drive, Suite 300, Tampa, Florida.

15.     Defendant Meritage Mortgage Corporation is a lending institution with a principal place of business at 7215 Financial Way, Jacksonville, Florida, 32256.

## FACTS

## ALLEGATIONS REGARDING ROBERT SMITH

16.     Plaintiff Robert Smith was the victim of a real estate scheme as set forth herein. Certain defendants in this case agreed, conspired and schemed with each other to prey upon Mr. Smith – a Marine Corps veteran who has limited reading and comprehension skills – by having him borrow hundreds of thousands of dollars to buy two houses without his knowledge.  In the process, those defendants were able to take for themselves approximately $120,000 from Mr. Smith's two purchases in hidden fees, broker's commissions and closing costs.

17.     Robert Smith is a United States Marine Corps veteran who until recently was living at the New England Shelter for Homeless Veterans in Boston, Massachusetts. He suffers from schizophrenia, post-traumatic stress disorder, depression, and/or mild mental retardation.  He also has delusions and suffers from a learning disability.  He graduated from high school in 1978 after taking special education classes.  Mr. Smith does not read or write at the level and proficiency of an average, normal adult.

18.     In January, 2005 Mr. Smith was working as a trash collector for Waste Management Corporation. One day in January, 2005 he was collecting trash at Fields Corner in Dorchester when a woman approached him and introduced herself to him Laurice Taylor. She said she worked for RE/MAX out of its offices located at 1532 Dorchester Avenue in Dorchester, Massachusetts.

19.     Ms. Taylor told Mr. Smith that RE/MAX was offering a special investment program, and she asked if he was interested. He said he did not have any money to invest. She said that he did not need any money to invest through RE/MAX. He said he did not have any experience in investments or in real estate. She said that RE/MAX was expert in real estate and that he would not have to make any decisions in order to participate.

20.     Mr. Smith told her that it sounded good but he had to return to work. She gave him her business card and a RE/MAX advertisement, which stated: "Let us show you HOW TO, and LEARN ABOUT:" Invest, Rent to own, commercial properties, rehabs, repair credit, find home, buy a home, legal insurance, land ownership, construction, home repair "and more!!!" She invited him to call her.

21.     Several days later Mr. Smith called Ms. Taylor and she told him to come down to RE/MAX.  He went to the RE/MAX office in Dorchester and met with Ms. Taylor. She again stated that RE/MAX was offering investment opportunities to people who qualified, and that he would not have to put in any money. She said that if he participated he would receive $10,000 for each investment he made with RE/MAX. He said again that he did not know anything about real estate investment.  She said that did not matter, and that "RE/MAX would take care of everything" concerning the investments.  She said that RE/MAX does a lot of work with veterans such as Mr. Smith.

22.     Ms. Taylor said that in order to see if he qualified he would need to give her copies of his latest W-2 tax document and two recent pay stubs.  She gave him a document from New England Merchants Corp that listed the required documents.  After the meeting, Mr. Smith obtained copies of his latest W-2 form and several pay stubs and brought them to RE/MAX.  Several days later RE/MAX called Mr. Smith back and told him to come in again.  When he arrived, RE/MAX said that he qualified to participate in the investment program.

23.     RE/MAX said they would select the investment, that the investment would last approximately one year, and that during that year Mr. Smith did not have to do anything or be actively involved in any way.  Mr. Smith would receive his $10,000 upon entering into the investment.

24.     Ms. Taylor was not the only representative from RE/MAX Mr. Smith spoke with. He met with Starr Mosely, who introduced herself as a RE/MAX employee who also finds investors and makes them money. Mr. Smith was also introduced to an Asian man in the RE/MAX office whom Mr. Smith was told was the manager of the office. The man asked Mr. Smith what he did for work, and Mr. Smith said he worked for Waste Management. The RE/MAX manager said, "Oh, we just did an investment with someone else who works for Waste Management".  Everyone in the office who worked for RE/MAX encouraged Mr. Smith to get involved.

**The Dighton Property**

25.     Soon thereafter, in February, 2005 Ms. Taylor called Mr. Smith and told him he would have to go to the Law Offices of Robert E. Kelley in Braintree on February 7, 2005 to sign some papers for the investment.

26.     Mr. Smith went to the Law Offices of Robert E. Kelley at the scheduled time. There, Attorney Louis Bertucci introduced himself as the lawyer would was handling the paperwork for the investment.  Mr. Smith believed that Attorney Bertucci was representing him and was protecting his interests in this transaction.

27.     Mr. Smith believed that Attorney Bertucci was his attorney, based on the statements of Attorney Bertucci.

28.     Ms. Taylor was also there, along with a real estate agent from Century 21 and a man named Dwight Jenkins.  Mr. Smith was informed by Taylor and Jenkins that Jenkins worked with RE/MAX, that Jenkins was experienced in real estate investments, and that he, together with

RE/MAX and all of RE/MAX's support team, would be managing the investment.  Taylor and Jenkins said they would take good care of Mr. Smith's interests.

29.     Attorney Bertucci then had Mr. Smith sit at a table and he put a stack of documents in front of him. Attorney Bertucci advised Mr. Smith that he had prepared the documents and that they were all in proper order.  Attorney Bertucci advised Smith to sign the documents, but did not read or explain their contents to him.

30.     Attorney Bertucci, Ms. Taylor, Mr. Jenkins and the Century 21 agent led Mr. Smith to believe that this was a good investment, that he could put his trust in them, that Mr. Smith would not have to do anything further for the investment, and that Jenkins and RE/MAX would manage the investment and would "take care of everything".

31.     It was obvious and apparent to Bertucci, Taylor, Jenkins and the Century 21 agent that Smith had no genuine understanding of the purpose, nature or meaning of the documents he was signing.  Mr. Smith did not understand what the documents meant or what they were for.

32.     Mr. Smith put his trust and confidence in the people in the room, the reputation of the companies involved, and that fact that an attorney was advising him and was protecting his interests.  Accordingly, he signed all of the documents without understanding what he was signing.

33.     After Mr. Smith signed the documents, the lawyer shook his hand. Mr. Smith was told he would get his $10,000 in a few days.

34.     Without Smith's knowledge or awareness, by signing these documents he had purchased a residential dwelling in his own name as his principal place of residence.  The documents he signed that day were real estate closing documents, promissory notes, mortgage agreements and other closing documents for a property located at 2715 Winfield Lane, Dighton, Massachusetts 02715 (the "Dighton Property").

35.    Also without his knowledge, Mr. Smith was signing papers for him to borrow $411,964.24 by means of two mortgages from Fremont Investment and Loan.  Thousands of dollars of fees were taken by the defendants, including $42,000 of which was borrowed to pay a so-called "contract release" fee to Mr. Jenkins with the knowledge of all of the those defendants at the closing.  Mr. Smith received no real economic benefit for his payment of the $42,000.

36.    The mortgage broker for the closing on the Dighton Property was New England Merchant Corp.  Mr. Smith's financial information (including a W-2 form and paystubs were forwarded to New England Merchants Corp. in or around late January, 2005 by RE/MAX and Dwight Jenkins.

37.    The mortgage application completed and submitted to the lender by New England Merchants Corp contained numerous false statements without Smith's knowledge:

(i)    It falsely stated that the application was taken by "face-to-face interview".  In fact, Mr. Smith was never interviewed for a mortgage face to face or even over the telephone.

(ii)    New England Merchants Corp falsely listed his base monthly income as $7,500, or $90,000 per year. Mr. Smith was a garbage collector, he did not earn $90,000 per year, and he never stated that he earned that amount.

(iii)    The loan application falsely stated that he had two separate bank accounts containing $12,500 and $6,000, respectively.  This was not true.

(iv)    New England Merchants Corp also stated that Mr. Smith completed 14 years of school, rented his last home for 5 years, and spent 4 years and 6 months at his current place of employment, and that his net worth was $397,037.  These were all completely false and fabricated.

(v)    The application also falsely stated that Mr. Smith intended to occupy the property as his principal place of residence.  This was not true.

