UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12067-RGS

ROBERT SMITH and
MARIA DASILVA

v.

DWIGHT JENKINS, CHERRY JENKINS,
DOREA SMITH, ROBERT E. KELLEY,
RKELLEY-LAW, P.C., LOUIS G. BERTUCCI,
EB REAL ESTATE GROUP, INC.,
DORCHESTER REAL ESTATE, INC., NEW
ENGLAND MERCHANTS CORP.,
UNION CAPITAL MORTGAGE BUSINESS
TRUST, MID CITY MORTGAGE, LLC,
FREMONT INVESTMENT & LOAN, and
MERITAGE MORTGAGE CORPORATION

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

June 18, 2010

STEARNS, D. J.

    This action, which sounds primarily in fraud, arises out of an alleged multi-party real

estate mortgage scheme in which plaintiffs Robert Smith and Maria DaSilva claim to have

been victimized.  On June 16, 2009, the court issued a Memorandum and Order granting

in part and denying in part certain defendants' motions to dismiss.  Six of the remaining

defendants have now moved for summary judgment.[1]  The court heard oral argument on

---

[1]The motions were filed by Mid City Mortgage, LLC, Union Capital Mortgage
Business Trust, EB Real Estate Group Inc. (RE/MAX), Dorchester Real Estate, Inc.
(Century 21), Fremont Reorganizing Corporation, and New England Merchants Corp.
(NEMCO).  At issue on summary judgment are the claims in the Second Amended
Complaint asserting fraud (Count I – asserted by Smith against RE/MAX, Century 21,
NEMCO and Union Capital; asserted by DaSilva against RE/MAX, Union Capital, and Mid
City); violation of the Truth in Lending Act (TILA), 15 U.S.C. § 1601, et seq. (Count II –

April 8, 2010.

BACKGROUND

The Dighton Property

Smith suffers from schizophrenia, depression, post traumatic stress disorder, and mild mental retardation.  Smith has heard voices in his head since suffering traumatic injuries while serving in the United States Marine Corps from 1978 to 1980.  Smith is homeless and functionally illiterate.  In January of 2005, Smith was working as a trash collector for Waste Management Corporation (WMC) in the Fields Corner neighborhood of Dorchester.  Smith was approached while at work by a woman who introduced herself as Laurice Taylor.  Taylor told Smith that she worked at a nearby RE/MAX office on Dorchester Avenue.[2, 3]

---

asserted by Smith only against Fremont); violation of Mass. Gen. Laws ch. 140D, § 1, et seq. and 209 CMR 302, et seq. (Count III – asserted by Smith only against Fremont); violation of Mass. Gen. Laws ch. 93A (Count IV – asserted by Smith only against all moving defendants); negligence (Count V – apparently asserted by both plaintiffs against Century 21, RE/MAX, NEMCO, Union Capital, and Mid City); breach of contract and of the implied covenant of good faith and fair dealing (Count VI – asserted by Smith against Century 21, RE/MAX, and Fremont); unjust enrichment (Count VIII – asserted by both plaintiffs against Century 21, RE/MAX, NEMCO, Union Capital and Mid City); breach of fiduciary duty (Count IX – apparently asserted by both plaintiffs against RE/MAX, Century 21, Union Capital, Mid City, and NEMCO); conspiracy (Count X – asserted by Smith against Century 21, RE/MAX, NEMCO, and Union Capital; asserted by DaSilva against Union Capital and Mid City); and intentional and negligent infliction of emotional distress (Counts XII and XIII – apparently asserted by both plaintiffs against Century 21, RE/MAX, NEMCO, Union Capital, and Mid City).  The court notes that the motions for summary judgment were filed when the First Amended Complaint was pending.  On April 8, 2010, the court granted plaintiffs leave to file a Second Amended Complaint (SAC) for the sole purpose of clarifying that the mortgage broker defendants were named in the breach of fiduciary duty count.  Therefore, the court will refer to the claims as asserted in the SAC.

[2]A Laurice Taylor was at the time affiliated with RE/MAX.  Although RE/MAX states in its summary judgment papers that the identity of Laurice Taylor is in dispute, it has

Taylor invited Smith to participate in a "special investment program" through RE/MAX. Taylor told Smith that he would receive $10,000 and would not have to invest any money. Smith testified that Taylor told him that she and Dwight Jenkins, a co-defendant in the case and the alleged mastermind of the scheme, would "take care of everything." Smith Dep. at 64. Smith testified that he visited Taylor at the RE/MAX office in Dorchester where he met several other RE/MAX employees. Taylor showed Smith a form from NEMCO, which purported to list the documentation that he would require to become an "investor."

Rachel Noyes, an independent contractor associated with NEMCO, completed a loan application on Smith's behalf (and without his knowledge).[4] The application contained numerous false statements, among them: (1) that the application had been completed in a face-to-face interview; (2) that Smith's monthly income was $7,500 (or $90,000 annually); (3) that Smith had two separate bank accounts totaling $18,500; (4) that Smith had completed fourteen years of school; (5) that Smith had rented his current residence for five years; (6) that he had been employed by WMC for four and one-half years; (7) that he had a net worth of $397,037; and finally, (8) that he intended to occupy the listed property as his primary residence.

---

offered no evidence that this Laurice Taylor is not the same woman who approached Smith.

[3]Taylor refused to appear for her noticed deposition.

[4]NEMCO was licensed as a mortgage broker and lender in Massachusetts and several other states until 2007. Noyes was a NEMCO "branch manager" from October of 2003 through February of 2005.

