UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
**CASE NO. 1:07-CV-12067**

| | | |
|---|---|---|
| ROBERT SMITH and<br>MARIA DASILVA,<br>     Plaintiffs<br><br>vs.<br><br>DWIGHT JENKINS, CHERRY JENKINS,<br>DOREA SMITH, ROBERT E. KELLEY,<br>RKELLEY-LAW, P.C., LOUIS G.<br>BERTUCCI, EB REAL ESTATE GROUP,<br>INC., DORCHESTER REAL ESTATE,<br>INC., NEW ENGLAND MERCHANTS<br>CORP., UNION CAPITAL MORTGAGE<br>BUSINESS TRUST, MID CITY<br>MORTGAGE, LLC, SIGNATURE<br>GROUP HOLDINGS, INC. f/k/a<br>FREMONT REORGANIZING<br>CORPORATION f/k/a FREMONT<br>INVESTMENT & LOAN<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **SUPPLEMENTAL BRIEF OF UNION<br>CAPITAL MORTGAGE BUSINESS<br>TRUST FILING TRIAL TRANSCRIPTS<br>OF JOHN RICHMAN AND LINDA<br>BRYANT PER COURT ORDER** |

On November 18, 2010, defendant, Union Capital Mortgage Business Trust ("Union Capital") moved for judgment as a matter of law pursuant to Rule 50(b). On December 6, 2010, plaintiff opposed defendant's motion, citing to, without attaching, the trial testimony of John Richman and Linda Bryant. On December 8, 2010 (#464) the court allowed defendant's motion to wait to rule on its motion for judgment until the trial transcripts could be provided to the court. The trial transcripts are attached as Exhibits "A" (Richman) and "B" (Bryant).

I.     Essence of Dispute about these Witnesses' Testimony

     A.     John Richman

Defendant moved for judgment, in part, based on the plaintiff's failure to put in evidence the loan application Union Capital provided to Meritage, the lender. Plaintiff's opposition, at

page 8, countered, claiming Mr. Richman testified Union Capital Mortgage Business Trust employee P.J. Goodwin prepared the loan applications in the first and second loan closing files marked trial exhibits 122 and 123.  However, these files were prepared by the lender, Meritage, not Union Capital, and the loan application contained therein bears Meritage's name as the producer.  Neither Exhibits 122 nor 123 were shown to, or discussed with, Mr. Richman during his testimony (See Exhibit "A").  On Page 18 of his testimony, Mr. Richman stated:  "I don't know…" about the source of Mr. Smith's financial information provided to Mr. Goodwin (Exhibit "A").  Mr. Richman was not asked if any document prepared by Mr. Goodwin, or any document based on information supplied by Mr. Goodwin, was part of trial exhibits 122 and 123 (Exhibit A, page 18).  Mr. Richman did state that the software Union Capital used would automatically check the box indicating a "face-to-face" interview on the loan application Union Capital initially generated (Exhibit "A", Page 22) but Mr. Smith's initial loan application was not shown to Mr. Richman, nor offered into evidence.  Mr. Richman stated he did not know if Mr. Goodwin met with Mr. Smith (Exhibit "A", Page 21).  Accordingly, plaintiff's opposition, at page 9, (claiming Richman's testimony about "face-to-face" interview boxes being checked on a loan application which was part of Exhibits 122 and 123), is not supported by Mr. Richman's actual testimony.  He simply did not say what plaintiff claims he said.

There was no evidence at trial that Meritage relied on any part of a Union Capital loan application in issuing a loan to Mr. Smith, nor any evidence that Meritage would not have issued the loan unless the Union Capital application was obtained in a "face-to-face" interview.  The application itself has multiple categories for interview, by "mail" and "telephone", and there was no evidence at trial that Meritage preferred one interview method over another.

At page 10 of plaintiff's opposition, plaintiff claims Mr. Richman testified that Mr. Goodwin assembled "the loan application". However, the only loan application entered into evidence was the loan application prepared by Meritage as part of the closing package, Exhibits 122 and 123. The "Exhibits" list to Mr. Richman's testimony (Exhibit "A", page 34) clearly shows no loan application was used in his examination.

B.    Linda Bryant

Plaintiff's opposition at Page 10, claims emails to and from Mr. Richard Champ, a sales representative at Meritage, marked trial Exhibit 141, established that Ms. Bryant knew Mr. Smith's income, as stated, was inflated "because Meritage indicated that in the emails." (Plaintiff's opposition to Motion for Judgment at page 10). However, the actual email does not say this (Exhibit "141"). The actual email from Mr. Champ notes Mr. Goodwin's stated income "may seem a little high" for his stated occupation (Trial Exhibit "141"). Mr. Champ goes on to suggest verifying Mr. Smith had cash deposits, and other possible adjustments to the loan application, to increase the likelihood Meritage would approve Mr. Smith's loan (Exhibit "141"). No part of any of the emails of Exhibit "141" state the sender, or recipient, thought Mr. Smith's stated income was greater than his actual income. When asked about the email at trial, Ms. Bryant testified she did not know what information Mr. Goodwin put on Mr. Smith's loan application (Exhibit "B" at page 13). Ms. Bryant was not shown any loan application during her testimony. (Exhibit "B" at pages 12-15). Moreover, the email from Mr. Champ, Meritage's representative, reflects Meritage was aware of the lower income projections for the rental units in Mr. Smith's prospective apartments and this only demonstrates Union's disclosure of known facts to Meritage. No part of Ms. Bryant's testimony (Exhibit "B") or the email (Exhibit "141") was evidence from which the jury could find that Union "knowingly falsified information"

3

(Plaintiff's opposition at page 12). Given that the loan application Union prepared was never put in evidence or used with witnesses, and no one ever testified that Meritage was misled and would not have issued the loan but for some fact supplied by Union, the plaintiff's proof at trial was insufficient.

II.    Conclusion

Plaintiff's opposition claims Exhibits 122, 123 and 141, and the testimony of John Richman and Linda Bryant, gave the jury enough evidence to ground its verdict. But, Exhibits 122, 123 and 141 are not any loan application prepared by Union Capital, and neither Mr. Richman, nor Ms. Bryant, testified about any loan application Union prepared for Mr. Smith. There was no evidence at trial that Meritage mistakenly relied on bad information in a Union Capital prepared loan application. Hence, plaintiff simply did not give the jury enough evidence to support the verdict. Thus, the defendant's motion for judgment should be allowed.

/s/ Douglas A. Robertson
Douglas A. Robertson, BBO No. 552315
Anthony R. Brighton, BBO No. 660193
Attorneys for Defendant,
    Union Capital Mortgage Business Trust
MARTIN, MAGNUSON, MCCARTHY &
    KENNEY
101 Merrimac Street
Boston, MA  02114
(617) 227-3240

## *CERTIFICATE OF SERVICE*

I, Douglas A. Robertson, attorney for Union Capital Mortgage Business Trust, hereby certify that on the 13th day of January, 2011, I served a copy of the above document to all counsel of record via electronic filing:

> /s/ Douglas A. Robertson
> Douglas A. Robertson, BBO No. 552315
> Anthony R. Brighton, BBO No. 660193
> Attorneys for Defendant,
>     Union Capital Mortgage Business Trust
> MARTIN, MAGNUSON, MCCARTHY &
>     KENNEY
> 101 Merrimac Street
> Boston, MA  02114
> (617) 227-3240

# Exhibit "A"

1

1    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
2

3    * * * * * * * * * * * * * * * * * *
     *ROBERT SMITH and MARIA DASILVA        *
4            Plaintiffs                      *        CIVIL ACTION
             v.                              *        No. 07-12067-RGS
5                                            *
     *DWIGHT JENKINS, CHERRY JENKINS,        *
6    DOREA SMITH, ROBERT E. KELLEY,          *
     R.KELLEY-LAW, P.C., LOUIS G. BERTUCCI,*
7    EB REAL ESTATE GROUP, INC.,             *
     DORCHESTER REAL ESTATE, INC.,           *
8    NEW ENGLAND MERCHANTS CORP.,            *
     UNION CAPITAL MORTGAGE BUSINESS TRUST,*
9    MID CITY MORTGAGE, LLC,                 *
     FREMONT INVESTMENT & LOAN, and          *
10   MERITAGE MORTGAGE CORPORATION           *
             Defendants                      *
11   * * * * * * * * * * * * * * * * * *