38.     Several days later, on or about February 22, 2005, RE/MAX called Mr. Smith and had him come down to the office to pick up the $10,000. When he arrived, prior to giving him $10,000 RE/MAX told him to sign a document which RE/MAX said was necessary so that they could take care of the investment.  Unbeknownst to Mr. Smith, the document was a power of attorney granting to Dwight Jenkins (whose trade name is "OneWorld OneLink") control over the disposition of the property.

39.     Smith had no knowledge as to the meaning or nature of this power of attorney document.  This fact was clear and obvious to RE/MAX, and RE/MAX never explained or disclosed to Smith the nature or substance of this document.

**The Boston Property**

40.     Several days later, RE/MAX contacted Mr. Smith again.  RE/MAX offered Mr. Smith the opportunity to make another "investment".

41.     RE/MAX instructed Mr. Smith to return to Attorney Kelley's office to sign papers for the investment.  This second meeting occurred on February 28, 2005.

42.     At this second meeting on February 28, 2005 at Attorney Kelley's office, Ivana Foley from Century 21 was present, and she said that she would be working with Dwight Jenkins and RE/MAX in managing the investment.

43.     Once again, Attorney Bertucci presided over the closing.  Attorney Louis Bertucci again advised Mr. Smith that he was protecting Mr. Smith's interests in this transaction and that he personally ensured the documents were properly prepared.  Attorney Bertucci told Smith said because this was his second time it would go even quicker.

44.     The same process occurred: Attorney Bertucci put a number of documents in front of Mr. Smith and advised him to sign them.  Attorney Bertucci did not read the documents to Mr. Smith, he did not explain them to him, and he discouraged Mr. Smith from reading them.

45.     Mr. Smith still trusted and placed his confidence in RE/MAX, Century 21, Dwight Jenkins and the licensed Massachusetts attorney.  Accordingly, he signed the documents placed before him.

46.     It was obvious and apparent to everyone at the closing that Smith had no genuine understanding of the purpose, nature or meaning of the documents he was signing.

47.     Without Smith's knowledge or awareness, by signing these documents he had purchased another residential dwelling.  This time the documents he signed were real estate closing documents, promissory notes, mortgage agreements and other documents for his purchase of a parcel of residential property located at 27 West Cottage Street, Boston, Massachusetts 02125 (the "Boston Property") in his own name for his principal place of residence.

48.     Also without his knowledge, Mr. Smith had borrowed $437,198.13 by means of two mortgages from Meritage Mortgage Corporation.  Thousands of dollars of fees were taken by the defendants, including $41,500 of which was used to pay another so-called "contract release" fee to Mr. Jenkins for no real economic benefit or service, and $18,950 was used to pay a commission to Century 21.

49.     Mr. Smith's financial information (including a W-2 form and paystubs were forwarded to Union Capital Mortgage Business Trust by RE/MAX in or around mid-February, 2005.

50.     Union Capital Mortgage completed the Uniform Residential Loan Application for Mr. Smith's purchase of the Boston Property and submitted it to the lender.  The mortgage application contained numerous false statements without Smith's knowledge, including:

(i)     It falsely stated that the application was taken by "face-to-face interview".  Mr. Smith was never interviewed for a mortgage face to face or even over the telephone.

(ii)     On that application, Mr. Smith is reported to have completed 16 years of school, rented his last home for 2 years, and spent 20 years in his occupation. These are all false.

(iii)    The Dighton Property loans were not listed among his assets and liabilities at the time of the Boston Property closing.

(iv)    Mr. Smith's monthly income (including salary and rental income) is listed as $8,516, or $102,912 per year, which is completely false and fabricated.

(v)     The application also falsely stated that Mr. Smith intended to occupy the property as his principal place of residence.  This was not true.

51.    It was obvious and apparent to all present that Smith had no genuine understanding of the purpose, nature or meaning of the documents he was signing.  Mr. Smith did not understand what the documents meant or what they were for.

52.    Neither Attorney Bertucci nor anyone else at the closings explained to Mr. Smith the nature or consequences of any of the documents he signed at either of the closings, that he was buying houses in his own name, that he was borrowing money which he would be personally obligated to pay back, or that he was borrowing money which was being used to pay Dwight Jenkins, Attorney Kelley, RE/MAX, Century 21 and the mortgage brokers.  Mr. Smith did not know any of these important things.

53.    At all times relevant hereto, Attorney Bertucci was an attorney working at the law offices of RKELLEY-LAW, P.C. under the supervision, direction and control of Attorney Robert Kelley.

54.    It was within the scope of Attorney Bertucci's duties at RKELLEY-LAW, P.C. to handle real estate closings such as the ones addressed above, and RKELLEY-LAW, P.C. earned legal fees arising out of said closings.  All actions of Attorney Bertucci as set forth herein are imputed to Attorney Kelley and RKELLEY-LAW, P.C.

55.     Several months after the closings, Mr. Smith started to receive phone calls from banks he had borrowed from regarding unpaid mortgage bills, and calls from tenants complaining of utility bills not getting paid. He called RE/MAX, Jenkins and Taylor and they said they would take care of these problems.  However, the problems continued. The banks and tenants continued to call but the payments were not being made.

56.     The lenders relied on the false mortgage applications in determining to loan Smith the funds.

57.     Eventually, both of the properties were foreclosed upon.  Each of Mr. Smith's mortgages contained the statutory power of sale pursuant to G.L. c. 244 (the Massachusetts foreclosure statute).  The lenders exercised their statutory rights and foreclosed the mortgages.

58.     Mr. Smith is currently liable for enormous sums he borrowed from the defendant banking institutions.

59.     Further, Smith's credit has been substantially harmed.

60.     Any rents collected by the defendants from the tenants at the properties were never paid to Mr. Smith or used to pay down the mortgages, and he has not received the amounts for which he contracted.

61.     Mr. Smith has suffered emotional distress resulting in physical symptoms including depression, stomach problems and high blood pressure as a result of the wrongful conduct of the defendants.

62.     Mr. Smith wrote a demand letter to the defendants pursuant to G.L. c. 93A, sec. 9. Despite the passage of thirty days, none of the defendants made a reasonable offer of settlement.

## ALLEGATIONS REGARDING MARIA DASILVA

63.     Plaintiff Maria Dasilva was also the victim of a real estate scheme.  In or around November, 2004 Ms. Dasilva was approached by Dwight Jenkins who asked her if she was

11

interested in making some money with him in real estate investments.  Mr. Jenkins stated that if she did so they could make money and it would also build up her credit.

64.     Jenkins advised Dasilva that it was his standard business practice to identify prospective "investors" who had good credit and would purchase residential properties in their own name.  He further stated that it was his standard business practice to arrange for a prospective "investor" to borrow 100% of the purchase price of the real property.

65.     Mr. Jenkins stated that Dasilva would receive $20,000 for each property she bought, $10,000 when she purchased it and $10,000 when it was sold.  Mr. Jenkins stated that he would select the best properties for her to buy and that he would arrange for financing.

66.     Jenkins said that after the purchases he would collect rents from the tenants in the properties, he would pay the mortgages, and he would do all necessary repairs, maintenance and upkeep on the properties.  Then, he would find buyers for the properties and they would be sold. Jenkins promised that he would handle all of the paperwork, financing and documentation necessary for the transactions.

67.     He said she could trust him because he was experienced in real estate financing, investment and property management, and because everything he did was run by a lawyer and that he and the lawyer would be present at the closing to ensure that all documents were prepared and executed in the proper way.

68.     These conversations continued between Jenkins and Dasilva throughout the month of November, 2004.

### The Brockton Property

69.     In late November or early December, 2004 Jenkins advised Ms. Dasilva that he had identified a suitable piece of residential real property that would make an excellent investment for her located at 10-12 Palm Place, Brockton, Massachusetts (the "Brockton Property").

70.     Jenkins introduced Dasilva to Union Capital Mortgage Business Trust ("Union Capital") and advised her that Union Capital would arrange for financing on the property.  Jenkins advised her to provide information regarding her finances to Union Capital.