In February of 2005, upon Taylor's instruction, Smith went to the office of Attorney Robert Kelley in Braintree, Massachusetts.[5]  Unbeknownst to Smith, he was attending a closing on a home in Dighton, Massachusetts.  Taylor was present, along with James Adamos (a purported representative of Century 21).[6]  Smith unwittingly "borrowed" $411,964.24, secured by two mortgages issued by Fremont, the lender to whom NEMCO had submitted Smith's loan application.[7]  The Purchase and Sale Agreement (P & S) signed by Smith read, in part,

> [t]he BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): NONE, AND NONE IMPLIED.

Smith did not read any of the closing documents, including those that he signed. He alleges that defendants lulled him into believing that they had his best interests in

---

[5]Kelley is a defendant who has not moved for summary judgment.

[6]Adamos was hired by Century 21 in 2004.  Jenkins testified that he has known Adamos since at least 2002, and that he looked to Adamos to locate undervalued properties for him to sell.  Jenkins knew that Adamos had a second business performing mortgage brokerage services, which he engaged in while affiliated with Century 21. Adamos operated his mortgage brokerage business out of his home.  Adamos did not give Smith any documents to sign at the closing, nor did he make any representations to Smith regarding whether he should sign any papers, enter into the transaction, whether Smith was doing the right thing, whether Smith should ask any questions, whether Smith understood what he was doing, or as to Smith's financial responsibilities.   Smith had no subsequent contact with Adamos.  Century 21 did not receive a brokerage commission for the purchase of the Dighton property.

[7]Prior to the closing, Fremont provided Smith with all of the requisite pre-closing documents required by the TILA, its Massachusetts analog, and the implementing regulations.  As discussed below, Smith states that he was never provided with the required documents and did not read or otherwise seek to understand them.

4

mind.  Smith states that he was told that RE/MAX "would pay all of the bills and manage the properties and deal with the tenants and collect the rents and shovel the snow and pay the taxes. . . . All I did – I just believed what RE/MAX and Century 21 were telling me what the truth was, that they were going to take care of the property and I trusted them to do what they told me they were going to do."  Smith Dep. at 65-66.  Smith testified that although he did not understand the documents, he signed them because he was "just thinking about [his] money."  Id. at 129.  With regard to the assurances given him by Century 21, Smith testified that he was told that "[t]hey would take care of whatever they were supposed to take care of and I really – that went over my head because I wasn't even thinking about nothing.  The only thing I was thinking about was my $10,000."  Id. at 402.

Several days after the Dighton closing, Smith went to RE/MAX's office and received a check in the amount of $10,000.  Unbeknownst to him, Smith had signed a document giving Jenkins a power of attorney over the Dighton property.  Smith testified that he also received $500 in cash from Laurice Taylor.  Jenkins received a "contract release" fee of $42,000 as a result of the Dighton closing.  NEMCO received a broker's commission of $8,800, of which ninety percent was remitted to Noyes.

The  Boston Property

Several days later, Smith was contacted by Attorney Kelley and instructed to attend a second closing on February 28, 2005.  On this occasion, Philip Goodwin of Union Capital filled out a loan application for a residential property on West Cottage Street in Boston.[8]

_____

[8]Goodwin declined to answer questions at his deposition, pleading the Fifth Amendment.  Although Union Capital states that Smith has never spoken with anyone at Union Capital, Union Capital's Statement of Facts (SOF) ¶ 6, Smith denies this, but does

The application falsely stated that Smith's monthly income was $9,754, including employment income of $7,129 per month.  An Ivana Foley from Century 21 was present. Foley gave Smith her business card and introduced herself, but according to Century 21, she had no further conversation with Smith, nor did she have any contact with Smith afterwards.[9]  Smith testified that Foley told him "that everything will be okay and she gave me the business card. . . . And I was thinking everything was okay because she said, Don't worry about nothing, they'll take care of everything.  Everybody was telling me the same story."  Smith Dep. at 214.

> The P & S for the Boston property included the following language.

> The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): NONE, AND NONE IMPLIED.

On signing the closing documents, Smith had unwittingly borrowed $437,198.13 for the purchase of the Boston property, secured by two mortgages from Meritage.  Jenkins received a contract release fee of $41,500, while Century 21 received a broker's commission of $18,950.

> Smith testified that he had no understanding of either the Dighton or the Boston

---

not offer any facts to counter Union Capital's assertion.  Pls.' Resp. to SOF ¶ 6.

[9]Century 21 states that Foley made no representations to Smith concerning whether he should sign any papers, enter into the investment, whether he should ask any questions, whether he was doing the right thing, whether he understood what he was doing, and what his financial responsibilities would be.  Smith argues that whether Foley made a misrepresentation is a question of fact for the jury to decide.

transaction.  He was unaware that the documents he had signed involved real estate, or that he was borrowing money to make the purchases.  Smith did not tell anyone at the closings that he could not read, that he was uncomfortable signing documents, or that he did not understand what the documents said.  Nor did he ask anyone to explain any of the documents to him.

The Dighton and Boston properties were eventually foreclosed after Jenkins failed to make payments on the mortgages.  Smith testified that the severity of the voices in his head increased after September of 2005, and that his previous "symptoms [are] worse because I'm going through this stuff."[10]  Smith Dep. at 240.