12

13

14        BEFORE THE HONORABLE RICHARD G. STEARNS
          UNITED STATES DISTRICT JUDGE AND A JURY
15         EXCERPT:  TESTIMONY OF JOHN RICHMAN
                   October 19, 2010
16

17

18

19                          Courtroom No. 21
                            1 Courthouse Way
20                          Boston, Massachusetts 02109

21

22

23             JAMES P. GIBBONS, RPR, RMR
                 Official Court Reporter
24            1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25                jmsgibbons@yahoo.com

```
 1    APPEARANCES:

 2         BAKER & ASSOCIATES, P.C., (By Jeffrey S. Baker,
      Esq.) Two West Hill Place, Boston, Massachusetts
 3    02114, on behalf of Plaintiffs

 4                        and

 5         CHARDON LAW OFFICES, (By Jonathan D. Plaut, Esq.)
      One State Street, Suite 1200, Boston, Massachusetts
 6    02109, on behalf of Plaintiffs

 7


 8         ROBINSON & COLE, LLP, (By John R. Bauer, Esq.) One
      Boston Place, Boston, Massachusetts  02108, on behalf of
 9    Mid City Mortgage, LLC

10         McLAUGHLIN & McLAUGHLIN, P.C., (By James F.
      McLaughlin, Esq.) 1135 North Main Street, Brockton,
11    Massachusetts 02301, on behalf of Robert E. Kelley &
      RKelley-Law, P.C.
12
           FEIN LAW OFFICE, P.C., (By Christopher J. Fein,
13    Esq.) 25 Braintree Hill Office Park, Suite 403,
      Braintree,, Massachusetts   02184, on behalf of Louis G.
14    Bertucci

15         BULKLEY, RICHARDSON and GELINAS, LLP, (By J.
      Patrick Kennedy, Esq.) 98 North Washington Street, Suite
16    500, P.O. Box 9750, Boston, Massachusetts 02114, on
      behalf of Signature Group Holdings, Inc.,
17
           MARTIN, MAGNUSON, McCARTHY & KENNEY, (By Douglas R.
18    Robertson, Esq.) 101 Merrimac Street, Boston,
      Massachusetts  02114, on behalf of Union Capital
19    Mortgage Business Trust

20         MURPHY & RILEY, (By Joseph A. King, Esq.) 141
      Tremont Street, Boston, Massachusetts 02111, on behalf
21    of EB Real Estate Group, Inc.

22         LECLAIR RYAN, (By Jay S. Gregory, Esq.) One
      International Place, 11th Floor, Boston, Massachusetts
23    02110, on behalf of Dorchester Real Estate, Inc.

24

25
```

1        LAW OFFICES OF MICHAEL J. MARKOFF, (By Michael J. Markoff, Esq.) P.O. Box 212, Falmouth, Massachusetts

2 02541, on behalf of New England Merchants Corp.

3

4        PISCIELLI, DOMENICO & MURPHY, LLP, (By Geoffrey A. Domenico, Esq.), 171 Washington Street, North Easton,

5 Massachusetts   02356, on behalf of Dwight Jenkins, Cherry Jenkins, Dorea Smith

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X C E R P T

 2                    * * * * * * * *

 3          THE COURT:  Mr. Baker anything further?

 4          MR. BAKER:  Mr. Richman, please, your Honor.

 5          THE COURT:  We're not going to go through the

 6    Banking Commissioner's findings again, are we?

 7          MR. BAKER:  No.  I'm just going to put it into

 8    evidence and I'll move on.

 9                    JOHN RICHMAN, sworn

10          THE CLERK:  Please be seated.

11       Please state your name and spell your last name for the

12    record.

13          THE WITNESS:  John Richman, R-I-C-H-M-A-N.

14                    DIRECT EXAMINATION

15    BY MR. BAKER

16    Q   Mr. Richman, you're the same John Richman that is the

17    subject of a "Findings of Fact, Temporary Order to Cease and

18    Desist from Mortgage Operations"?

19    A   Correct.

20    Q   You personally; is that a fair statement?

21    A   Correct.

22          MR. BAKER:  I would like to admit this into

23    evidence.

24          THE COURT:  147.

25          (Plaintiff's Exhibit No. 147 received in evidence.)
```

1    Q    Mr. Richman, I'm not going to belabor the point today

2    about what this document contains, but you were sitting here

3    as we went through Mr. Fabrizio's questions, correct?

4    A    Correct.

5    Q    And many of the same complaints that he testified to are

6    in this document as well with respect to you; fair

7    statement?

8    A    Is that the same document as this document?

9         MR. BAKER:  May I approach the witness, your Honor?

10        THE COURT:  You may.

11   A    Okay.  A different document.

12        The question?

13   Q    Sir, you remember receiving this document, correct?

14   A    I do.

15   Q    And without going through all the details, because time

16   is precious, many of the same types of claims that appear in

17   the first document that Mr. Fabrizio testified to relate to

18   you personally in this document that I just presented to

19   you?

20   A    They do.

21   Q    And what is the date, sir, that this document was

22   issued?  Would you look at the last page?

23   A    It was November 12, '09.

24   Q    November 12, 2009.

25        MR. BAKER:  May I have that, please?

PDF created with pdfFactory trial version www.pdffactory.com

```
1    Q    Sir, you recall being in my office for a deposition on
2    or about January 22, 2010?
3    A    I do.
4    Q    Do you remember me asking you specific questions about
5    your awareness on January 22, 2010, of any fraudulent loan
6    application activity within Union Capital?
7    A    I do.
8    Q    And do you recall what your answer was, sir?
9    A    I do.
10   Q    Do you want to tell the jury.
11   A    Could you refresh my memory from the deposition?
12   Q    Sure.
13        MR. BAKER:  I am looking, sir, specifically at
14   page 65, gentlemen, ma'am.
15   Q    "QUESTION:  Sir, are you aware of any instances where
16   anybody presented a loan application to a prospective lender
17   that was -- that contained fraudulent information?
18        "ANSWER:  No.
19        "QUESTION:  None whatsoever?
20        "ANSWER:  None whatsoever.
21        "QUESTION:  Did Mr. Brennan ever bring to your
22   attention that possibility?"
23        You know who Mr. Brennan was.
24   A    Correct.
25   Q    And who was he, sir?  Please tell the jury.
```

```
 1   A   He worked for our company in a management position.

 2   Q   What was his title?

 3   A   Sales manager.

 4   Q   He reported to you, did he not?

 5   A   Both George Fabrizio and I.

 6   Q   "QUESTION:  Did Mr. Brennan ever bring to your attention

 7   that possibility?

 8       "ANSWER:  No.

 9       "QUESTION:  Did Mrs. Bryant?

10       "ANSWER:  No.

11       "QUESTION:  Did Mr. Goodwin?

12       "ANSWER:  No.

13       "QUESTION:  Are you satisfied --

14           MR. ROBERTSON:  Do we have a question?

15   Q   -- "as you sit before me today, that all of the loan

16   applications that Mr. Goodwin gave to the prospective

17   lenders that concern my clients contained accurate

18   information?

19       "ANSWER:  Yes."

20       Do you remember that testimony, sir?

21   A   Yes.

22   Q   Sir, do you recall, when you were in my office

23   testifying in the earlier -- strike that.