71.     On or about December 30, 2004 Ms. Dasilva went to RKELLEY-LAW, P.C. to sign documents regarding the investment.

72.     Attorney Bertucci had Ms. Dasilva sit at a table and he put a stack of documents in front of her.  Neither Attorney Bertucci nor Dwight Jenkins explained the documents to her or encouraged her to read them.  They advised her to sign the documents.  Ms. Dasilva did not understand what the documents meant.  Ms. Dasilva trusted the attorney and Mr. Jenkins and thus signed the documents.

73.     Dasilva was nervous and she felt rushed to sign the documents at the closing.

74.     Attorney Bertucci did not ask her if she understood what she was signing.  Attorney Bertucci knew that Dasilva did not have an attorney and that she had no genuine understanding of the terms of the transaction she was entering into.  He encouraged her to sign the documents without reading them.

75.     Union Capital completed the Uniform Residential Loan Application for Dasilva's purchase of the Brockton Property.  Union Capital never actually interviewed, met with or spoke with Ms. Dasilva, and never verified with her the information in her loan application.

76.     Union Capital knew that the mortgage application it submitted to the lender on this transaction contained numerous false statements, including:

(i)     It falsely states that there was an interview conducted by mail, which was not true.

(ii)    It falsely states that Dasilva intended to occupy the purchased property as her principal place of residence, which was not true.

(iii)   The mortgage application stated that Ms. Dasilva's income was $9,529 per month, which is $114,348 per year.  This was grossly exaggerated, as she was a security guard who earned approximately $15 per hour.

(iv)   Union Capital overstated the net cash flow income for the property.

(v)   Union Capital falsely stated that she had 16 years of schooling, which was not true.

(vi)   Union Capital falsely stated that Dasilva had $21,345 in a bank account at Sovereign Bank.  This was not true.

(vii)   Union Capital falsely stated that Dasilva worked for OneWorld OneLink doing business as Liquid Markets at 36 Milton Ave, Boston, as the Operations Manager of a car dealership.  This was totally untrue.

77.   Union Capital was an active and willing participant in Jenkins' real estate schemes.  Union Capital was introduced to Dasilva by Jenkins, and it was fully aware of Jenkins' business practices and his numerous legitimate-sounding d/b/a trade names including "OneWorld OneLink" and "Liquid Markets" which he routinely used to perpetrate his real estate fraud.

78.   Union Capital's complicity in the scheme is evidenced by the fact that it knew that there was no such legal entity as OneWorld OneLink, that OneWorld OneLink did not do business as Liquid Markets, and that neither trade name was a car dealership.  The false statement by Union Capital that Dasilva was an employee of such car dealership is a clear indication of its knowing involvement in the scheme.

79.   Moreover, upon information and belief 36 Milton Avenue is the residence where Jenkins' mother and sister resided at the time in question, and it is not a car dealership.

80.   Thus, Union Capital knowingly falsified Dasilva's loan application on or around December 30, 2004 for the purpose of making it appear that she would, in fact, qualify for the 100% finance of the Brockton Property.

81.     If in fact Union Capital had properly investigated the income, assets and liabilities of Dasilva, it would have known that she was not reasonably capable of supporting the debt of the Brockton Property.  Notwithstanding this, Union Capital submitted the knowingly fraudulent mortgage application to Meritage Mortgage Corporation on behalf of Dasilva on or about December 30, 2004.

82.     Ms. Dasilva did not understand that at the closing, she was borrowing money to pay $15,954.30 to Mr. Jenkins.

83.     Because Attorney Bertucci rushed Dasilva through the signing of the documents, it was obvious to him that Dasilva had no genuine understanding that she was borrowing money to pay Jenkins or that the mortgage application was false in the respects set forth above.

### The Whitman Property

84.     Approximately one week later, Jenkins informed Ms. Dasilva that he had found another piece of property which was suitable for her as an investment known as and located at 316 Raynor Avenue, Whitman, Massachusetts (the "Whitman Property").

85.     On or about January 7, 2005 Ms. Dasilva went to another lawyer's office at Mr. Jenkins' instruction to sign documents regarding her purchase.  Ms. Dasilva was asked to trust the attorney and Mr. Jenkins, and she did.

86.     Ms. Dasilva did not understand that at the closing, she was borrowing money to pay $24,500 to Mr. Jenkins through his d/b/a called "One World One Link".  Ms. Dasilva also did not know that she had qualified for 100% financing on the strength of another false mortgage application.

87.     The mortgage broker, Mid-City Mortgage, knew that the mortgage application it submitted to the lender on this transaction contained numerous false statements, including:

15

(i)      It falsely states that Dasilva intended to occupy the purchased property as her principal place of residence, which was not true;

(ii)     It falsely stated that she had 14 years of schooling, which was not true.

(iii)    It stated that she worked for OneWorld OneLink car wholesalers for three years, which was completely false as set forth above.

(iv)    It falsely stated that she was the Operations Manager for OneWorld OneLink car wholesalers, which was completely false.

(v)     It falsely stated that she earned $7,000 monthly base salary which was not true, and it also falsely stated that she earned $900 per month in other income.

(vi)    Mid-City Mortgage never spoke with Dasilva regarding the contents of its application to the lender on her behalf.

(vii)   There was no disclosure in the loan application of her liability on the Brockton Property which she had purchased less than two weeks earlier.

88.     After the closings on these properties, however, Mr. Jenkins failed to collect rent and/or failed to use rent money to pay the mortgages, and he failed to upkeep or manage the properties.

89.     Soon, the tenants in the Brockton Property started to phone Dasilva to complain about the lack of hot water.  The tenants in the third floor said that they were Dwight's friends and that Jenkins said they did not have to pay rent.

90.     Several months after the closings, Ms. Dasilva started to receive phone calls from banks she had borrowed from regarding unpaid mortgage bills.

91.     Eventually, both of the properties were foreclosed upon.  Each of Ms. Dasilva's mortgages contained the statutory power of sale pursuant to G.L. c. 244 (the Massachusetts foreclosure statute).  The lenders exercised their statutory rights and foreclosed the mortgages.

92.     Ms. Dasilva is obligated to pay back the banks all the amounts she borrowed, and her credit has been substantially harmed.  She also never received the amounts Jenkins contracted to pay her.

93.     The lenders relied on the false mortgage applications in determining to loan Dasilva the purchase funds.

94.     Ms. Dasilva has suffered emotional distress resulting in physical symptoms including stomach problems, headaches, sleeping problems and stress as a result of the wrongful conduct of the defendants.

95.     Jenkins has admitted that his wife, Defendant Dorea Smith, and his sister, Defendant Cherry Jenkins, knowingly allowed him to use checking accounts in their names for his benefit and in furtherance of his real estate "investments".  Jenkins still retains constructive control over all such money held in the names of his sister and his wife.

96.     Jenkins has admitted that his Cherry Jenkins is the signatory on the One World One Link bank account which was one of his business entities through which he conducted his real estate business, into which he deposited money and from which he received money.

97.     Jenkins has further admitted that Dorea Smith was the signatory on a bank account from which he tendered checks and made deposits.  Jenkins signed Ms. Smith's name on checks that were issued to certain of the victims in the schemes in which he was involved, and Smith allowed a bank account in her name to be used in conjunction therewith.

98.     On at least one occasion Jenkins signed Dorea Smith's name on closing and/or real estate conveyancing documentation in furtherance of the schemes.

99.     Accordingly, Dorea Smith and Cherry Jenkins are co-conspirators in Jenkins' real estate fraud schemes and are vicariously liable for the conduct of Dwight Jenkins.  Dorea Smith and

Cherry Jenkins have knowingly aided and abetted Dwight Jenkins in furthering his schemes, and they are jointly and severally liable for all of his actions as set forth herein.