DaSilva's Allegations

DaSilva met Jenkins in 2004, after her boyfriend told her that Jenkins could offer her an opportunity to make money.  At the time, DaSilva was 22 years-old and working as a security guard.  Jenkins told DaSilva that if she purchased designated properties (with no money down), he would find tenants, collect the rents, and pay the mortgages.  DaSilva would simply be a straw-woman and receive $10,000 at each closing and another $10,000 when a property was sold.  DaSilva did not investigate Jenkins or his proposal.  DaSilva admits that she understood that the transactions involved real estate, that she would own the properties, and that she would be obligated on the mortgage loans.  However, she trusted Jenkins to take care of the payments, and anticipated that having the loans paid in her name would improve her credit rating.

---

[10]Smith maintains that whether these auditory hallucinations compromised his capacity to enter a contract is an issue for a jury to decide.

On December 3, 2004, DaSilva met with Jenkins and signed a number of documents without reading them.  Jenkins told DaSilva that the documents were necessary to qualify her for a loan.  DaSilva signed the documents in the back of Jenkins' car, as she was in a hurry to get back to work.  Among the documents that DaSilva signed was a Uniform Residential Loan Application.  The application falsely reported DaSilva's employment income as $7,654 per month, plus an anticipated $1,875 in monthly rental on the purchased property.  The application further stated that DaSilva had $21,345 in an account at Sovereign Bank.  Philip Goodwin of Union Capital completed the loan application.

On December 30, 2004, DaSilva met with Jenkins to close on a property in Brockton for a price of $440,000.  The only persons present at the closing were DaSilva, her boyfriend, Jenkins, an unidentified seller, and an attorney whose identity is not clear. Jenkins gave DaSilva a check for $5,000.  He later gave her another $5,000 in cash. DaSilva signed a Borrower's Certification and Authorization form, acknowledging that she had completed a loan application containing information about, *inter alia*, her employment, income, and assets.  She certified that the information was "true and correct."  Union Cap. Ex. 'I'.

DaSilva was given copies of the closing documents but she did not read them because she "trusted the lawyer."  DaSilva Dep. at 68.  DaSilva later testified that although she knew that she was buying a house, she had not visited the property, nor did she know the sale price.  "I didn't know how much I was paying for it.  I didn't – I wasn't thinking about it and I didn't ask because I was – I was there for, you know, basically for the

8

investment. I was there for my [$]10,000 in the beginning, [$]10,000 in the end, that the property would be bought, the property would be sold. That's basically what it was." DaSilva Dep. at 71-72. She additionally stated that she knew that she was "making $20,000 for really not doing much." Id. at 75-76. As a result of the Brockton closing, Jenkins received $15,954.30. Union Capital netted $11,915.

At the Brockton closing, DaSilva signed a second loan application containing the same income and asset information as the first. The second application was completed by Mid City, a mortgage brokerage company formed in 2003.[11] Mid City hired Lucio Avila in 2003 as a mortgage originator/loan officer. Avila worked for Mid City until April of 2007. In December of 2004, Adamos asked Avila to provide mortgage brokerage services to DaSilva in connection with a property in Whitman. Adamos told Avila that DaSilva was employed as an operations manager by OneWorld OneLink Car Wholesalers (OneWorld), a job that she had held for three years. Adamos also told Avila that DaSilva's monthly income was $7,000, and that she intended to occupy the property as her primary residence. In reality, DaSilva had never worked for OneWorld, she earned only $1,600 per month, and she had no intention of living in Whitman.[12]

Avila ran a credit check on DaSilva and also contacted OneWorld to verify DaSilva's employment.[13] Avila generated two loan applications for the Whitman property,

---

[11]Mid City filed a Certificate of Cancellation with the Secretary of the Commonwealth of Massachusetts in July of 2009.

[12]Mid City states that neither Avila, it, or anyone else at Mid City knew that the information provided by Adamos was false.

[13]According to plaintiffs, OneWorld was a fictitious entity concocted by Jenkins.

one for $276,000, and the other for $69,000.  He sent the two applications to DaSilva for her signature.  DaSilva signed both applications without reviewing them.  After receiving the signed loan applications, Mid City shopped the applications to potential lenders. People's Choice Home Loan, Inc., offered to make the two loans to DaSilva. The loans for which DaSilva was approved were "stated-income" or so-called "liar's loans" – that is, People's Choice did not require verification of any of DaSilva's financial information.

Both of the loan applications signed by DaSilva included an "Acknowledgment and Agreement," pursuant to which DaSilva affirmed that she

> specifically represents to Lender and to Lender's actual or potential agents . . . that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application . . . .

On January 7, 2005, DaSilva went to an unidentified lawyer's office at Jenkins' instruction.  In the now familiar scenario, DaSilva received 100 percent financing for the $345,000 purchase of a home in Whitman.  The P & S for this property contained the same language as the Brockton P & S.

> The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): NONE, AND NONE IMPLIED.

At the Whitman closing, DaSilva signed two Loan Origination and Compensation Agreements, two Brokerage Agreements, and two Mortgage Loan Origination Agreements.

The Brokerage Agreements stated in part that "[Mid City] is not responsible for any false information given by the applicant; the application then becomes null and void." DaSilva also signed an Occupancy Affidavit and Financial Status form, representing that she would occupy the Whitman property by February 6, 2005. DaSilva stated that she knew that if she failed to move into the property by the specified date, she might be subject to prosecution. Subsequent to the closing, Jenkins gave DaSilva $5,000 in cash in a supermarket parking lot.[14]  As a result of the closing, Jenkins received $24,500, and Mid City received a total of $7,700.