24       -- the subsequent deposition on January 22, 2010, I

25   asked you questions about a verification of employment.
```

1    A    I can't recall.

2    Q    You know what a "verification of employment" form is; do

3    you not?

4    A    I do.

5    Q    In fact, it's a document that Union Capital routinely

6    receives in its loan origination process?

7    A    I wouldn't say "receive" it.  We'll send a form out to

8    try to get receipt back from the employer if that program

9    calls for that.

10   Q    You'll generate the document and solicit a signature?

11   A    We'll generate the document.

12   Q    And solicit information about the employment of a

13   particular borrower?

14   A    To the employer, yes.

15   Q    And you are aware, sir, are you not, that Maria DaSilva

16   borrowed money through a lender which Union Capital placed,

17   correct?

18   A    Correct.

19   Q    In fact, I asked you a number of questions at that

20   deposition, you'll recall?

21   A    Correct.

22          MR. BAKER:  May I approach the witness, your Honor?

23          THE COURT:  You may.

24       (Counsel conferred.)

25   Q    Mr. Richman, you've seen this document before; have you

PDF created with pdfFactory trial version www.pdffactory.com

1    not?

2    A    I have.

3    Q    In fact, you testified about it at the deposition;

4    you'll recall?

5    A    Yes.

6    Q    And it's got the name "Union Capital Mortgage Corp.," on

7    it, correct?

8    A    Correct.

9    Q    Kimberly Collins used to work for you as somebody who

10   would assist in the origination process?

11   A    She was a processor.

12   Q    And you've recognized P.J. Goodwin's handwriting,

13   previously, have you not?

14   A    I do.

15   Q    In fact, that's his handwriting in the middle blocks?

16   A    No.   That is not his handwriting in the middle blocks,

17   to the best of my knowledge.

18   Q    Is this the type of form that you would routinely and

19   systematically receive to verify employment on certain types

20   of loans?

21   A    Correct.

22   Q    And that was the job that Kimberly Collins did, too,

23   enter her name and "Union Capital" where it states where

24   it's from, correct?

25   A    Correct.

1           And if you see the parts that are circled, that's the

2      parts where the employer fills out.

3      Q    Okay.

4      A    So the employer fills out all the portions from there

5      down.  So this person that signed this form, this Claude

6      McClinton [ph.], is the other person that filled this part

7      out.

8      Q    In fact, you verified it once previously as a

9      Verification of Employment Form of Union Capital; do you

10     recall?

11     A    It's a "Request for Verification of Employment" form.

12          MR. BAKER:  I would like to move this into

13     evidence, your Honor.

14          THE COURT:  148.

15          (Plaintiff's Exhibit No. 148 received in evidence.)

16     BY MR. BAKER

17     Q    Sir, do you know who Claude McClinton is?

18     A    I do not.

19     Q    Do you have any knowledge, sir, as to his relationship

20     with the defendant Dwight Jenkins?

21     A    I do not.

22     Q    Do you see on the document it says, "One World/One Link"

23     is the employer?

24     A    Yes, I do.

25     Q    Can you tell me what your understanding is of what One

```
1    World/One Link is?

2    A    I do not know.

3    Q    Even as you sit here today you've never heard that

4    phrase before?

5    A    Correction.

6         Since the case came about, I heard that that was a

7    company Dwight Jenkins owned.

8    Q    Was this a loan that Mr. Goodwin originated?

9    A    Yes.

10   Q    Sir, is it fair to say that unless this transaction

11   closes Union Capital doesn't get paid?

12   A    That's true in every mortgage deal in the country, for

13   every company in the country.

14   Q    You wouldn't get paid unless the deal closed and

15   Mr. Goodwin wouldn't get paid.

16   A    Correct.

17   Q    You paid Mr. Goodwin on a commission basis, correct?

18   A    Correct.

19   Q    So if this transaction closed, the one we're referring

20   to, Maria DaSilva, he would be paid; fair statement?

21   A    Correct.

22   Q    Sir, you're familiar with the phrase "Owner-Occupancy

23   Affidavit," correct?

24   A    Yes.

25   Q    And what steps would Union Capital take to ensure that
```

PDF created with pdfFactory trial version www.pdffactory.com

1   if the name of the borrower -- strike that.

2       -- if the box on the loan application was checked off

3   for owner occupancy status, that the borrower actually

4   intended to live there?

5   A   Well, the steps that would be taken is that the borrower

6   was being truthful when they signed their name to the form.

7   Q   So if the name is on the document, that's as far as you

8   go?

9   A   There's not much you can do after a closing to ensure

10  that someone moved into the property after they stated they

11  were going to and signed documents that said they were going

12  to.

13  Q   Yes, sir.  But I was actually referring to before the

14  closing when you were filling out the application.

15  A   Yes.

16      You take -- there's a number of forms that the borrower

17  signs and states their intention as to whether or not

18  they're going to move into the property.

19  Q   So you just rely on the documents, correct?

20  A   Correct.

21  Q   Sir, you're familiar with R. Kelley Law Offices; are you

22  not?

23  A   Yes.

24  Q   In fact, Robert Kelley Law Offices represented Union

25  Capital in 2005, 2006, that period, correct?

1      MR. McLAUGHLIN:  Objection to the characterization,

2   "represented."

3      THE COURT:  I haven't seen any evidence that that

4   was the case.

5   Q   Sir, do you recall testifying at your deposition about

6   Union Capital's relationship with R. Kelley Law Offices?

7   A   Yes.

8   Q   What do you recall you testified to?

9   A   They did some closings for us during that time.

10  Q   When you say, "they did some closings," you understood

11  that R. Kelley was a law office, correct?

12  A   Correct.

13  Q   And is it your understanding that when they did these

14  closings they were acting as your attorney at the time?

15      MR. McLAUGHLIN:  Objection.

16  A   I don't think so.  I think they were acting as the

17  attorney for the lender.

18  Q   With respect to Linda Bryant, you understood that she

19  assisted Mr. Goodwin in his loan originations, correct?

20  A   She was a mortgage processor for many loan officers that

21  worked for our company.

22  Q   And one such loan originator was Mr. Goodwin, correct?

23  A   Correct.

24  Q   Did you ever have occasion to review her work product?

25  A   I did.

1    Q    Ever have occasion to say, "I'm not sure you're doing

2    your job correctly"?

3    A    To Linda Bryant?

4    Q    That's correct?

5    A    Not that I recall.

6    Q    Have you ever heard the phrase "contract release fee"

7    before today?

8    A    I found out about that term as this case transpired.

9    Q    What did you learn?

10   A    I learned that there had been some contract release fees

11   on some files that had closed at our office.

12   Q    What is your understanding of what that term means, sir?

13   A    I guess it's -- I guess the way they did it was it was a

14   release fee to transfer the P&S contract from one person to

15   another and then pay out a fee towards it.

16   Q    In fact, you'd never heard of it before Mr. Jenkins was

17   attending closings that UCMBT financed, correct?

18   A    That's correct.

19   Q    And you were so concerned that you called Mr. Bertucci

20   about this phrase, did you not?

21   A    I did call Mr. Bertucci.

22   Q    And you said -- I won't say exactly what you said.

23        But you said, What the heck is going on here, or

24   something to that effect; is that correct?

25   A    I did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    And were you satisfied with what Mr. Bertucci told you?

2    A    Yes.

3    Q    What did he tell you, do you recall?

4    A    I can't recall.

5    Q    Okay.

6         In fact, you asked him why these HUD statements that

7    went to closing, these settlement statements, had these, to

8    use your very words, humongous contract release fees on

9    them, but they weren't on the preliminary settlement

10   statements that you would review, correct?

11   A    That's correct.

12   Q    But you still allowed this practice to continue after

13   you had this conversation; fair statement?

14   A    No.   That's a complete incorrect statement.

15   Q    You asked Mr. Bertucci to give you an explanation and he

16   wouldn't answer to your satisfaction; do you recall

17   testifying?

18   A    I don't recall testifying to that.

19   Q    His response says, "It was okay with the lender."

20        Does that refresh your recollection, sir?

21             MR. ROBERTSON:   What deposition?   What page and

22   line?

23             MR. BAKER:   I'm on page 104 of the first

24   transcript.

25   Q    Does that --

PDF created with pdfFactory trial version www.pdffactory.com

1   A   Ask the question again, please.

2   Q   Mr. Bertucci said, "Well, it's okay because the lender

3   says it's okay."

4       Do you remember that conversation?

5   A   I do.

6   Q   And you weren't satisfied that that was still correct;

7   fair statement?

8   A   I wasn't satisfied that that had gone on the HUD without

9   our knowledge.

10  Q   In fact, you also knew that Bertucci had done other

11  closings with Jenkins and that Jenkins had received fees,

12  correct?

13  A   I did not know that at the time.

14  Q   Okay.

15      MR. BAKER:   Page 108, Volume I.

16  Q   "QUESTION:  But you know that there were other

17  transactions" -- strike that.

18      MR. BAKER:  I'm going to go back a little earlier.

19      Line 7.

20  Q   "Down on how many other transactions Mr. Jenkins

21  received fees?"

22      MR. McLAUGHLIN:  Objection, your Honor.

23      I'm sorry.

24      Objection, your Honor.  This was the subject of a

25  motion.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  I believe it was, Mr. Baker.

2    Q    Sir, you're familiar with a document, "Verification of

3    Rent," are you not?

4    A    I am.

5    Q    And you are aware that James Adamos signed a

6    Verification of Rent for Mr. Smith; are you not?

7    A    I am now.

8    Q    That caused you some concern; did it not?

9    A    Yes.

10   Q    Could you explain why?

11   A    Well, when the case came up, I was then informed that a

12   Mr. Adamos had acted as a real estate broker on some of

13   these transactions.  So for him to also act as landlord --

14   Q    It's not proper, is it?

15   A    I wouldn't say it's not proper.  I would say it would be

16   coincidental.

17   Q    Especially in light of the fact that the document may

18   not be accurate.  That would be a cause for concern also,

19   would it not?

20   A    It would.

21   Q    Sir, was it the custom and practice of Union Capital to

22   only obtain the information that would be put on a loan

23   application from the borrower directly?

24   A    No.  In many cases -- not in "many."

25        In some cases borrowers have agents acting for them.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    Such as?

2    A    Financial planner, CPA, cousin, brother, uncle, mom who

3    can't speak English.

4    Q    To your knowledge are you aware how P.J. Goodwin

5    obtained the financial information from Mr. Smith on the

6    27 West Cottage Street closing?

7    A    I don't know how he obtained the information.

8    Q    Do you know whether Mr. Jenkins provided that

9    information to him?

10   A    I have no knowledge.

11        MR. ROBERTSON:  Objection.

12   Q    Do you know whether Mr. Adamos provided that information

13   to him?

14        MR. ROBERTSON:  He answered he doesn't know.

15        THE COURT:  New question now.

16   A    I don't know.

17   Q    Sir, it's a fair statement that you personally never

18   reviewed Goodman's [sic] loans for quality control?

19   A    You mean "Goodwin"?

20   Q    Yes, Mr. Goodwin.

21   A    Correct.

22   Q    At Union Capital, what was the process you had to make

23   sure that your loan originators did not engage in any

24   misbehavior with respect to presenting the loan

25   applications?

1    A    All the originators in the beginning, when they first

2    came on, were required to -- Mr. Fabrizio would put them

3    through a two-week training, where they had to listen to a

4    series of tapes.

5         And then, as Mr. Fabrizio testified earlier, as

6    regulations and compliance things came up, we would schedule

7    periodical meetings with all employees to keep them up to

8    date on, you know, new rules and new regulations that have

9    been coming about, whether it was from the various different

10   state and federal regulation agencies.

11   Q    Sir, with respect to the period of 2004 to 2007, that

12   was not the case; fair statement?

13   A    No, it's not a fair statement.

14   Q    In fact, you left it to the originators to self-police

15   themselves; is that correct?

16   A    That is not correct.

17        MR. BAKER:   Page 11, Volume II, line 17.

18   Q    "Okay, sir, with respect to the way in which Union

19   Capital was operated from 2004 to 2007, that period, can you

20   describe to me the controls or systems that were in place at

21   Union Capital that were intended to ensure that no loans

22   were placed that contained any false or fraudulent

23   information?

24        "ANSWER:   Basically, everybody's under a general ethics

25   code, you know, not to do anything fraudulent.   That's