100.    New England Merchant Corp acted for its own benefit and on behalf of the ultimate lender to Mr. Smith on the Dighton Property, Freemont Investment and Loan.  All of the wrongful acts and practices of New England Merchant Corp as set forth herein are imputable to Freemont Investment and Loan under a principal-agent relationship.  Freemont Investment and Loan is vicariously liable for those wrongful acts and omissions of New England Merchant Corp under agency principles.

101.    Similarly, regarding Mr. Smith's Boston Property and Ms. Dasilva's Brockton Property, Union Capital Mortgage acted for its own benefit and on behalf of the ultimate lender, Meritage Mortgage Corporation.  All of the wrongful acts and practices of Union Capital Mortgage are imputable to Meritage Mortgage Corporation under a principal-agent relationship.  Meritage Mortgage Corporation is vicariously liable for those wrongful acts and omissions of Union Capital Mortgage under agency principles.

102.    Said banks by and through their agents knew that Smith and Dasilva did not understand the nature of the transactions they were engaging in, but they lent them money anyway. The banks are vicariously liable for the falsification of the loan applications, and they are liable for their complete failure to inform the borrower of the nature of the transactions they were entering into.  The banks violated the state and federal truth and lending laws because Smith and Dasilva did not understand the nature or meaning of the documents they signed and the transactions they entered into.

103.    The lenders and mortgage brokers dissuaded the plaintiffs from taking seriously the disclosures required to be made pursuant to: (a) the Federal Truth in Lending Act, 15 U.S.C. § 1601, et. seq.; (b) the Massachusetts counterpart, known as the Consumer Credit Cost Disclosure

Act, G.L. c. 140D (which require, among other things, that a lender accurately and timely disclose the costs of a mortgage loan to a borrower); (c) the Federal Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et. seq.; and (d) the Massachusetts counterpart, G.L. c. 184, §17D (requiring that a lender provide advanced disclosures about the costs of a mortgage loan).  Under these circumstances, if in fact these advance disclosures had been adequately provided, the plaintiffs would not have proceeded with these "investments" as they would have understood that to do so would not be in their best interests.

### COUNTS

### COUNT I

### FRAUD

104.    All allegations set forth above are restated and realleged as if set forth in full herein.

105.    Robert Smith seeks redress for fraud against Dwight Jenkins, Cherry Jenkins, Dorea Smith, E.B. Real Estate Group, Dorchester Real Estate, Inc., Louis Bertucci, Robert E. Kelley, RKELLEY-LAW, P.C., New England Merchants Corp., and Union Capital Mortgage Business Trust.

106.    Maria Dasilva seeks redress for fraud against Dwight Jenkins, Cherry Jenkins, Dorea Smith, Robert E. Kelley, RKELLEY-LAW, P.C. Louis Bertucci, E.B. Real Estate Group, and Union Capital Mortgage Business Trust and Mid-City Mortgage.

107.    Both plaintiffs relied on the fraud perpetrated by said defendants and acted in reliance thereon, as set forth below.

108.    Each defendant, with the exception of the lenders, either directly or indirectly: (i) made material misrepresentations to one or both of the plaintiffs in order to encourage said plaintiffs into using their services in conjunction with the purchase and/or financing of real estate; (ii) steered the plaintiffs toward homes they could not qualify for or afford; (iii) pressured the plaintiffs to sign

mortgage loan documents which contained false and misleading information in order to "qualify" them for substantial loans they could not afford; and/or (iv) pressured plaintiffs to close on these transactions and mortgage contracts by making material misstatements of fact and false promises, and by discouraging them from seeking counsel and legal advice.

109.    Said defendants each made representations, directly or indirectly, which they knew were false and misleading, and they made such statements with the knowledge of their falsity and with the intention that the plaintiffs would rely thereupon.  Plaintiffs did, in fact, rely upon such false representations and have been harmed as a result.

110.    Each of said defendants received payments in the schemes.  Upon information and belief, each received compensation and/or other benefits based on the quantity of loans, the interest rate of the loans and/or the dollar value of the loans they closed, and the sale of the properties in question.

111.    They omitted crucial information about the terms of the documents plaintiffs were signing, they did not advise plaintiffs to seek their own legal advice, and they made false promises regarding what they would do for the plaintiffs after the documents were signed.

112.    Once the properties were bought, none of the promises were fulfilled. The properties were managed very poorly or were not managed at all. Rents were either not collected or were not used to pay down the mortgages.

Specific Allegations of Fraud

113.    In compliance with the requirements of Fed. R. Civ. P. 9(b), plaintiffs incorporate by reference herein all allegations above and further state with particularity as follows.

(i)     Dwight Jenkins, Cherry Jenkins and Dorea Smith

Dwight Jenkins defrauded Mr. Smith into purchasing two properties without his knowledge on February 7, 2005 and February 28, 2005.  Jenkins deceived Mr. Smith into purchasing the two

20

properties by portraying such purchases as "hands-off" investments that he, RE/MAX and Century 21 (regarding the Dorchester property) would take care of completely and for which Mr. Smith did not need any experience.  He did not tell Mr. Smith that he was borrowing large amounts of money that he would be obligated to repay, or any of the important terms, concepts and obligations involved therewith.  Jenkins knew that Smith had no real ability to learn these facts on his own.

114.    Jenkins failed to explain any of the terms of the deals to Mr. Smith and hid from him the true nature of the deals.  Jenkins falsely induced Mr. Smith to believe that he was looking out for Smith's best interests, when in fact the opposite was true. Jenkins encouraged Mr. Smith to put his trust in him and assured him that he would act in his best interests, when in fact he had no intention at any point of doing so.

115.    Jenkins did this in order to garner and split with his co-defendants over $83,500 in bogus "contract release fees" and other transactional costs at the closings of these properties. Jenkins knew that Mr. Smith was a street-level garbage collector with no experience in buying real estate.  Nonetheless, Jenkins aided RE/MAX and the mortgage brokers in the falsification of Mr. Smith's income information without Smith's knowledge in order to bind and commit him to huge mortgage loans he could not afford to repay and that he did not even know he was receiving.

116.    Jenkins also defrauded Dasilva by inducing her on false pretenses into entering into the same type of real estate scheme.  The specifics of his fraud against Dasilva are set forth above in paragraphs 63-90, supra.

117.    Cherry Jenkins and Dorea Smith are liable for the fraud of Jenkins because they were complicit in his scheme and they knowingly allowed Jenkins to utilize their names and bank accounts to perpetrate his fraud in the manner set forth in Paragraphs 95-99, *supra*.

(ii)     EB Real Estate Group, d/b/a RE/MAX

118.    RE/MAX engaged in fraud against Robert Smith by its active participation in all aspects of the fraudulent scheme referenced immediately above on February 7, 2005 and February 28, 2005, and in the month of January, 2005.  RE/MAX initially induced Smith into these schemes and made the same false promises as Jenkins made, namely that these were "hands off" investments for which Smith needed no money or experience in order to participate.  RE/MAX knew that Smith had no understanding whatsoever that he was purchasing two parcels of real estate in his own name or that he was borrowing over $83,000 to pay bogus fees for no actual benefit to himself on the basis of wholly fraudulent and fabricated loan applications.

(iii)    <u>Dorchester Real Estate, Inc., d/b/a Century 21</u>

119.    Dorchester Real Estate, Inc., d/b/a Century 21 engaged in fraud against Robert Smith by its active participation in all aspects of the fraudulent scheme referenced immediately above on February 7, 2005 and February 28, 2005.  Century 21 gave Smith assurances at the closings of the Dighton Property on February 7, 2005 and on the Boston Property on February 28, 2005 that that these were "hands off" investments which would be of benefit to Smith.  Century 21 appeared at both the Dighton and Boston Property closings and gave Smith false confidence that he it was in his best interests to enter into these transactions.  Century 21 knew that Smith had no understanding whatsoever that he was purchasing two parcels of real estate in his own name or that he was borrowing over $83,000 to pay bogus fees for no actual benefit to himself on the basis of wholly fraudulent and fabricated loan applications.