Several months after the closings, DaSilva learned that the mortgages were in arrears, that the properties were in a deteriorated condition, and that some tenants were not paying rent. Both properties were eventually sold at public auction. DaSilva has never complained of or been treated for any emotional distress related to her involvement in the transactions.

<u>DISCUSSION</u>

Defendants argue at the outset that they are completely exempt from liability for the actions of independent contractors. NEMCO argues, for example, that Noyes was an independent contractor who worked out of her own office (for which she paid all the expenses) and managed her brokerage business without supervision by NEMCO.[15]

---

[14]DaSilva received a total of $15,000 from Jenkins in 2004, but did not report any of the money as income on her 2004 tax return.

[15]NEMCO states that as a mortgage broker, it engaged in business primarily through independent contractors, also known as branch managers, who maintained their own offices, paid their own expenses, managed their own businesses, and hired their own employees or subcontractors. In any specific mortgage loan transaction, NEMCO's

NEMCO maintains that if Noyes inserted false or incorrect information in a loan application, she did so without NEMCO's knowledge and was acting outside of the scope of any employment relationship that she had with NEMCO.

RE/MAX similarly argues that it cannot be held liable for the conduct of Taylor and Mosley, who it contends were independent contractors with neither apparent nor implied authority to act on its behalf.[16]  RE/MAX's independent contractor agreements with Taylor and Mosley specifically stated that they could not bind RE/MAX by any promise or representation "unless specifically authorized in advance and in writing by RE/MAX." Warren Aff. Ex. A.

Finally, Century 21 states that it hired Adamos as an independent contractor in 2004.  Century 21 contends that it would not have allowed Adamos or any other sales agent to provide false documentation to a mortgage lender, and that it is unaware of any false documents signed by any Century 21 sales agent from 2004 to 2006.   It informed Adamos that he was not permitted to do real estate work for any other entity during his affiliation with Century 21, and was not permitted to conduct any mortgage brokering business.

A principal has liability for an agent's acts "only if the agent was acting within the actual or apparent authority of the principal in that transaction."  Theo & Sons, Inc. v. Mack

function was limited to reviewing the documents originated by a branch office.

[16]RE/MAX states that Taylor was involved in only three transactions during her affiliation with RE/MAX, none of which were related to either of the plaintiffs.  RE/MAX similarly states that Mosley was involved with only one real estate transaction from September of 2004 until October of 2005.  These assertions are disputed by plaintiffs.

Trucks, Inc., 431 Mass. 736, 743 (2000).  Even assuming for sake of argument that the named contractors did not have actual authority to bind defendants, they may nonetheless be held vicariously liable based on the apparent authority doctrine.  Apparent authority is "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03 (2006).  See also Weisman v. Saetz, 11 Mass. App. Ct. 440, 442 (1981).  It is the conduct of the principal, and not the conduct of the agent, that creates apparent authority.  Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991). Nonetheless, where an agent lacks actual authority, the principal may still be bound if it acquiesces in the agent's action, or fails to promptly disavow the unauthorized conduct after disclosure of material facts.  Linkage Corp. v. Trs. of Boston Univ., 425 Mass. 1, 18 (1997) (ratification relates back and has the same effect as a prior grant of authority by the principal to the agent).

Whether an agent had the real or apparent authority to bind its principal is in most cases – as it is here – an issue for the finder of fact.  White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F. 2d 63, 66 (1st Cir. 1970) ("In Massachusetts the proof of agency is held to be ordinarily a question of fact for the jury . . . to be determined from all the evidence and reasonable inferences to be drawn therefrom.") (internal citations omitted); Trans Nat'l Commc'ns, Inc. v. Overlooked Opinions, Inc., 877 F. Supp. 35, 44 (D. Mass. 1994) ("The existence and extent of an agency relationship is ordinarily a question of fact to be decided by a jury.").  See also Shear v. Gabovitch, 43 Mass. App. Ct. 650, 670

(1997).[17, 18]

Count I - Fraud

The fraud claims are brought by Smith against RE/MAX, Century 21, NEMCO and Union Capital.  They are brought by DaSilva against RE/MAX, Union Capital and Mid City. To state a claim for fraud in Massachusetts, a plaintiff must allege that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment."  Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 81 (D. Mass. 2004).

With regard to RE/MAX, Smith alleges that Taylor told him that RE/MAX would take

_____

[17]Plaintiffs argue that RE/MAX and Century 21 are liable for their contractors' misrepresentations to Smith pursuant to several statutory provisions related to real estate licensure.  Mass. Gen. Laws ch. 112, § 87RR, governs real estate licenses and states in pertinent part that "[n]o salesman may conduct or operate his own real estate business nor act except as the representative of a real estate broker who shall be responsible for the salesman and who must approve the negotiation and completion by the salesman of any transaction or agreement which results or is intended to result in the sale, exchange, purchase, renting or leasing of any real estate or in a loan secured or to be secured by mortgage or other encumbrance upon real estate."  Section 87AAA, in turn, permits the Board of Registration of Real Estate Brokers and Salesmen to suspend or revoke the license of an individual who "in performing or attempting to perform any act authorized by his [real estate] license, has . . . knowingly made any substantial misrepresentation."  Mass. Gen. Laws ch. 112, § 87AAA.  According to plaintiffs, these statutes render RE/MAX and Century 21 automatically liable for the actions of Taylor, Mosley, and Adamos. However, the court agrees with Justice Troy's ruling in a similar case against RE/MAX that "[s]ection 87RR does not purport to make a broker vicariously liable in tort to a third party for its affiliated salesman's misrepresentation, as opposed to making the broker subject to discipline by the Board for the salesman's misconduct."  Montrond v. RE/MAX Int'l, Inc., Civ. Act. No. 06-03375 (Mass. Super. May 29, 2009), slip op. at 24.  Plaintiffs have not cited any authority to the contrary.