```
 1    the -- there's -- you know, as a -- all the loan officers

 2    were not required.  Well, I know P.J. hadn't.

 3         "One of the things I used to do was ask them to

 4    subscribe to Origination News, that magazine.  There's

 5    articles regarding doing things ethically and things like

 6    that.

 7         "We encourage them to go to trade show meetings that

 8    are always available.  They weren't forced to, because they

 9    had to pay them out of their own pocket."

10         Do you recall that testimony, sir?

11    A    I do.

12              MR. ROBERTSON:  Do you want to finish that answer?

13              MR. BAKER:  Sure.

14    Q    "They weren't forced to.  They paid for them out of

15    their own pocket because they're highly compensated,

16    commissioned guys.  If they chose to do so, they could.  If

17    they didn't, they didn't.

18         "We did have them sign a fraudulent form regarding, you

19    know, not committing fraud.  And that's probably about it."

20         Is that correct, sir?

21    A    Yes.

22    Q    So other than self-policing themselves, you, as the

23    owner of the company, took no active management in these

24    loan originators during that period except to encourage them

25    on their own to do things?
```

1    A    And to have periodical meetings regarding updates on

2    regulations.

3    Q    Now, sir, you don't have any knowledge whether

4    Mr. Goodwin actually met with Mr. Smith or Ms. DaSilva, do

5    you?

6    A    I don't have any knowledge.

7    Q    And you would only check off as the loan originator the

8    box that says "face to face interview" if they actually sat

9    down with the loan originator, correct?

10   A    Our mortgage software system had a glitch in it, as all

11   -- we used a software called "CALYX," which is the prevalent

12   software in the industry.  And the computer automatically

13   defaults to "face-to-face interview" the minute you start

14   doing an application.  So unless the originator remembers to

15   change the box and click a different box, then all

16   applications get generated with the "face-to-face

17   interview."

18   Q    It's on the loan application --

19   A    It's on the loan application.

20   Q    -- that qualification is on the loan application,

21   "face-to-face interview," correct?

22   A    That's one of the boxes.

23   Q    It's important, is it not?

24   A    Is what important?

25   Q    The existence of that statement on the loan application.

1    There's a reason for it, correct?

2    A    Correct.

3    Q    You want to know that this information is reliable, and

4    that's one of the boxes that's checked off to show that the

5    loan originator met with the borrower; fair statement?

6    A    No, because there's also, "By mail, by telephone."

7    Q    But, sir, if that box was checked off by Mr. Goodwin,

8    you understood that he met with Mr. Smith, correct?

9    A    If he filled out the application correctly, yes.

10   Q    Do you have any knowledge that in these cases,

11   Mr. Smith's cases -- excuse me, Mr. Smith's loan, the

12   computer was not working correctly that day?

13   A    Well, as I said, on all loan applications, there's a box

14   automatically checked.  But that box -- that's the way the

15   software is.  That box is "face to face."  You have to

16   change the box if it's not going to be face-to-face.

17   Q    So it's --

18   A    Or you can print a blank application and manually check

19   it.

20   Q    Sir, do you recall discussing the status of the market

21   back in 2005 at our deposition?

22   A    You'd have to refresh my memory.

23   Q    Do you remember characterizing it, sir, as the "Wild,

24   wild, West"?

25   A    It was a situation where it was very easy for anyone in

PDF created with pdfFactory trial version www.pdffactory.com

1    the country to get a mortgage.

2    Q    In fact, you described, to my profound education,

3    exactly how the market work.  It was originally driven by

4    Wall Street, correct?

5    A    Correct.

6    Q    In fact, you described Wall Street's interest in

7    generating loan origination as "incentive based."  Do you

8    remember that?

9    A    Correct.  That is how it works on Wall Street.

10   Q    Could you explain what that means?

11   A    Well, basically, the guys at Lehman Brothers, the guys

12   at Goldman Sachs, were coming up with these guidelines and

13   programs that enabled people to get financing.  They're like

14   anybody else in most of the industry, where they get paid on

15   commissions based on, you know, volume-driven.

16   Q    In fact I think you described it as "crazy"?

17   A    In hindsight I would think that would be the case with

18   some of the programs that were available to people.

19   Q    And all the parties -- excuse me.

20        All a person, a borrower, needed to get subprime money

21   for no-money-down loans was good credit?

22   A    That's not 100 percent accurate.

23   Q    Do you recall testifying that would be one way for them

24   to get it?

25   A    That would be one of the aspects, yeah.