(iv)    <u>Attorney Louis G. Bertucci, Attorney Robert Kelley, and RKELLEY-LAW, P.C.</u>

120.    Attorney Bertucci defrauded the plaintiffs by handling the closings on both of Mr. Smith's closings on February 7, 2005 and February 28, 2005 and on the closing of Ms. Dasilva's Brockton Property on December 30, 2004.  Attorney Bertucci knew that neither plaintiff had any genuine understanding (especially Mr. Smith) of the nature of the documents they were signing or

the obligations they were undertaking, that the loan applications were false and were designed to unjustifiably increase the plaintiffs' creditworthiness to a lender, and that the transactions would be disastrous for the plaintiffs with respect to the enormous loans they were undertaking without receiving commensurate value.

121.    With respect to Mr. Smith, Attorney Bertucci held himself out to Mr. Smith as Mr. Smith's lawyer by introducing himself as the lawyer would was handling the paperwork for the investment, by advising Mr. Smith that all of the paperwork for the investments was properly drafted, by advising Mr. Smith to sign all of the documents, and by stating to Mr. Smith that he was protecting Smith's interests in the transactions.

122.    Attorney Bertucci advised both Mr. Smith and Ms. Dasilva that the documents he had prepared for their signatures were standard legal documents and that they did not need to read them.  Bertucci failed to provide accurate truth in lending disclosures to Mr. Smith on a timely basis in any meaningful way as mandated by both state and federal law, he failed to give plaintiffs a genuine opportunity to review the documentation that the lenders required prior to the signing of the same, also in violation of state and federal law, and he violated the consumer credit disclosures mandated by G.L. c. 140D.

123.    At all times relevant hereto, Attorney Bertucci was an attorney working at the law offices of RKELLEY-LAW, P.C. under the supervision, direction and control of Attorney Robert Kelley.  It was within the scope of Attorney Bertucci's employment duties to handle real estate closings such as the transactions referenced above.  All wrongful conduct of Attorney Bertucci is imputed to his employer, Attorney Robert Kelley and law offices of RKELLEY-LAW, P.C. pursuant to the doctrine of *respondeat superior*.

(v)    New England Merchants Corp.

124.    New England Merchants Corp. played an integral role in defrauding Robert Smith regarding the closing on the Dighton Property on February 7, 2005.  New England Merchants Corp. falsely stated in the application (1) that the application was taken by "face-to-face interview"; (2) that Smith's base monthly income was $7,500, or $90,000 per year; (3) that Smith had bank accounts containing $18,500; (4) that Mr. Smith completed 14 years of school; (5) that Smith rented his last home for 5 years; (6) that Smith spent 4 years and 6 months at his current place of employment; (7) that Smith's net worth was $397,037; and (8) that Mr. Smith intended to occupy the property as his principal place of residence.

125.    Rachel Noyes, who was the representative of New England Mortgage Corp. who prepared the loan application, was familiar with the fraudulent business practices and real estate schemes of co-defendant Dwight Jenkins.  Indeed, Jenkins referred Smith's loan to Ms. Noyes.

126.    New England Mortgage Corp. gave to Smith a mortgage application which it knew contained materially false information in numerous important respects.  Both RE/MAX and Jenkins worked together with New England Mortgage Corp. to prepare the loan application.  Based on its close working relationship between RE/MAX and Jenkins, New England Mortgage Corp. knew that Smith would have no meaningful understanding of the loan application and that Smith would rely on whatever documents were presented to him for signature.

127.    New England Merchants Corp. submitted this fraudulent mortgage application in order to increase the chance that Smith would receive 100% financing on the properties, which he did, despite New England Merchants Corp.'s knowledge that Smith did not actually qualify for such loans and had no ability to service or repay that debt.

128.    Smith relied on the loan application created by New England Mortgage Corp. to be necessary for his investment but he had no knowledge that the content of the document was

completely false and was designed to obtain a mortgage on a piece of property he neither intended to purchase or reside in.

129.    As a mortgage broker, New England Merchants Corp. has a duty to deal with prospective borrowers such as Smith fairly, honestly and truthfully, and to present mortgage applications that are truthful in all material respects based on the information it receives.

130.    New England Mortgage Corp. intended to present the loan application in its fully falsified form to a prospective lender.  Smith relied on the documentation presented by New England Mortgage Corp. to be truthful and accurate, and as part of his "investment".

131.    The Attorney General of Massachusetts has filed suit against New England Merchants Corp and others regarding a variety of illegal money lending practices and has obtained Temporary Restraining Orders against them regarding same. See Commonwealth of Massachusetts v. Zeus Funding, et al., Suffolk Superior Court Civil Action No. 06-3657-B.  The Attorney General sought and received a Temporary Restraining Order from the Massachusetts Superior Court against New England Merchants Corp and others arising out of the conduct set forth in said lawsuit.

(vi)    Union Capital Mortgage Business Trust

132.    Like New England Merchants Corp. in the Dighton Property, Union Capital Mortgage Business Trust played an integral role in defrauding Robert Smith regarding the closing on the Boston Property on February 28, 2005 and Maria Dasilva on the Brockton Property on December 30, 2004.  Union Capital Mortgage Business Trust submitted a mortgage application for Mr. Smith and Ms. Dasilva to their ultimate lenders, which Union Capital Mortgage Business Trust knew were rife with completely false information.

133.    Union Capital Mortgage completed the Uniform Residential Loan Application for Mr. Smith's purchase of the Boston Property and submitted it to the lender.  The mortgage application contained numerous false statements without Smith's knowledge, including: (i) that the

application was taken by "face-to-face interview"; (ii) that Mr. Smith completed 16 years of school; (iii) that Mr. Smith rented his last home for 2 years, and spent 20 years in his occupation; (iv) that Mr. Smith's monthly income (including salary and rental income) is listed as $8,516, or $102,912 yearly; and (v) that Mr. Smith intended to occupy the property as his principal place of residence. The Dighton Property loans were not listed among his assets and liabilities at the time of the Boston Property closing.

134.    Union Capital completed the Uniform Residential Loan Application for Dasilva's purchase of the Brockton Property on December 30, 2004.  Union Capital never actually interviewed, met with or spoke with Ms. Dasilva, and never verified with her the information in her loan application.  Union Capital knew that the mortgage application it submitted to the lender on this transaction contained numerous false statements, including:

(i)      It falsely states that there was an interview conducted by mail, which was not true.

(ii)     It falsely states that Dasilva intended to occupy the purchased property as her principal place of residence, which was not true;

(iii)    The mortgage application stated that Ms. Dasilva's income was $9,529 per month, which is $114,348 per year.  This was grossly exaggerated, as she was a security guard who earned approximately $15 per hour.

(iv)    Union Capital the net cash flow income for the property.

(v)     Union Capital falsely stated that she had 16 years of schooling, which was not true.

(vi)    Union Capital falsely stated that Dasilva had $21,345 in a bank account at Sovereign Bank.  This was not true.

(vii)   Union Capital falsely stated that Dasilva worked for OneWorld OneLink doing business as Liquid Markets at 36 Milton Ave, Boston, as the Operations Manager of a car dealership.  This was totally untrue.

135.     Union Capital was an active and willing participant in Jenkins' real estate schemes. Union Capital was introduced to Dasilva by Jenkins, and it was fully aware of Jenkins' business practices and his numerous legitimate-sounding d/b/a trade names including "OneWorld OneLink" and "Liquid Markets" which he routinely used to perpetrate his real estate fraud.

136.     Union Capital's complicity in the scheme is evidenced by the fact that it knew that there was no such legal entity as OneWorld OneLink, that OneWorld OneLink did not do business as Liquid Markets, and that neither trade name was a car dealership.  The false statement by Union Capital that Dasilva was an employee of such car dealership is a clear indication of its knowing involvement in the scheme.

137.     If in fact Union Capital had properly investigated the income, assets and liabilities of Dasilva, it would have known that she was not reasonably capable of supporting the debt of the Brockton Property.  Notwithstanding this, Union Capital submitted the knowingly fraudulent mortgage application to Meritage Mortgage Corporation on behalf of Dasilva on or about December 30, 2004.