[18]This finding applies to all defendants to the extent that they argue that they can not as a matter of law be liable for the actions of the alleged independent contractors.

care of everything, and that he relied on Taylor's assurances in agreeing to participate in the investment scheme. Similarly, with regard to Century 21, Smith states that Adamos told him (in Jenkins' presence) that "[Jenkins is] going to be working with us. He know [sic] what he's doing. He's going to manage the property and all that stuff. And he was saying that they were going to take care of the stuff and that's it. . . . He just told me not to worry, that everybody would take care of everything." Smith Dep. at 209-211. Foley purportedly told Smith that everything "would be okay." Id. at 214. Century 21 does not dispute the statements, but characterizes them as "nothing more than pleasantries exchanged at the closing[s]." Century 21's Mem. at 11. Perhaps, but Smith's allegations are sufficient to survive summary judgment. Therefore, RE/MAX's and Century 21's motions will be DENIED as to Smith's claims. RE/MAX's motion will be ALLOWED as to DaSilva's claims, as she has failed to offer evidence that any RE/MAX representative made any misrepresentation to her.[19]

Turning to the mortgage broker defendants, plaintiffs allege that NEMCO, Union Capital, and Mid City committed fraud by presenting them with completed loan applications that contained false statements overstating each plaintiff's income and ability to repay the loans. It is not disputed that the loan applications contained materially false information.

---

[19]The only mention that DaSilva makes of RE/MAX is that it "made false representations to me by and through Jenkins on which I relied by entering into the two house purchases. RE/MAX was to collect the rents from the properties. If RE/MAX or Jenkins or any of the other defendants informed me of the true nature of the transactions, namely that I was borrowing more money that the sellers would be receiving and that I would be left with overvalued properties in my own name without the professional management promised . . . I never would have purchased the properties." DaSilva's Admis. No. 2. However, as RE/MAX points out, plaintiffs have not established, let alone intimated, the existence of an agency relationship between Jenkins and RE/MAX.

The issue of whether defendants made the statements with knowledge of their falsity and with the intent of inducing plaintiffs to act to their detriment is one of fact. Marram v. Kobrick Offshore Fund, 442 Mass. 43, 59 (2004). There is, however, a factual issue that can be determined as a matter of law: whether the broker defendants could have reasonably relied on Smith's understanding of what he was signing and being asked to do, or conversely, whether Smith could have reasonably relied on their misrepresentations. A person who executes a document will ordinarily be held to its terms whether or not he or she has read it and whether or not he or she claims to have understood its terms. Spritz v. Lishner, 355 Mass. 162, 164 (1969). In Smith's case, the undisputed facts of his illiteracy and schizophrenia (which defendants acknowledge) could not have escaped these defendants' notice. Therefore, these defendants' motions as to Smith's fraud claims will be DENIED.

The same is not true for DaSilva. Although the court gave her the benefit of every inference at the motion to dismiss stage, the necessary facts are now established and contradict DaSilva's earlier claim that she had no comprehension of the transactions or documents that she signed. It is now clear from the record that DaSilva made no attempt to inform herself as to what she was getting into, despite having had ample opportunity (and the intelligence) to do so. What Justice Holtz observed in a similar case against Union Capital applies equally here.

> In the present case, it should have been obvious to Plaintiffs that the mortgage application contained significant discrepancies. The alleged discrepancies were not subtle, but significantly inflated Plaintiffs' income and assets. Union allegedly submitted that [the first borrower-plaintiff] had $24,700 in a Wainwright Bank account that she did not actually hold, that

[she] had $28,675 in an ING account when she actually had only $1,000, and that [her] total liquid assets were $53,375 when in reality they were only $10,112.   Plaintiffs also maintain that Union stated [the second plaintiff's] monthly income as $9,931 when it was actually only $5,000.   Any reliance on the alleged misstatements cannot be reasonable because Plaintiffs should be aware of their own income, assets, and financial status and should have noticed such large and significant discrepancies.   Because Plaintiffs' reliance on the alleged misstatements could not have been reasonable, on Plaintiffs' fraud claim, summary judgment in favor of Union is appropriate.

Macharia v. Jenkins, Civ. Act. No. 06-2460 (Mass. Super. Feb. 18, 2009), slip op. at 6-7.

See also Collins v. Huculak, 57 Mass. App. Ct. 387, 392 (2003) (plaintiff's reliance on defendant's representations regarding contents of a document was unreasonable because even a cursory examination of the document would have revealed the truth).   A party, in other words, may not claim reasonable reliance on a patently false representation.   See Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 468 (2003).   Therefore, defendants' motions as to DaSilva's fraud claims will be ALLOWED.

> Counts II and III - Violation of the TILA and of Mass. Gen. Laws ch. 140D, §1, et seq., and 209 CMR 32.00, et seq.