```
1    Q   With respect to Mr. Smith, he had good credit at the

2    time, did he not?

3    A   I have no knowledge of his credit at the time.

4    Q   In fact, you did testify that subprime lenders, just to

5    be clear about your testimony, they were "out of their mind

6    at the time"?

7    A   Pardon me?

8    Q   You testified that subprime lenders were "out of their

9    mind at the time"?

10   A   Well, with some the programs -- I mean, there were

11   actually "no employment" programs.  You don't even verify

12   whether the person has a job, and you could get a loan.

13   Q   Right.

14       And you as the loan originator understood that,

15   correct?

16   A   As a mortgage broker, we processed the loans and sent

17   them to the lenders, who made the decision that came up with

18   the guidelines to get the borrowers the financing.

19   Q   In fact, I think you testified once before that, "If a

20   borrower had a pulse, you could get them one of these

21   subprime loans"?

22   A   I did say that at one of our eight-hour depositions.

23   Q   Now, sir, with respect to Mr. Smith and Ms. DaSilva,

24   Union Capital never verified their income, correct?

25   A   It was not required by the program.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    Q    Not only was it not required, but you testified it would
2    be a violation of the guidelines?
3    A    Correct.
4    Q    So you could slap anything you wanted on the loan
5    application and the lender would approve it?
6         MR. ROBERTSON:   Objection.
7    A    That's not correct.
8         THE COURT:   Sustained.
9    Q    Sir, with respect to your borrowers, what would you
10   systematically and typically do to make sure that the
11   information that they gave on the loan application with
12   respect to their income was correct?
13   A    Well, on loans that we brokered out, it was really not
14   our decision to determine whether the income that was stated
15   on the application by the borrower, you know, was sufficient
16   with their job title.  That was the decision of the
17   underwriter and the lenders that we were submitting the loan
18   to.
19   Q    Sir, was it the custom and practice of Union Capital in
20   2005 to routinely obtain an appraisal of the subject
21   property that was being financed?
22   A    Yes.
23   Q    Do you recall whether you did that for 10-12 Palm Place,
24   Ms. DaSilva's purchase?
25   A    Yes.  I think there was an appraisal done.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    May I approach the witness?

2              THE COURT:   You may.

3         (Counsel conferred.)

4    Q    Mr. Richman, this document that I've just presented to

5    you, this is an invoice on the first page addressed to Union

6    Capital, correct?

7    A    Yes.

8    Q    It says "DaSilva," right?

9    A    Yes.

10   Q    "10-12 Palm Place, Brockton;" fair statement?

11   A    Yes.

12   Q    You recognize the company that generated the invoice,

13   Patrick Lee.  You know who Patrick Lee was?

14   A    Yes.  He was an appraiser.

15   Q    You recognize the document?  It came from your business

16   records as an appraisal.

17   A    Yes.

18             MR. ROBERTSON:   Can you give him a chance to look

19   at it before you ask him questions?

20   A    Yes, I recognize it.

21             MR. BAKER:   Your Honor, I would like to move this

22   into evidence, please.

23             THE COURT:   149.

24             (Plaintiff's Exhibit No. 149 received in evidence.)

25   BY MR. BAKER

1    Q    Sir, you've read these on a number of occasions when you

2    were actively involved in mortgage origination, correct?

3    A    Correct.

4    Q    And on the page identified as "operating income

5    statement, one-to-four family investment," your appraiser

6    tells you what the market rents of the property are, does he

7    not?

8    A    Yes.

9    Q    With respect to this document, would you tell me what

10   the market rents were for the property at the time the

11   appraisal was created?

12   A    If all three units were rented, it would be $4,800.

13   Q    And the date of this document, sir, is December 13,

14   2004, correct?

15   A    Correct.

16   Q    And that's 10-12 Palm Place, right?

17   A    Correct.

18        MR. BAKER:  May I approach the witness, your Honor?

19        THE COURT:  Yes.

20   Q    Mr. Richman, showing you another document, have you seen

21   this document before?

22   A    I have not.

23   Q    You recognize the invoice, do you not, the format of the

24   invoice?

25   A    The format.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    And it's addressed to Union Capital, is it not?

2    A    It is.

3    Q    And, in fact, it was the custom and practice to order

4    appraisals in 2005, and this one refers to Robert Smith;

5    does it not?

6    A    Correct.

7    Q    27 West Cottage Street?

8    A    Correct.

9    Q    Take a moment to look at the document.

10   A    (Witness complies.)

11        Okay.

12   Q    This document came from the Union Capital business

13   files.

14        Do you recognize this to be an appraisal that you

15   received when considering the financing for Mr. Smith?

16   A    Correct.

17        MR. BAKER:  Your Honor, I would like to move this

18   into evidence, please.

19        THE COURT:  150.

20        **(Plaintiff's Exhibit No. 150 received in evidence.)**

21   BY MR. BAKER

22   Q    Sir, Exhibit 150, once again, this provides the rents on

23   the property at the time that this appraisal was created;

24   does it not?

25   A    It does.

```
 1     Q    Sir, drawing your attention to the page where the rents
 2     are identified, could you tell me what the fair market value
 3     of the rents were for the property at the time of the
 4     appraisal?
 5     A    This is a different property.
 6     Q    Yes.
 7     A    $3,400.
 8     Q    27 West Cottage Street?
 9     A    Correct.
10          These are only two one-bedrooms.  Those were all three
11     bedrooms.
12     Q    No issue.
13     A    Okay.
14          MR. BAKER:  Thank you, sir.
15          I have no further questions.  Thank you very much, your
16     Honor.
17          THE COURT:  Mr. Robertson.
18          MR. ROBERTSON:  Thank you, your Honor.
19                       CROSS-EXAMINATION
20     BY MR. ROBERTSON
21     Q    Good afternoon, Mr. Richman.
22     A    Good afternoon.
23     Q    You were asked some questions about different loan
24     programs.
25          What's a "stated income" loan?
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A    A stated income loan is where you state a number on the
2    application.   It's going -- you state the person's income,
3    and you don't verify any of it.
4    Q    Where the lenders' programs, did they say explicitly to
5    the loan originator working for you, for the mortgage
6    broker, Don't verify the income?
7    A    Correct.
8    Q    And there were other loan programs where income could be
9    verified?
10   A    Correct.
11   Q    And I think you indicated to Mr. Baker there were some
12   programs where there was no income?
13   A    No income, no employment.
14   Q    And no assets?
15   A    No assets.
16   Q    And the market for these sorts of programs in 2004 and
17   2005, was Union Capital defining what sort of mortgage
18   products were out there?
19   A    No.
20   Q    And that was defined by all the lenders and all the Wall
21   Street types out there that were designing this system?
22   A    Correct, from the Fremonts to the Goldman Sachses to
23   the --
24   Q    And, in hindsight, that didn't make a whole lot of
25   sense; can we agree?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A    In hindsight I think the whole country has figured that

2    out.

3    Q    But if we go back to 2004 and early '05 when

4    Ms. DaSilva and Mr. Smith were looking for loan money, the

5    programs that they were placed into were stated income

6    programs, correct?

7    A    Correct.

8         I mean, we had to have those programs or we wouldn't be

9    competitive.

10   Q    So you took what they stated was their income?

11   A    Correct.

12   Q    Sometimes that information would come from them;

13   sometimes it would come from somebody helping them out?

14   A    Correct, but ultimately signed by them.

15   Q    When you say "ultimately signed by them," signed by them

16   in the loan application?

17   A    The initial loan application, some other documents

18   during the process, other disclosures forms, and again at

19   the closing.

20   Q    And the "again at the closing," does that mean that the

21   whole loan application comes back from the lender all filled

22   out and the borrower signs it again with all the attorneys

23   at the closing?

24   A    Correct.

25   Q    You looked at the loan files for these two transactions

1    that are at issue, right?

2    A    I did.

3    Q    Anything in those loan files, as kept by Union Capital,

4    to indicate that either Ms. DaSilva or Mr. Smith didn't

5    understand English or didn't understand the transactions?

6    A    No.

7    Q    And in those files are there signatures on the loan

8    apps. and on the loan documents in those boxes that say

9    "true and correct," and they sign and they date?

10   A    There are.

11   Q    Any indication to you or Mr. Fabrizio that Mr. Goodwin

12   is doing anything other than a good job with respect to

13   those particulars applications?

14   A    No indication.

15   Q    Mr. Baker asked you some questions about a temporary

16   order and cease and desist.  Do you remember that a while

17   ago?

18   A    I do.

19   Q    Anything in this document that has anything to do with

20   Mr. Smith or Ms. DaSilva?

21   A    No.

22   Q    This document came, along with the other that

23   Mr. Fabrizio testified about, toward the middle of

24   November of '09?

25   A    It did.

1    Q    At that point you guys had already decided you were

2    wrapping up business; is that fair?

3    A    We had already called them and told them we were

4    shutting down the company.

5    Q    Did you have any motivation to go through this line by

6    line and go back and contest anything?

7    A    You know, the cost involved -- if we fought it, we would

8    have won it, but it could have cost us probably a million

9    dollars.

10          MR. ROBERTSON:  I don't have any other questions.

11          THE COURT:  I think that's probably it,

12   Mr. Richman.  Thank you.

13          THE WITNESS:  Thank you.

14        (Witness excused.)

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

34