138.     Union Capital submitted these fraudulent mortgage applications in order to increase the chances that Smith and Dasilva would receive 100% financing on the properties, which they did, despite its knowledge that Smith and Dasilva did not actually qualify for those loans had no ability to service or repay that debt.

(vii)   Mid-City Mortgage

139.     Mid-City Mortgage played an integral role in defrauding Dasilva regarding the closing on the Whitman Property on January 7, 2005.  Mid-City Mortgage submitted a mortgage application for Ms. Dasilva to the lender which it knew was rife with completely false information.

140.     Mid-City Mortgage, knew that the mortgage application it submitted to the lender on this transaction contained numerous false statements, including:

27

(i)      It falsely states that Dasilva intended to occupy the purchased property as her principal place of residence, which was not true;

(ii)     It falsely stated that she had 14 years of schooling, which was not true.

(iii)    It stated that she worked for OneWorld OneLink car wholesalers for three years, which was completely false.

(iv)    It falsely stated that she was the Operations Manager for OneWorld OneLink car wholesalers, which was completely false.

(v)     It falsely stated that she earned $7,000 monthly base salary which was not true, and it also falsely stated that she earned $900 per month in other income.

(vi)    Mid-City Mortgage never spoke with Dasilva regarding the contents of its application to the lender on her behalf.

(vii)   There was no disclosure in the loan application of her liability on the Brockton Property which she had purchased less than two weeks earlier.

141.    Mid-City Mortgage gave Dasilva a mortgage application which it knew contained materially false information in numerous important respects.  Jenkins worked with Mid-City Mortgage to prepare the loan application.  Based on its close working relationship with Jenkins, Mid-City Mortgage knew that Dasilva would have no meaningful understanding of the loan application and that she would rely on whatever documents were presented to her for signature.

142.    Mid-City Mortgage submitted this fraudulent mortgage application in order to increase the chance that Dasilva would receive 100% financing on the properties, which she did, despite its knowledge that Dasilva did not actually qualify for such loans and had no ability to service or repay that debt.

143.    The plaintiffs were harmed by all of the fraud referenced hereinabove.

**COUNT II**

**VIOLATION OF 15 U.S.C. §§1602 et. seq., THE TRUTH-IN-LENDING DISCLOSURES
(AGAINST FREEMONT INVESTMENT AND LOAN AND MERITAGE MORTGAGE
CORPORATION - AS TO ROBERT SMITH ONLY)**

144.    All allegations set forth above are restated and realleged as if set forth in full herein.

145.    Freemont Investment and Loan and Meritage Mortgage Corporation violated the

Federal Truth in Lending Disclosure Act, 15 U.S.C.§§ 1602 et. seq. That act imposes a mandatory

scheme of disclosure on lenders as to all material terms of credit prior to a loan closing transaction,

so that the consumer may make an informed decision about the cost of credit. Freemont Investment

and Loan and Meritage Mortgage Corporation failed to comply with the provisions of said act

regarding Mr. Smith's purchases.  Mr. Smith had no meaningful idea of the nature of the documents

that he was signing, or even that he was engaging in number of credit relationships and borrowing

money to purchase homes.

**COUNT III**

**VIOLATION OF G.L. c. 140D §1 et. seq., and 209 CMR
(AGAINST FREEMONT INVESTMENT AND LOAN AND
MERITAGE MORTGAGE CORPORATION - AS TO ROBERT SMITH ONLY)**

146.    All allegations set forth above are restated and realleged as if set forth in full herein.

147.    In addition to the federal law, there exists Massachusetts law which governs lending

and disclosure requirements codified at G.L. c. 140D, and the regulations promulgated thereunder

set forth at 209 CMR. These statutes and regulations are for the benefit of the consumer and

obligate the lender to make a disclosure of all of the material terms of the cost of credit prior to the

closing of the transaction so as to afford the consumer/borrower the opportunity to make an

informed decision concerning the terms of such credit. Freemont Investment and Loan and Meritage

Mortgage Corporation failed to comply with said law.  Mr. Smith has been harmed thereby.

## COUNT IV

## VIOLATION OF G.L. c. 93A
## (AGAINST ALL DEFENDANTS – ROBERT SMITH ONLY)

148.     All allegations set forth above are restated and realleged as if set forth in full herein.

149.     All of the defendants are engaged in trade or commerce.  For all of the reasons set forth above, each defendant has engaged in knowing and willful unfair and deceptive business acts and practices in violation of the Massachusetts Consumer Protection Act, G.L. c. 93A.  Smith seeks three times his damages suffered, including attorney's fees, costs and interest.

150.     Pursuant to Fed. R. Civ. P. 8(a)(3), Robert Smith pleads in the alternative as follows. He seeks redress for unfair and deceptive business practices against Dwight Jenkins, Cherry Jenkins, Dorea Smith, E.B. Real Estate Group, Dorchester Real Estate, Inc., Louis Bertucci, Robert E. Kelley, RKELLEY-LAW, P.C., New England Merchants Corp., Freemont Investment and Loan, Union Capital Mortgage Business Trust and Meritage Mortgage Corporation pursuant to G.L. c. 93A, sec. 11 insofar as he entered into the transactions with the intention of making an investment. In the alternative, he seeks redress against said parties pursuant to G.L. c. 93A, sec. 9 insofar as he was defrauded into purchasing residential properties for the purpose of them serving as his primary residence.

## COUNT V

## NEGLIGENCE
## (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, ROBERT E. KELLEY, RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE, INC., NEW ENGLAND MERCHANTS CORP, UNION CAPITAL MORTGAGE BUSINESS TRUST, MID CITY MORTGAGE, LLC )

151.     All allegations set forth above are restated and realleged as if set forth in full herein.

152.     Each defendant referenced above failed to comply with the standard of care with respect to the plaintiffs in their respective transactions.

153.     Regarding Mr. Smith, Jenkins, RE/MAX and Century 21 had the duty to manage and maintain the properties he purchased, to collect rents, deal with tenants, pay all of the operating bills and mortgages and all other expenses, and to sell them, in a good, professional and businesslike manner, but failed to do so.

154.     Jenkins individually had such obligations to Ms. Dasilva, but he failed to do so.

155.     Further, Attorney Kelley and RKELLEY-LAW, P.C., directly and through Attorney Bertucci or other employees or agents, engaged in malpractice against Mr. Smith to his detriment.

156.     Attorney Kelley and RKELLEY-LAW, P.C., directly and through Attorney Bertucci, represented Mr. Smith by holding themselves out to Mr. Smith as his lawyers and then rendering legal advice to him which was incorrect and/or incomplete, to wit: (1) they held out the proposed transactions to Mr. Smith as though they were in his best interests, when in fact they were certainly not; (2) they failed to advise Mr. Smith as to the true nature and terms of the proposed transactions; (3) they failed to actively dissuade Mr. Smith from signing the documents without understanding them first; (4) they concealed the true meaning and nature of those documents from him; (5) they failed to disclose to Mr. Smith their loyalty to Mr. Jenkins insofar as they had an ongoing business relationship with Jenkins (which evolved into an attorney-client relationship) and the fact that Jenkins' interests in the transactions were opposed to Smith's interests; and (6) they failed to disclose their own self-interest and the interests of their co-defendants in Smith's signing of such legal documents.

## COUNT VI

## BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE GROUP, INC., MERITAGE MORTGAGE CORPORATION AND FREEMONT INVESTMENT AND LOAN)

157.     All allegations set forth above are restated and realleged as if set forth in full herein.

31

158.    Jenkins, RE/MAX and Century 21 breached their contracts with Mr. Smith as referenced above by failing to pay him the amounts they promised to pay, and by failing to collect the rents, pay the mortgages, manage the properties or sell the properties.