Smith asserts Counts II and III against Fremont.  However, it is undisputed that prior to the closing, Smith was in possession of all of the pre-closing disclosures required by the TILA, its Massachusetts statutory counterpart, and their implementing regulations.  Smith denies, however, that he was "provided" with the documents as a practical matter, as he did not understand them.   (He does not deny their receipt).   As Fremont notes, the standard with regard to a TILA claim is an objective one - whether "*any reasonable person*, in reading the form provided . . ., would so understand it."   Melfi v. WMC Mortgage Corp., 568 F.3d 309, 312 (1st Cir. 2009) (emphasis added).   See also Palmer v. Champion

17

Mortgage, 465 F.3d 24, 28 (1st Cir. 2006) (courts must evaluate TILA disclosures "from the vantage point of a hypothetical average consumer – a consumer who is neither particularly sophisticated nor particularly dense.").   Here, it is undisputed that Fremont provided all of the requisite forms.   Whether Smith was able to understand them is necessarily a subjective inquiry that has no place in the analysis.   Fremont's motion will therefore be ALLOWED as to Counts II and III.

Count V - Negligence and Count IX - Breach of Fiduciary Duty

The negligence claims are asserted by Smith and DaSilva against RE/MAX, Century 21, NEMCO, Union Capital, and Mid City.   To prevail on a negligence claim, plaintiffs must show: (1) that defendants owed them a legal duty; (2) a breach of that duty; and (3) that plaintiffs suffered damages as a result of the breach.   See Glidden v. Maglio, 430 Mass. 694, 696 (2000).   Whether a person owes a duty to another is a question of law.   Leavitt v. Brockton Hosp., 454 Mass. 37, 40 (2009); Coughlin v. Titus & Bean Graphics, Inc., 54 Mass. App. Ct. 633, 638 (2002).   "'The concept of 'duty' . . . 'is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.'"   Luoni v. Berube, 431 Mass. 729, 735 (2000), quoting W.L. Prosser & W.P. Keeton, Torts § 53, at 358-359 (5th ed. 1984).

With regard to RE/MAX and Century 21, Smith appears to base his negligence claims on the real estate agencies' duty not to perform the real estate contracts in such a way as to cause him harm.   See, e.g., Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass.

141, 144 (1937).   It is true, that in general terms, Massachusetts courts have recognized

that "[a]s a general principle of tort law, every actor has a duty to exercise reasonable care

to avoid physical harm to others.'"   Remy v. MacDonald, 440 Mass. 675, 677 (2004), citing

Restatement (Second) of Torts § 302 comment a (1965).   "A precondition to this duty is,

of course, that the risk of harm to another be recognizable or foreseeable to the actor."

Afarian v. Mass. Elec. Co., 449 Mass. 257, 262 (2007).

In the first instance, as defendants accurately point out, absent a showing of

personal injury or physical damage to property, the economic loss doctrine bars the

recovery of losses incurred because of another's failure to execute a contract according

to its terms.   See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 469

(2009); FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993).[20]   Smith does argue,

with some force, that the breaches of contract led to a deterioration of his credit rating,

which in turn caused him embarrassment resulting in emotional distress.[21]   Although the

---

[20]These damages are, in any event, encompassed by Smith's breach of contract
claims.

[21]Both plaintiffs allege harm to their credit reputation.   DaSilva's credit score
dropped from 685 to 500.   She has been rejected credit, denied employment, and turned
down for an apartment lease, presumably as a result.   Smith has been denied new credit
and claims to have been turned down by two prospective landlords.   The court does not
agree with NEMCO's somewhat cavalier argument that by "describing himself as homeless
and unemployed, Smith makes clear that his allegation that his credit rating has been
impaired is frivolous."   NEMCO's Mem. at 10-11.   While harm to credit reputation is not a
claim with significant precedential support in a negligence context, it has been at least
noted by the First Circuit as possibly sounding in defamation.   See, e.g., Jimenez-Nieves
v. United States, 682 F.2d 1, 6 (1st Cir. 1982). See also Stevenson v. TRW Inc., 987 F.2d
288, 297 (5th Cir. 1993) (damages available for "considerable embarrassment" where
plaintiff was denied credit); In re Knickerbocker, 827 F.2d 281, 291 (8th Cir. 1987)
(recognizing cause of action for injury to credit reputation).

argument is sympathetic, it simply cannot be said as a matter of law it would be foreseeable to a reasonable lending intermediary that a default on a mortgage obligation would eventually cause emotional distress to a borrower over a lowered credit rating.[22] Therefore, defendants' motions with respect to the claims for negligence will be ALLOWED.

The claims for breach of fiduciary duty are asserted by both plaintiffs against Century 21, RE/MAX, Union Capital, NEMCO, and Mid City.  With regard to the mortgage brokers, plaintiffs merely argue that the brokers owed them a fiduciary duty as a matter of law.  This argument has no support as a general proposition in Massachusetts law. Plaintiffs rely on Haser v. Wright, 2002 WL 31379971 (Mass. Super. Sept. 4, 2002), for their argument that a mortgage broker owes a fiduciary duty to a borrower.  However, Haser is inapposite.  The Haser court did not rule as a general matter that a mortgage broker owes its customer a fiduciary duty.  Rather, the court found that the broker in that case had known the clients for a lengthy period of time and had had numerous interactions with them.  Thus, the court found a fiduciary duty based on "the special trust relationship that had developed between these parties."  Id. at *4.  Haser reflects an exception to the usual rule requiring that a fiduciary relationship be defined by a high degree of trust and formality, namely, that where a plaintiff reposes trust and confidence in a defendant, *and* the defendant knows of the plaintiff's reliance, a fiduciary relationship may be imposed by law.  See Patsos v. First Albany Corp., 48 Mass. App. Ct. 266, 272 (1999) (broker-client);

_____

[22]DaSilva has not adduced any facts that would allow her to hold RE/MAX and/or Century 21 liable in negligence.