```
 1                     I N D E X

 2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 3    JOHN RICHMAN

 4      By Mr. Baker          5

 5      By Mr. Robertson              29

 6                     E X H I B I T S

 7    PLAINTIFFS                                         IN EV.

 8    No. 147      Banking Commissioner's Findings,        4

 9                 Re: Richman

10    No. 148      Request for Verification of            10

11                 Employment form

12    No. 149      10-12 Palm Place appraisal             26

13    No. 150      27 West Cottage St. appraisal          28

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**C E R T I F I C A T E**</u>

I, James P. Gibbons, Official Court Reporter for the
United States District Court for the District of
Massachusetts, do hereby certify that the foregoing pages
are a true and accurate transcription of my shorthand notes
taken in the aforementioned matter to the best of my skill
and ability.


/s/James P. Gibbons                    January 9, 2011


_____
James P. Gibbons



                    JAMES P. GIBBONS, CSR, RPR, RMR
                         Official Court Reporter
                       1 Courthouse Way, Suite 7205
                        Boston, Massachusetts 02210
                          jmsgibbons@yahoo.com

PDF created with pdfFactory trial version www.pdffactory.com

# Exhibit "B"

1

1   UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
2

3   * * * * * * * * * * * * * * * * * * *
    *ROBERT SMITH and MARIA DASILVA      *
4             Plaintiffs                 *        CIVIL ACTION
              v.                         *        No. 07-12067-RGS
5                                        *
    *DWIGHT JENKINS, CHERRY JENKINS,     *
6   DOREA SMITH, ROBERT E. KELLEY,       *
    R.KELLEY-LAW, P.C., LOUIS G. BERTUCCI,*
7   EB REAL ESTATE GROUP, INC.,          *
    DORCHESTER REAL ESTATE, INC.,        *
8   NEW ENGLAND MERCHANTS CORP.,         *
    UNION CAPITAL MORTGAGE BUSINESS TRUST,*
9   MID CITY MORTGAGE, LLC,              *
    FREMONT INVESTMENT & LOAN, and       *
10  MERITAGE MORTGAGE CORPORATION        *
              Defendants                 *
11  * * * * * * * * * * * * * * * * * * *

12

13

14        BEFORE THE HONORABLE RICHARD G. STEARNS
     UNITED STATES DISTRICT JUDGE AND A JURY
15        EXCERPT:  TESTIMONY OF LINDA BRYANT
                October 19, 2010
16

17

18

19                            Courtroom No. 21
                              1 Courthouse Way
20                            Boston, Massachusetts 02109

21

22

23           JAMES P. GIBBONS, RPR, RMR
                Official Court Reporter
24           1 Courthouse Way, Suite 7205
             Boston, Massachusetts  02210
25               jmsgibbons@yahoo.com

PDF created with pdfFactory trial version www.pdffactory.com

2

1    APPEARANCES:

2          BAKER & ASSOCIATES, P.C., (By Jeffrey S. Baker, Esq.) Two West Hill Place, Boston, Massachusetts

3    02114, on behalf of Plaintiffs

4                 and

5          CHARDON LAW OFFICES, (By Jonathan D. Plaut, Esq.) One State Street, Suite 1200, Boston, Massachusetts

6    02109, on behalf of Plaintiffs

7

8          ROBINSON & COLE, LLP, (By John R. Bauer, Esq.) One Boston Place, Boston, Massachusetts  02108, on behalf of

9    Mid City Mortgage, LLC

10         McLAUGHLIN & McLAUGHLIN, P.C., (By James F. McLaughlin, Esq.) 1135 North Main Street, Brockton,

11   Massachusetts 02301, on behalf of Robert E. Kelley & RKelley-Law, P.C.

12

13         FEIN LAW OFFICE, P.C., (By Christopher J. Fein, Esq.) 25 Braintree Hill Office Park, Suite 403,

14   Braintree,, Massachusetts   02184, on behalf of Louis G. Bertucci

15         BULKLEY, RICHARDSON and GELINAS, LLP, (By J. Patrick Kennedy, Esq.) 98 North Washington Street, Suite

16   500, P.O. Box 9750, Boston, Massachusetts 02114, on behalf of Signature Group Holdings, Inc.,

17

18         MARTIN, MAGNUSON, McCARTHY & KENNEY, (By Douglas R. Robertson, Esq.) 101 Merrimac Street, Boston,

19   Massachusetts  02114, on behalf of Union Capital Mortgage Business Trust

20         MURPHY & RILEY, (By Joseph A. King, Esq.) 141 Tremont Street, Boston, Massachusetts 02111, on behalf

21   of EB Real Estate Group, Inc.

22         LECLAIR RYAN, (By Jay S. Gregory, Esq.) One International Place, 11th Floor, Boston, Massachusetts

23   02110, on behalf of Dorchester Real Estate, Inc.

24

25

3

1            LAW OFFICES OF MICHAEL J. MARKOFF, (By Michael J. Markoff, Esq.) P.O. Box 212, Falmouth, Massachusetts

2    02541, on behalf of New England Merchants Corp.

3

4            PISCIELLI, DOMENICO & MURPHY, LLP, (By Geoffrey A. Domenico, Esq.), 171 Washington Street, North Easton,

5    Massachusetts   02356, on behalf of Dwight Jenkins, Cherry Jenkins, Dorea Smith

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     **E X C E R P T**

2                  * * * * * * * *

3              P R O C E E D I N G S

4        THE CLERK:  All rise for the jury.

5     (Whereupon, the jury entered the courtroom.)

6        THE CLERK:  All rise for the Honorable Court.

7     The case before this Court carries Case No. 07cv12067,

8 Smith, et al. versus Jenkins, et al.

9     Court is open.  You may be seated.

10        THE COURT:  Good morning, counsel.

11     Good morning, jurors.  It's good to see you.

12     I'm sorry it was a little tropical this morning, but I

13 think we're going to have it fixed shortly.

14     All right.  Are we ready to resume?

15        MR. PLAUT:  Yes, your Honor.

16     Would your Honor permit me to address the jury with

17 respect to the documents that you furnished to counsel this

18 morning?

19        THE COURT:  That is with respect to the Goodwin

20 deposition?

21        MR. PLAUT:  Yes.

22        THE COURT:  Yes.  As I ruled, you will be permitted

23 to read a statement into the record about the content of the

24 deposition.

25        MR. PLAUT:  Thank you very much, your Honor.

1        Good morning, ladies and gentlemen.  Again, I'm Jon

2    Plaut.  I represent the plaintiffs.

3        His Honor, Judge Stearns, has permitted me to address

4    you with respect to Philip J. Goodwin, who you heard was

5    sworn to tell the truth and then refused to testify several

6    days ago; not Mr. Jenkins, but the other gentlemen.