159.    Regarding Ms. Dasilva, Jenkins breached his contract with her in the same manner.

160.    Cherry Jenkins and Dorea Smith are liable for the breaches of contract by Dwight Jenkins because they knowingly participated in and were co-conspirators with Dwight Jenkins in his contracts with the plaintiffs.  Both plaintiffs have been harmed thereby.

161.    Meritage Mortgage Corporation breached its statutory obligations in its loan contracts and related lending documents with Smith regarding the Boston Property, as set forth in full above, and breached the covenants of good faith and fair dealing imputed in said contracts.

162.    Meritage Mortgage Corporation breached its statutory obligations in its loan contracts and related lending documents with Dasilva regarding the Brockton Property, as set forth in full above, and breached the covenants of good faith and fair dealing imputed in said contracts.

163.    Freemont Investment and Loan breached its statutory obligations in its loan contracts and related lending documents with Smith regarding the Dighton Property, as set forth in full above, and breached the covenants of good faith and fair dealing imputed in said contracts.

## COUNT VII

### CONVERSION
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH)

164.    All allegations set forth above are restated and realleged as if set forth in full herein.

165.    Dwight Jenkins, Cherry Jenkins and Dorea Smith benefited from the fraudulent schemes as set forth above, and each received payment from funds the plaintiffs were fraudulently induced to borrow.  Both plaintiffs have been harmed thereby.

## COUNT VIII

### UNJUST ENRICHMENT
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, ROBERT E. KELLEY, RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE, INC., NEW ENGLAND MERCHANTS CORP, UNION CAPITAL MORTGAGE BUSINESS TRUST, MID CITY MORTGAGE, LLC)

166.    All allegations set forth above are restated and realleged as if set forth in full herein.

167.    Each defendant referenced immediately above has been unjustly enriched by the funds which they received from the closings on the above-referenced properties, insofar as the plaintiffs received no real economic benefit in exchange for such amounts.

168.    Jenkins and RE/MAX were further unjustly enriched by any rents they collected but for which they failed to remit to the plaintiffs or use to pay down the mortgages.

169.    Both plaintiffs have been harmed thereby.

## COUNT IX

### BREACH OF FIDUCIARY DUTY
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, ROBERT E. KELLEY, RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, EB REAL ESTATE GROUP, INC., UNION CAPITAL, MID-CITY MORTGAGE, NEW ENGLAND MERCHANTS CORP.)

170.    All allegations set forth above are restated and realleged as if set forth in full herein.

171.    Dwight Jenkins, Cherry Jenkins, Dorea Smith, Robert E. Kelley, RKELLEY-LAW, P.C., Louis G. Bertucci, EB Real Estate Group, Inc., Union Capital, New England Merchants Corp. and Mid-City each breached their fiduciary duties to the plaintiffs by seeking and gaining their trust and confidence but then failing to act in their best interests in conjunction with their respective transactions, by failing to advise them of the fraudulent nature or any of the details of the transactions, by failing to advise them that it was not in their best interests to enter into the transactions, and failing to advise them of their own adverse self-interests in the transactions.

172.    Union Capital, by and through its agents and co-conspirators Re-Max, Jenkins and Century 21, obtained confidential and sensitive personal financial information and documentation from Robert Smith which Smith entrusted to Union Capital.

173.    New England Merchants, by and through its co-conspirators Re-Max, Jenkins and Century 21, obtained confidential and sensitive personal financial information and documentation from Robert Smith which Smith entrusted to New England Merchants.

174.    Union Capital obtained confidential and sensitive personal financial information and documentation from Dasilva which Dasilva entrusted to Union Capital.

175.    Mid-City obtained confidential and sensitive personal financial information and documentation from Dasilva which Dasilva entrusted to Mid-City. Mid-City knew that Jenkins had a history of failing to honor his promises and obligations to the borrowers, but failed to disclose same to her.

176.    Union Capital, by and through its agents, sought and obtained Smith's signature on numerous mortgage broker disclosures and authorizations and the loan applications themselves. Those documents, together with the representations made by Union Capital's co-conspirators and the representations made at closing, make clear that Union Capital would act in a fiduciary capacity towards Smith.

177.    Union Capital sought and obtained Dasilva's signature on numerous mortgage broker disclosures and authorizations and the loan applications themselves.  Those documents, together with the representations made by Union Capital's co-conspirators and the representations made at closing, make clear that Union Capital would act in a fiduciary capacity towards Dasilva.

178.    Mid-City sought and obtained Dasilva's signature on numerous mortgage broker disclosures and authorizations and the loan applications themselves.  Those documents, together

with the representations made by Mid-City's co-conspirators and the representations made at closing, make clear that Mid-City would act in a fiduciary capacity towards Dasilva.

179.    Union Capital provided to Jenkins and Taylor numerous written documents for Smith to sign as part of the loan transaction, including broker disclosures.  Taylor met with Smith at Re-Max and advised Smith that as part of the investment Smith would have to sign those documents.

180.    Taylor, on behalf of Re-Max, Century 21, Jenkins, Union Capital and New England Merchants Corp., induced Smith to repose his trust and confidence in her to give him guidance in conjunction with his transactions.  Smith entrusted her with sensitive information and private documentation that she advised him was required for the transactions, including his social security number, wages documentation and authorizations to conduct credit checks and to investigate and verify his personal financial information.

181.    Taylor then provided such information and documentation to Union Capital and New England Merchants Corp.

182.    Taylor intended to use – and did use – Smith's personal and confidential information in conspiracy with Century 21, Jenkins, Union Capital and New England Merchants to obtain mortgage financing on the properties which Smith would never be able to repay.

183.    Adamos, Jenkins and Taylor all acted in concert with Union Capital and on behalf of Union Capital to obtain Smith's signatures on said documentation.

184.    Union Capital breached its fiduciary duties to Smith by obtaining his signatures and his confidential personal information and documentation which it intended to – and in fact did – misuse by knowingly altering and falsifying information in Smith's loan application.

185.    Union Capital breached its fiduciary duties to Dasilva by obtaining her signatures and her confidential personal information and documentation which it intended to – and in fact did – misuse by knowingly altering and falsifying information in her loan application.

186.    New England Merchants breached its fiduciary duties to Smith by obtaining his signatures and his confidential personal information and documentation which it intended to – and in fact did – misuse by knowingly altering and falsifying information in his loan application.

187.    In addition, New England Merchants breached its fiduciary duties to Smith by failing to provide Smith with mandatory written mortgage broker disclosures.

188.    Mid-City breached its fiduciary duties to Dasilva by obtaining her signatures and her confidential personal information and documentation which it intended to – and in fact did – misuse by knowingly altering and falsifying information in her loan application.

189.    By and through Re-Max, Smith reposed reliance, trust and confidence on the honesty, professionalism, candor and trustworthiness of all parties involved in the transactions, including Jenkins, Union Capital, New England Merchants Corp., Century 21 and Bertucci.

190.    Dasilva reposed reliance, trust and confidence on the honesty, professionalism, candor and trustworthiness of all persons involved in the transactions, including Jenkins, Union Capital, Mid-City, Century 21 and Bertucci.

191.    At the closings on the respective transactions, Bertucci, Taylor, Jenkins, Century 21 and Re-Max, Union Capital, Mid-City Mortgage, and New England Merchants Corp., all induced plaintiffs to repose their trust and confidence in them once again.

192.    Mr. Jenkins and RE/MAX also breached their fiduciary duties to Smith by failing to collect rents and/or failing to apply those rents to Smith's mortgages, by failing to adequately manage the properties, by failing to pay the mortgages, by allowing the properties to slip into

disrepair, and by acting wholly in their own self interests and with complete disregard for the best interests of Smith.

193.    Further, Attorney Robert E. Kelley and RKELLEY-LAW, P.C., directly and through Attorney Bertucci, breached their fiduciary duties to Smith by engaging in malpractice against him as set forth in detail above.

194.    Further, New England Merchants Corp., Union Capital Mortgage Business Trust and Mid City Mortgage violated their fiduciary duties to the plaintiffs in their respective transactions by violating 209 CMR §§32.00 et seq. and by presenting knowingly false mortgage applications for their signatures and exposing them to very large mortgages which they knew the plaintiffs could not repay.