<u>Cahaly v. Benistar Prop. Exch. Trust Co.</u>, 68 Mass. App. Ct. 668, 681 (2007) (escrow

agent).

According to Smith, he was lured into entering into the transactions because of a

misplaced trust in defendants' representations that they were acting in his best interest

and, as the court has found, they were fully aware of his gullibility and took advantage of

it.  As the court has already noted,

> [t]he plaintiff alone, by reposing trust and confidence in the defendant,
> cannot thereby transform a business relationship into one which is fiduciary
> in nature.  The catalyst in such a change is the defendant's knowledge of the
> plaintiff's reliance upon him."  <u>Broomfield v. Kosow</u>, 349 Mass. 749, 755
> (1965).  "Whether a relationship of trust and confidence exists is a question
> of fact. . . . The relationship may be found on evidence indicating that one
> person is in fact dependent on another's judgment in business affairs or
> property matters."  <u>Collins v. Huculak</u>, 57 Mass. App. Ct. 387, 395 (2003)
> (internal quotation marks and citations omitted).  Factors to consider include
> "the relation of the parties prior to the incidents complained of, the plaintiff's
> business capacity or lack of it contrasted with that of the defendant, and the
> readiness of the plaintiff to follow the defendant's guidance in complicated
> transactions wherein the defendant has specialized knowledge."  <u>Broomfield</u>,
> 349 Mass. at 755.   Smith was indisputably a novice at real estate
> investment, and he additionally claims that defendants were fully aware that
> he did not have the capacity to understand the underlying transactions.
> Indeed, the allegations in the Amended Complaint portray a scenario in
> which defendants intentionally preyed upon Smith, whose trust was easily
> earned.  "As Judge Cardozo once put it, 'When property has been acquired
> in such circumstances that the holder of the legal title may not in good
> conscience obtain the beneficial interest, equity converts him into a trustee.'"
> <u>Id</u>. at 757-758 (citation omitted).

June 16, 2009 Mem. and Order at 20-21.  DaSilva, on the other hand, makes no similar

argument, nor could she, as it is clear from the record that she was acting not out of

reliance on defendants' representations, but out of mercenary self-interest.  The motions

with respect to Smith's claims of breach of fiduciary duty will be <u>DENIED</u>.  The motions

with respect to DaSilva's fiduciary claims will be <u>ALLOWED</u>.

<u>Count VI - Breach of Contract and the Covenant of Good Faith and Fair Dealing</u>

Smith asserts these claims against RE/MAX, Century 21, and Fremont.  Smith alleges that RE/MAX and Century 21 had a contractual duty (originating with Jenkins) to manage and maintain his properties, collect the rents, deal with the tenants, pay utility bills and mortgages, and to sell the properties in a business-like manner.[23]  With regard to Fremont, Smith essentially argues that it was obligated to write responsible loans,  and to decline to make loans where, as in his case, there was an obvious risk of default.  Whether a contract exists is a question to be resolved by the finder of fact.  <u>See</u> <u>Brooks v. AIG SunAmerica Life Assurance Co.</u>, 480 F.3d 579, 586 (1st Cir. 2007).  Therefore, the motions will be <u>DENIED</u> as to Smith's contract claims.

The covenant of good faith and fair dealing reflects an implied condition that inheres in every contract "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471-472 (1991).  "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the

---

[23]The court rejects any argument by RE/MAX that the claims are barred by the Massachusetts Statute of Frauds, Mass. Gen. Laws ch. 259, § 1, which provides that no action shall be brought upon a contract for the sale of land "[u]nless the promise, contract or agreement upon which such action is brought . . . is in writing and signed by the party sought to be charged therewith" or his representative.  As Justice Troy noted in a similar case, "the plaintiffs are not seeking to enforce oral agreements for the purchase or sale of land; rather, the crux of their suit is that the defendants fraudulently, and in breach of a fiduciary duty, induced them into entering into real estate transactions, and then breached a contract to manage, renovate, and resell the properties for the parties' joint benefit. . . . These claims are not barred by the statute of frauds." <u>Montrond</u>, slip op. at 21.

existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Boston Kenmore Realty Group, 441 Mass. 376, 385 (2004).  Absent a contract, there can be no violation of the covenant of good faith and fair dealing. Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005).  Because the covenant claims depend upon the survival of the contract claims, and are merely elements to be considered in assessing the gravity of any breach, the motions will be DENIED.

Count X - Conspiracy

These claims are asserted by Smith against Century 21, RE/MAX, NEMCO, and Union Capital.  The claims are asserted by DaSilva against Union Capital and Mid City. As the court has previously noted,

> [a] plaintiff may allege one of two types of civil conspiracy.  The first type requires proof of coercion; the second requires proof of a common plan to commit a tortious act.  Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998). Under the first type of conspiracy, a plaintiff must allege that the defendant and others combined to have a special coercive power that they did not possess individually. Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  To state a claim for the second type of conspiracy, the plaintiff must allege "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Id. at 1564.

June 16, 2009 Mem. and Order at 23-24.  Members of a conspiracy have joint and several liability for the actions of their co-conspirators.  See P&B Autobody, 43 F.3d at 1564. Here, plaintiffs allege that various of the defendants worked in concert to coerce plaintiffs into purchasing the properties. Jenkins assembled the group who, in combination, exerted

coercive power.  Plaintiffs argue that without the mortgage brokers, there would have been no money; without the sales agents, there would have been no properties; and without Jenkins, there would have been no victims.