7        His Honor has permitted me to inform you that

8    Mr. Goodwin was deposed at our offices, and at that

9    deposition Mr. Goodwin refused to answer questions regarding

10   his relationships with Dwight Jenkins, and he refused to

11   answer questions regarding his relationship with Laurice

12   Taylor, and James Adamos.  And he refused to answer

13   questions regarding his relationships with Attorney Louis

14   Bertucci and his relationships with Attorney Robert Kelley.

15   And he also refused to answer questions regarding his

16   relationships with his employer/supervisors at Union Capital

17   Mortgage Business Trust, all on the grounds that his answers

18   might be personally incriminating.

19       And now I would call Linda Bryant to the stand.

20                    **LINDA BRYANT, sworn**

21       THE CLERK:  Please be seated.

22       Please state your name for the record and spell your

23   last name.

24       THE WITNESS:  Linda Bryant, B-R-Y-A-N-T.

25       MR. PLAUT:  May I proceed, your Honor?

```
 1              THE COURT:  You may.

 2                    DIRECT EXAMINATION

 3    BY MR. PLAUT

 4    Q   Ms. Bryant, you worked at Union Capital Mortgage

 5    Business Trust from 2005 to 2008, correct?

 6    A   Yes.

 7    Q   And George Fabrizio and John Richman were the owners of

 8    the company, correct?

 9    A   Correct.

10    Q   And Mr. Fabrizio and Mr. Richman supervised the loan

11    originators such as P.J. Goodwin, correct?

12    A   Correct.

13    Q   But you don't know if Mr. Fabrizio and Mr. Richman

14    actually provided any supervision to the loan originators,

15    including P.J. Goodwin, correct?

16    A   I wouldn't have any idea about that.

17    Q   Now, you became the compliance officer at Union Capital

18    Mortgage Business Trust, correct?

19    A   Correct.

20    Q   But you received no training as to how to be the

21    compliance officer, correct?

22    A   Correct.

23    Q   And you received no manuals to guide you in how to be a

24    mortgage processor, correct?

25    A   Correct.
```

1    Q    And you received no manuals to guide you in how to be a

2    compliance officer, correct?

3    A    Correct.

4    Q    In fact, you testified, did you not, that it was a joke

5    that being the compliance officer at Union Capital was your

6    title, correct?

7    A    It wasn't a joke that I would have that title.  The

8    longstanding joke was how long it took for me to get the

9    title.

10   Q    You processed P.J. Goodwin's loans at Union Capital,

11   correct?

12   A    Correct.

13   Q    And you had to keep a close watch on Mr. Goodwin because

14   he tried to stretch things a little bit, correct?

15   A    By stretching things...

16   Q    Just, just --

17   A    Correct.

18   Q    Is that a yes or no?

19        MR. ROBERTSON:  Can she be allowed to answer?

20        THE COURT:  Yes.  I agree.

21   Q    He tried to stretch things a bit, didn't he?

22   A    Stretching things in terms of always having rush

23   closings, doing sloppy applications, and that sort of thing.

24   Q    Okay.

25        And "sloppy applications" was not what the lenders

1  wanted; it was what the lenders wanted?  Did it have

2  anything to do with what the lenders wanted?

3          MR. ROBERTSON:  I object to the form.

4          THE COURT:  Overruled.

5  A   No.  It would have to do with taking a complete

6  application and filling in all the blanks.

7  Q   While at Union, did you ever submit a loan to a

8  prospective lender which you knew contained false

9  information?

10  A   I, in my deposition, said that I knew that; but, in

11  retrospect, it was more of a judgment call on my part that

12  this loan was not going to be an owner-occupied loan.

13  Q   But yet you submitted to the lender the loan application

14  that stated that the property was going to be lived in as

15  the applicant's primary residence, correct?

16  A   I went to my supervisor, told him of my concern.  My

17  memory is vague as to how long it took from the time I went

18  to him to the time the loan got submitted.

19  Q   And you -- correct me if I'm wrong, please.

20          You saw a loan application that stated that the

21  applicant intended to live in the property as his or her

22  primary residence, correct?

23  A   Correct.

24  Q   You then learned or believed that that applicant was not

25  going to live in the property as his or her primary

PDF created with pdfFactory trial version www.pdffactory.com

1    residence, correct?

2    A    That statement is incorrect.   I did not learn that.

3         I made a judgment based on my experience as a mortgage

4    processor.   By looking at the file, by looking at the

5    appraisal, I did not believe they were going to live there.

6    Q    Do you recall being deposed in my office several years

7    ago?

8    A    Yes, I do.

9    Q    And you recall me asking you --

10            MR. PLAUT:   Page 99, line 5.

11   Q    -- "Why, Ms. Bryant --

12            MR. ROBERTSON:   -- if you want to refresh her

13   recollection --

14            MR. PLAUT:   Thank you, Mr. Robertson.

15   Q    Do you recall testifying --

16            MR. PLAUT:   Page 99, line 5.

17            MR. ROBERTSON:   I object.

18            THE COURT:   I'm not sure why we're reading a

19   transcript to her.

20            MR. PLAUT:   May I approach the witness, your Honor?

21            THE COURT:   No.   Is there a question you want to

22   ask her?   And then if you want to refresh her memory, fine,

23   or if there is some inconsistency --

24            MR. PLAUT:   I understand.

25            THE COURT:   -- you may proceed --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PLAUT:  Thank you.

2          THE COURT:  -- but right now there is no question.

3          MR. PLAUT:  I understand, your Honor.  Thank you.

4    Q    Do you recall why you submitted the loan application to

5    the lender if you knew it contained false information?

6    A    Again, I did not know for a fact.  It was my best

7    judgment that it contained information that it was going to

8    be owner-occupied.  I did not believe that it was.

9    Q    And you approached management, correct?

10   A    Correct.

11   Q    And what did management tell you with respect to whether

12   or not you should submit this loan application to the

13   lender?

14   A    The actual conversation I don't remember.

15       I remember that I did talk to Tom Brennan, and I

16   remember that at some point the loan was submitted.  I can't

17   tell you if it was submitted immediately or later.

18          MR. PLAUT:  May I approach the witness, your Honor?

19          THE COURT:  You may.

20   Q    Ms. Bryant, I am going to approach you with a copy of

21   the transcript of your deposition.

22       Would you please -- I will read the question that I

23   asked you at the deposition, and if you would be so kind as

24   to read the answer, please.

25       "Ms. Bryant --

```
1              MR. ROBERTSON:  I object.

2              THE COURT:  Overruled.

3     Q    -- "why did you submit the application to the lender if

4     you knew that it contained false information"?

5     A    My answer was, "Management told me to."

6     Q    Thank you.

7          And at deposition do you recall me asking you further

8     questions on this line of questioning and you refusing to

9     answer the questions?

10    A    I did not refuse to answer the questions.

11             MR. PLAUT:  Page 105.

12             MR. MARKOFF:  Objection, your Honor.

13             THE COURT:  Overruled.

14             MR. PLAUT:  If I may approach, your Honor?

15             THE COURT:  You may.

16             MR. PLAUT:  This is page now 106, line 5.

17    Q    I will ask you -- I will recite what I had asked you at

18    deposition.  If you would be so kind as to provide your

19    response at deposition.

20         "Ms. Bryant, you've just spoken to your attorney.  What

21    is your answer?

22    A    "I am not going to answer any questions on this subject

23    matter."

24             MR. PLAUT:  Thank you, ma'am.

25             MR. DOMENICO:  Your Honor, objection.  I don't know
```

```
1    what application he is talking about.  I don't know if it
2    has anything to do with this case or he's just --
3              THE COURT:  It certainly sounds like it has to do
4    with this case.
5              MR. PLAUT:  Indeed it does, Mr. DOMENICO.
6    Q    It's --
7              THE COURT:  Let's ask --
8              MR. PLAUT:  I'll ask the question, and it will
9    dovetail right into it.
10             THE COURT:  Yes.  Why don't we deal with the
11   witness, not the lawyer.
12             MR. PLAUT:  Yes.
13   Q    Now, P.J. Goodwin worked on Robert Smith's loan
14   application for 27 West Cottage Street?
15   A    I don't remember the address.  I knew there was a Robert
16   Smith loan that P.J. Goodwin worked on.
17   Q    And you worked with Mr. Goodwin on that loan?
18   A    Again, if that's the one that was done in February,
19   2005, yes.
20   Q    Yes, that is the one.
21        Now, on February 11, 2005, to try to get Mr. Smith's
22   loan approved, P.J. Goodwin changed the net rental value of
23   the property to match the appraisal; isn't that correct?
24             MR. ROBERTSON:  I object to the form.
25             THE COURT:  If she knows.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    If you know.

2    A    I would not know that he did that.

3    Q    And do you know if Mr. Goodwin changed the taxes on the

4    loan application?

5    A    I don't know what P.J. Goodwin did.

6    Q    Do you know if Mr. Goodwin changed Mr. Smith's income on

7    the loan application?

8    A    I don't know what he changed.

9         MR. PLAUT:   May I approach the witness, your Honor?

10        THE COURT:   You may.

11   Q    Now, while at Union Capital Mortgage Business Trust, did

12   you use email in your day-to-day operations?

13   A    Yes.

14   Q    And were you using email on February 11, 2005,

15   approximately that time frame?

16   A    I would use it on a daily basis.

17   Q    Did you work with Richard Champ of Meritage Mortgage

18   Corporation?

19   A    Not directly.

20   Q    Did you ever have any email communications with him?

21   A    Not to my recollection.

22   Q    I'm going to show you a document, which I will provide a

23   copy to defense counsel.

24        Do you recognize the document that I've placed in front

25   of you, and, if so, what do you recognize it to be?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    I recognize it to be an e-mail, and I recognize that it

2   has my name on it, and that I saw it at the deposition.

3           MR. PLAUT:  I would ask that this document be

4   marked as an exhibit.

5           THE COURT:  What is the next number in sequence,

6   141?

7           THE CLERK:  141.

8           THE COURT:  141.

9           **(Plaintiff's Exhibit No. 141 received in evidence.)**

10  BY MR. PLAUT

11  Q    I'm going to take that same document that I just showed

12  you, and I'm going to blow it up a little bit for the jury;

13  and in the lower section of this email, Mr. Goodwin has sent

14  you an email on February 10, 2005, correct?

15  A    Correct.

16  Q    And could you read the part where Mr. Goodwin asks a

17  question to you starting with -- could you read the email

18  into the record, please, starting with, "So I am"...

19  A    "So I am looking at the appraisal, and the market rents

20  are lower than what we thought and the taxes are higher.  If

21  we change the net rental to 1,875, which will be 1,250, each

22  unit matching the appraisal, the taxes to 308.81, and the

23  income to 7,912 per month, do we think this income will fly?

24  I get a DTI of 43.7.

25          "Rich, please advise Linda and I on this one, and we

1    will ship ASAP."

2    Q    "Rich" is who?

3    A    It looks like Rich Champ.

4    Q    And "DTI" is what?

5    A    "Debt to income."

6         MR. PLAUT:   Thank you.

7         I have nothing further for this witness, your Honor.

8         Ms. Bryant, thank you.

9         MR. ROBERTSON:   A few questions, your Honor, if I

10   might.

11        Good morning, ladies and gentlemen of the jury.   My

12   name is Doug Robertson, and I represent Union Capital.   I've

13   been up from time to time, so I figure I'd just reintroduce

14   myself.

15                    **CROSS-EXAMINATION**

16   BY MR. ROBERTSON

17   Q    Ms. Bryant, Mr. Plaut didn't get a chance to, but tell

18   us a little bit about yourself.

19        Where do you live?

20   A    I live in Pembroke, Mass.

21   Q    Have you worked in the mortgage industry for long?

22   A    I have been in the mortgage industry for, I think, about

23   12 years.

24   Q    When you came to Union Capital, what was your job

25   preceding that?

1    A    The job preceding that was a mortgage processor at a

2    very small broker firm.

3    Q    Were you a loan processor at Union Capital?

4    A    Most of the work I did there was mortgage processing.

5    Q    Would you explain to the jury what a loan processor

6    does?

7    A    A loan processor will receive a file that should have

8    all the documents to submit to an underwriter, and my job

9    would be to verify that everything was there.  We would have

10    to have the credit report, the appraisal.  If the loan

11    program called for income documents, I would make sure that

12    they were there.  We would have to have disclosures,

13    appraisals, purchase and sales on a purchase.

14        And my job was to go through the documents and to make

15    sure that everything that was on the application matched the

16    documents.  For example, if it was a "full document" loan

17    and there were pay stubs, I would calculate the income; and

18    if it was incorrect on the application, I would adjust it.

19    Again with the bank statements, if it was wrong, I would

20    adjust it.

21    Q    I think the jury has heard that there were different

22    types of loans being offered to borrowers back in this time

23    period of 2005, 2004 and 2005; is that correct?

24    A    Absolutely.

25    Q    And what were some of the different types of loan

```
1   programs that you were handling for Union Capital at that
2   time?
3   A   I would handle a variety.
4       In the industry, and I don't want to use a lot of
5   jargon, but "A Paper" would be the best loan.  That would be
6   Fannie Mae, Freddie Mac.  You're going to get full document,
7   and generally they needed a large down payment.
8       And I would use the Fannie Mae or Freddie Mac software
9   engine, put the information in.  That would come back with
10  an approval or denial, and then I would then, like, submit
11  that to the underwriter to confirm everything.
12      The next subcategory would be known as "A Minus."
13  There would be just something about that that you may not be
14  able to go full document on.  You might -- it could be a
15  "stated loan," but the borrower would have good credit and
16  have some assets and, you know, be able to qualify with just
17  a minor thing that would have to be less than full
18  documentation.
19      Then we get into the subprime loans, and that ran the
20  gamut.  The subprime lenders all had their own rules.  There
21  wasn't one set of rules.  Some of them had niche programs,
22  you know, I can do an investment property or I can do, you
23  know, self-employed.  Somebody else can do a W-2 stated
24  income.  So they all had different programs and different
25  guidelines.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    I think Mr. Plaut was asking you some questions about a

2    deposition you gave a few minutes ago.  Do you remember

3    that?

4    A    I do.

5    Q    And do you remember if the transaction at issue that he

6    was asking you about was handled by a loan originator named

7    Uri Dahan?

8    A    Correct.

9    Q    And Mr. Dahan's transaction, was that something

10   different than either of the two plaintiffs in this case?

11   A    It was completely different.

12   Q    Mr. Plaut asked you a question about what has been

13   marked as Exhibit 141, that was an email you got.  Do you

14   remember that just a few minutes ago?

15   A    Yes.

16        MR. ROBERTSON:  May I approach, your Honor?

17        THE COURT:  You may.

18   Q    That email he asked you about, down at the bottom it

19   says, "Rich, please advise Linda and I on this one and we

20   will ship ASAP."

21   A    Yes, it does.

22   Q    And "Rich" was Mr. Champ?

23   A    Rich Champ, which I believe was the representative from

24   Meritage.

25   Q    And since we got a lot of people and entities to keep

PDF created with pdfFactory trial version www.pdffactory.com

1          (Witness excused.)

2                         **I N D E X**

3    **WITNESS**          **DIRECT**   **CROSS**    **REDIRECT**    **RECROSS**

4    LINDA BRYANT

5       By Mr. Plaut          6

6       By Mr. Robertson              15

7                      E X H I B I T S

8    PLAINTIFFS'                              IN EV.

9    No. 141     Email                              14

10

11                   C E R T I F I C A T E

12

13       I, James P. Gibbons, Official Court Reporter for the

14   United States District Court for the District of

15   Massachusetts, do hereby certify that the foregoing pages

16   are a true and accurate transcription of my shorthand notes

17   taken in the aforementioned matter to the best of my skill

18   and ability.

19

20   /s/James P. Gibbons              January 8, 2011

21   _____

22   James P. Gibbons

23                JAMES P. GIBBONS, CSR, RPR, RMR

24                   Official Court Reporter
                  1 Courthouse Way, Suite 7205
25                 Boston, Massachusetts 02210
                    jmsgibbons@yahoo.com

PDF created with pdfFactory trial version www.pdffactory.com



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PDF created with pdfFactory trial version www.pdffactory.com