195.    Dwight Jenkins breached his fiduciary duty to Dasilva by failing to collect rents and/or failing to apply those rents to Dasilva's mortgages, by failing to adequately manage the properties, by failing to pay the mortgages, by allowing the properties to slip into disrepair, and by acting wholly in his own self interest and with complete disregard for the best interests of Dasilva.

196.    Each co-conspirator is liable for all of toritous acts and omissions of their co-conspirators in furtherance of the common schemes set forth herein.

197.    Century 21, by and through Adamos, provided to Mid-City a false verification of rent for Dasilva.

198.    Plaintiffs have been harmed thereby.

## COUNT X

### CIVIL CONSPIRACY
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE ASSOCIATES, INC., NEW ENGLAND MERCHANTS CORP, UNION CAPITAL MORTGAGE BUSINESS TRUST, MID CITY MORTGAGE, LLC)

199.    All allegations set forth above are restated and realleged as if set forth in full herein.

200.     Dwight Jenkins, Cherry Jenkins, Dorea Smith, EB Real Estate Group, Inc., Dorchester Real Estate, Inc. and New England Merchants Corp. conspired to defraud Smith with respect to the Dighton Property as set forth in full above.

201.     Dwight Jenkins, Cherry Jenkins, Dorea Smith, EB Real Estate Group, Inc., Dorchester Real Estate, Inc. and Union Capital Mortgage Business Trust conspired to defraud Smith with respect to the Boston Property as set forth in full above.

202.     Dwight Jenkins, Cherry Jenkins, Dorea Smith and Union Capital Mortgage Business Trust conspired to defraud Dasilva with respect to the Brockton Property as set forth in full above.

203.     Dwight Jenkins, Cherry Jenkins, Dorea Smith and Mid-City Mortgage conspired to defraud Dasilva with respect to the Whitman Property as set forth in full above.

204.     Each knowingly schemed together so as to form a conspiracy for the unlawful purpose of defrauding the respective plaintiffs in the manner set forth above.  Said defendants conspired to accomplish an unlawful purpose, and all acted in concert to achieve such purpose.  The liability in tort of each defendant is imputed to each other defendant because they each provided substantial assistance to the other with the knowledge that such assistance was contributing to a common tortious plan. See Restatement (Second) of Torts § 876 (1979); Kurker v. Hill, 689 N.E.2d 833, 44 Mass.App.Ct. 184 (Mass. App. Ct., 1998). Under the Restatement (Second) of Torts § 876(b) (1977), a person may be liable in tort if he "knows that the ... conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself"; see Nelson v. Nason, 343 Mass. 220, 222, 177 N.E.2d 887 (1961) (recovery allowed under concerted action theory of § 876(b)).  For further evidence of a conspiracy, see the allegations in the following Count.  Plaintiffs have been harmed thereby.

## COUNT XI
## DECLARATORY JUDGMENT

205.     All allegations set forth above are restated and realleged as if set forth in full herein.

38

206.    Plaintiffs seek a determination by this Court of the rights and obligations of all parties named herein.  Plaintiffs further seek a declaratory judgment pursuant to G.L. c. 231A, §§ 1 *et seq.* that all of the terms of the transactions complained of herein are in violation of the statutes and regulations of the Commonwealth of Massachusetts and the regulations cited herein, that the loan transactions are declared to be void and/or unenforceable, and that the defendants and their agents, successors and assigns are prohibited from further collection actions on the loans described above.

## COUNT XII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, ROBERT E. KELLEY, RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE, INC., NEW ENGLAND MERCHANTS CORP, UNION CAPITAL MORTGAGE BUSINESS TRUST, MID CITY MORTGAGE, LLC )

207.    All allegations set forth above are realleged as if set forth in full herein.

208.    The conduct of each defendant referenced above caused emotional distress for both plaintiffs arising out of their respective transactions.  Said defendants knew or should have known that emotional distress was the likely result of their conduct.

209.    Each such defendant committed the tort of intentional infliction of emotional distress on the plaintiffs insofar as they acted intending to cause emotional distress to the plaintiffs or with reckless disregard for whether emotional distress would result to the plaintiffs from their conduct, and those acts proximately caused the plaintiffs to suffer severe emotional distress.

210.    Both plaintiffs suffered from emotional distress as a result thereof, with physical symptoms resulting therefrom.

## COUNT XIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DWIGHT JENKINS, CHERRY JENKINS, DOREA SMITH, ROBERT E. KELLEY, RKELLEY-LAW, P.C., LOUIS G. BERTUCCI, EB REAL ESTATE GROUP, INC., DORCHESTER REAL ESTATE, INC., NEW ENGLAND MERCHANTS CORP, UNION CAPITAL MORTGAGE BUSINESS TRUST, MID CITY MORTGAGE, LLC )

211.    All allegations set forth above are realleged as if set forth in full herein.

212.    The conduct of each defendant referenced above caused emotional distress for both plaintiffs arising out of their respective transactions.  Said defendants knew or should have known that emotional distress was the likely result of their conduct.

213.    Each such defendant committed the tort of negligent infliction of emotional distress insofar as they were negligent towards the plaintiffs, such negligence amounted to extreme and outrageous conduct, and such conduct caused severe emotional distress to the plaintiffs which was evidenced by physical symptoms.  Said defendants' conduct was the cause of the plaintiffs' distress.  The defendants knew or should have known that emotional distress was the likely result of their conduct.

## COUNT XIV

### INJUNCTIVE RELIEF

214.    All allegations set forth above are restated and realleged as if set forth in full herein. appropriate injunctive relief.

215.    Plaintiffs seek injunctive relief enjoining Dwight Jenkins, Cherry Jenkins and Dorea Smith as well as their agents, representatives, successors, and assigns, and all persons acting in concert with them from transferring, disbursing, hypothecating, conveying, selling, pledging, secreting, dissipating, alienating or encumbering any assets, either legal or equitable, until further order of this Court.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs pray for the following relief:

1) An award of monetary damages to compensate plaintiffs for their harms as set forth above;

2) An order that the Defendants be ordered to disgorge their ill-gotten gains to the plaintiffs, and to be disgorged of the amounts by which they were unjustly enriched;

3) Any statutory remedies, damages, punitive damages and other relief pursuant to any state and/or federal law, plus emotional distress damages;

4) An award of damages, including punitive damages of not less than two and not more than three times actual damages, and attorney's fees, costs, and interest all in accordance with G.L. c. 93A;

5) An award of reasonable attorney's fees and costs;

6) The entry of an injunction enjoining Dwight Jenkins, Cherry Jenkins and Dorea Smith as well as their agents, representatives, successors, and assigns, and all persons acting in concert with them from transferring, disbursing, hypothecating, conveying, selling, pledging, secreting, dissipating, alienating or encumbering any assets, either legal or equitable, until further order of this Court;

7) The entry of an order setting aside the mortgages Plaintiff entered into;

8) An award of any statutory damages or other civil penalties determined pursuant to any of the federal truth in lending statutes, including, but not limited to 12 CFR §§226.1 et seq.; 15 U.S.C. §§ 1602 et. seq.;

9) An award of damages, civil penalties, and a rescission and restitution of any finance charges the Plaintiffs may have paid pursuant to G.L. c 140 D and the regulations promulgated thereunder;

10) A declaration of the parties' respective rights and obligations as set forth above; and

11) Any other legal or equitable relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

ROBERT SMITH and MARIA DASILVA

By their attorneys:


/s/ Jonathan D. Plaut
_____

Jonathan D. Plaut
BBO#: 638344
CHARDON LAW OFFICES
101 Tremont Street Suite 614
Boston, MA 02108
(617) 451-3200


/s/ Jeffrey S. Baker
_____

Jeffrey S. Baker
BBO#544929
101 Tremont Street Suite 614
Boston, MA 02108
(617) 357-9505
BBO#544929


Dated: April 27, 2010