The record contains sufficient evidence for plaintiffs' conspiracy claims to proceed against all moving defendants named in this count.  All four of the property transactions in this case involved Jenkins acting in concert with one or more of the real estate agencies and the mortgage brokers, all of whom (with the exception of RE/MAX) were handsomely remunerated for their efforts.[24]  The evidence is sufficient for a jury to infer that there may have been a common agreement among the actors, specific to each real estate transaction, although a jury may conclude that there was no rim completing the wheel, only a hub (Jenkins) with separate spokes.  This remains to be sorted out at trial.[25]  Therefore, the motions for summary judgment with respect to the conspiracy claims will be <u>DENIED</u>.

<u>Counts XII and XIII- Intentional and Negligent Infliction of Emotional Distress</u>

These claims are asserted by both plaintiffs against Century 21, RE/MAX, NEMCO, Union Capital, and Mid City.  To prevail on a claim of intentional infliction of emotional distress, plaintiffs must show "(1) that the actor[s] intended to inflict emotional distress or that [they] knew or should have known that emotional distress was the likely result of [their]

---

[24]RE/MAX remains a viable conspirator by virtue of Taylor's and Mosley's involvement.

[25]For example, with regard to Smith's Dighton property, RE/MAX, Century 21, and NEMCO were involved.  With regard to his Boston property, Century 21 and Union Capital were allegedly involved.  With regard to DaSilva's Brockton property, Union Capital was involved; and with regard to her Whitman property, Mid City was involved.  Each of the conspiracies involved Jenkins (although his role is not discussed as he is not a moving defendant).

conduct, (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community,' and (3) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure.'" Ball v. Wal-Mart, Inc., 102 F. Supp. 2d 44, 53 (D. Mass. 2000), quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976). A claim of negligent infliction of emotional distress requires "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Sullivan v. Boston Gas Co., 414 Mass. 129, 132 (1993), quoting Payton v. Abbott Labs, 386 Mass. 540, 557 (1982).

Smith concedes that he suffered from pre-existing psychosis dating back some thirty years. However, he testified that the voices in his head have grown louder as a result of the financial battering he endured because of the real estate frauds. In addition, Smith's sister states in an affidavit that after Smith began receiving collection calls, he

> felt ashamed, he felt like his trust was abused, and that he felt like he wanted to hurt himself or kill himself to punish himself. For several months whenever we talked about it he would cry. Since that time, I have personally observed Robert deteriorate and lose some of his zest for life. My personal observations have been that Robert has been moody, depressed, and he walks more slowly and appears more tired that he had been before. I have watched my brother suffer for three years, going on four years.

McCray Aff. ¶ 2. Accepting all of this as true, for the same reason that the court has dismissed the negligence claim (foreseeability), the court will ALLOW defendants' motions as to Smith's emotional distress claims. DaSilva has not alleged that she suffered any emotional harm at all. Therefore, the motions will also be ALLOWED as to DaSilva's

claims.[26]

Count VIII – Unjust Enrichment and Count IV – Chapter 93A

Unjust enrichment is a theory of equitable recovery, not a separate cause of action. Lopes v. Commonwealth, 442 Mass. 170, 179 (2004).   The equitable remedy is not available to a party who has an adequate remedy at law, as plaintiffs do here.  Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005).   Consequently, this claim will be DISMISSED.   Chapter 93A is also an equitable claim that is reserved for the court. Chamberlayne Sch. v. Banker, 30 Mass. App. Ct. 346, 354 (1991).  A judge may make a decision on a Chapter 93A claim that is directly contrary to the findings of the jury on a parallel common-law claim. Spaulding v. Young, 32 Mass. App. Ct. 624, 626 n.2 (1992); Chamberlayne Sch., 30 Mass. App. Ct. at 354-355.  As the court informed counsel at the hearing, it will reserve ruling on all Chapter 93A issues until after trial.

ORDER

For the foregoing reasons, defendants' motions for summary judgment are ALLOWED in part and DENIED in part.  The claims against the moving defendants that

---

[25]The intentional infliction claims will also be dismissed.  The intentional tort requires acts that are "extreme and outrageous," either reasonably viewed as an attempt to "shock and harm a person's peace of mind," or if not individually such, are part of a pattern of harassment intended to accomplish the same end.  See Ratner v. Noble, 35 Mass. App. Ct. 137, 139-140 (1993); Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (appalling conduct required to trigger the tort); Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994) (same, "profoundly shocking" conduct). Whether a defendant's conduct is "beyond all bounds of decency and . . . utterly intolerable in a civilized community" is an issue of law for the trial judge.  Sena v. Commonwealth, 417 Mass. 250, 264 (1994).  Not only is there no evidence that defendants intended to cause actual harm to plaintiffs or to harass them in any way, a reasonable person would not characterize defendants' acts as extreme and outrageous, however sleazy they might have been.

survive for trial are: (1) Smith's fraud claims against RE/MAX, Century 21, NEMCO, and Union Capital; (2) Smith's breach of fiduciary duty claims against RE/MAX, Century 21, Union Capital, and NEMCO; (3) Smith's claims of breach contract and of the covenant of good faith and fair dealing against RE/MAX, Century 21, and Fremont; (4) Smith's conspiracy claims against RE/MAX, Century 21, NEMCO, and Union Capital; (5) DaSilva's conspiracy claims against Union Capital and Mid City; and (5) Smith's Chapter 93A claims against all of the moving defendants.  Trial on the surviving claims will commence on September 7, 2010.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE