## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 07-12067-RGS

### ROBERT SMITH, et al.

v.

### DWIGHT JENKINS, et al.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO AWARD DAMAGES PURSUANT TO MASS. GEN. LAWS CH. 93A, § 9

October 11, 2011

STEARNS, D.J.

On July 21, 2011, the First Circuit Court of Appeals dismissed an appeal of a jury verdict taken by plaintiff Robert Smith and two of the named defendants. The Court of Appeals dismissed the appeal as prematurely brought, in that Smith's claims under the Massachusetts Consumer Protection Statute, Mass. Gen. Laws ch. 93A (Chapter 93A), remained pending against three defendants: Dwight Jenkins, Louis Bertucci, and New England Merchants Corporation (NEMC). This decision will address Smith's motion for a Chapter 93A award of treble damages and attorneys' fees.

## BACKGROUND

On November 1, 2010, after the jury returned a verdict in most respects favorable to Smith on claims of fraud and breach of fiduciary duty, the court entered

the following judgments: $50,000 apiece against Dorchester Real Estate d/b/a Century

21 (Century 21), NEMC, and Union Capital Business Mortgage Trust (Union) (for

fraud and breach of fiduciary duty); $25,000 against attorney Louis Bertucci (for fraud);

and $85,000 against Dwight Jenkins (for fraud, breach of contract, and breach of

fiduciary duty). *See* Judgment (Dkt. #452). The court prior to trial had reserved a

decision on Smith's Chapter 93A claims.[1]

In October and November of 2010, Signature Group Holdings, Inc. (a/k/a

Fremont), Union, Bertucci, and Century 21 renewed their motions for judgment as a

matter of law on the Chapter 93A claims. After a hearing in February of 2011, and the

filing of additional briefing regarding proper service of Smith's Chapter 93A demand

letters, the court allowed the motions of all of the moving defendants but Bertucci.[2] *See*

*Smith v. Jenkins*, 777 F. Supp. 2d 264 (D. Mass. 2011). In the same April of 2011

---

[1] At the close of plaintiffs' case, the court directed a verdict in favor of defendants Robert Kelley, RKelley-Law, P.C., Mid-City Mortgage, LLC, Fremont, Cherry Jenkins, and Dorea Smith. The court also directed a verdict against plaintiff Maria DaSilva on all claims. The jury found in favor of defendant RE/MAX on all claims presented to them.

[2] After an evidentiary hearing, the court found that demand letters had not been served on Fremont, Union, and Century 21. Dkt. #488. *See Spring v. Geriatric Auth. of Holyoke,* 394 Mass. 274, 287 (1985) ("We have often held that '[a] demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved . . . .'"); *Lingis v. Waisbren*, 75 Mass. App. Ct. 464, 468-471 (2009) (where there was no evidence that the demand letter had been sent, received, or replied to, plaintiff's Chapter 93A claim necessarily failed).

Order, the court set a schedule for Bertucci, NEMC, and Jenkins to file responses to
Smith's surviving Chapter 93A claims, and for Smith to reply.[3] Resolution of the issue,
however, was deferred after Smith, Century 21, and NEMC filed notices of appeal.[4]
*See United States v. Brooks*, 145 F.3d 446, 455-456 (1st Cir. 1998).

## DISCUSSION

To prevail on a Chapter 93A claim, a plaintiff must show that a defendant
engaged in "[u]nfair methods of competition and unfair or deceptive acts or practices
in business transactions." Mass. Gen. Laws. ch. 93A, § 2. Practices are deceptive in
the context of Chapter 93A if they could reasonably be found to have "'caused a person
to act differently from the way he [or she] otherwise would have acted.'" *See Aspinall*

_____

[3] In its April 11, 2011 Order, the court found that the demand letter predicate had
been met with respect to these three defendants. Bertucci had not only received a
certified demand letter sent by Smith's attorneys, but his counsel had replied to the
letter. *See* Mem. and Order on Defs.' Mot. for J. as a Matter of Law at 9-10 (Dkt.
#488). Jenkins admitted to receiving the demand letter; however, he argues that
because the demand was "too high," the letter was "inoperative," a proposition that has
no support in law. *See Fredericks v. Rosenblatt*, 40 Mass. App. Ct. 713, 716-718
(Chapter 93A demand letter adequate even though damages claimed grossly exceeded
the amount justified by the evidence). NEMC also admitted that it had received
Smith's demand letter. *See* NEMC Resp. to Pl.'s Req. for 93A Damages at 6-8 (Dkt.
#491).

[4] Prior to Smith, Century 21, and NEMC filing their appeals, the court denied
motions for judgment as a matter of law with respect to the fraud counts as to
defendants Bertucci, NEMC, and Century 21. The court granted Union's motion for
judgment as a matter of law with respect to claims of fraud and breach of fiduciary
duty, the two counts on which the jury found against Union. Dkt. #492.

3

*v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004), quoting *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 777 (1980). A Chapter 93A plaintiff must also prove that a defendant's deceptive conduct caused him some appreciable loss or injury. *See Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc.,* 445 Mass. 790, 799-800 (2006).[5]

The jury found that Jenkins, Bertucci, and NEMC engaged in fraudulent conduct and this court agrees. *Cf. Poly v. Moylan,* 423 Mass. 141, 151 (1996), quoting *Wyler v. Bonnell Motors., Inc.*, 35 Mass. App. Ct. 563, 567 (1993) ("[A] judge may make independent and, therefore, different, findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims."). *See also R. W. Granger & Sons, Inc. v. J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001), quoting *Schwanbeck v. Fed.-Mogul Corp.*, 31 Mass. App. Ct. 390, 415 (1991), *rev'd on other grounds* 412 Mass. 703 (1992) ("Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law."). Bluntly speaking, defendants' actions were tantamount to criminal behavior that only

---

[5] Section 9, as opposed to Section 11, of Chapter 93A is plainly at issue despite defendants' contentions to the contrary. Smith was a "consumer" within the meaning of the statute; that is, he acted as "an individual who participates in commercial transactions on a private, nonprofessional basis," in contrast to Section 11, which applies to a business person or entity engaged in trade or commerce. *See Shawmut Cmty. Bank, N.A. v. Zagami*, 411 Mass. 807, 814 (1992), citing Mass. Gen. Laws. ch. 93, §§ 9, 11.

4

by the vagaries of chance and undeserved fortune came to be privately litigated rather than pursued in a public prosecution.[6]

### *Dwight Jenkins*

Jenkins was the motive force in the fraud. Jenkins trolled the margins of society for the gullible (like Smith) and the greedy (like DaSilva) whom he recruited as straw "investors" in shady real estate deals. With the help of louche mortgage brokers and a complicit attorney, the "investors" were inveigled into taking out "liar loans" for the purchase of overvalued residential properties. The "investors" received a small fee, while Jenkins and his cohorts (including the brokers) skimmed fees and commissions from the grossly inflated purchase prices.[7]

Smith, a Marine veteran and former drug addict, had drifted in and out of the New England Shelter for Homeless Veterans in Boston. He suffers from schizophrenia, post-traumatic stress disorder, depression, and mental retardation. Smith graduated from high school in 1978 only with the help of special education courses. His

---

[6] Although Jenkins was indicted in December of 2009 for sixteen counts of wire fraud and nine counts of engaging in unlawful monetary transactions, charges to which he pled guilty in May of 2011, the indictment involved a mortgage scheme other than this one. *See United States v. Jenkins,* No. 09-cr-10373-GAO (D. Mass.).

[7] For their part, the lenders (like Fremont) turned a blind eye to the transactions knowing that because of rapid securitization in a lazily regulated market, they were taking on almost none of the risk of the inevitable defaults.

5

comprehension, reading, and writing skills are well below those of an average adult.

In January of 2005, Smith was living out of his car and working as a trash collector for Waste Management Corporation (WMC) in the Fields Corner neighborhood of Dorchester. He was approached by a woman named Laurice Taylor, to whom he was attracted.[8] Taylor identified herself as a RE/MAX employee. Taylor told Smith that RE/MAX was offering a special investment program and asked if he would like to participate. When Smith replied that he did not have any money to invest, Taylor responded that it didn't matter. Taylor promised that RE/MAX would provide the expertise and make all of the critical decisions. Taylor gave Smith her business card and invited him to call.

Several days later, Smith contacted Taylor. She invited him to meet her at the RE/MAX office on Dorchester Avenue. There she told Smith that if he signed up for the investment program, he would earn $10,000 for every investment in which he was placed. She reassured him that "RE/MAX would take care of everything," and claimed that RE/MAX worked regularly with veterans.[9]

After Smith agreed to participate, Jenkins and Taylor created a false financial

---

[8] Laurice Taylor is not a defendant in this case, nor was she called by either side as a witness at trial.

[9] The jury credited RE/MAX's defense that it terminated Taylor when it learned about her involvement with Jenkins.

6

profile for him. In late January of 2005, they provided the profile to Rachel Noyes, an NEMC branch manager.[10] Noyes completed loan applications in Smith's name using the false information to make him, on paper, a more attractive candidate for a mortgage loan. Noyes then forwarded the applications to Fremont. Once the loans were approved, Jenkins arranged for Bertucci, a Massachusetts real estate lawyer, to act as the closing attorney.

In February of 2005, Taylor directed Smith to travel to the RKelley-Law Offices in Braintree. When he arrived, he was met by Jenkins and James Adamos, a representative of Century 21. Jenkins told Smith that he would be making an "investment" in a residence in Dighton, Massachusetts, and that there was "nothing to worry about." Jenkins promised Smith that he would maintain the property, collect rent, deal with tenants, pay operating bills, mortgages, and other expenses, and eventually sell the property at a profit in which Smith would share. At Bertucci's direction, Smith signed real estate closing documents, promissory notes, mortgage agreements, and the completed loan applications. Without understanding the import of the documents, Smith unwittingly borrowed $411,964.24 in the form of two mortgages brokered through Fremont. Smith eventually received $10,000 for his role

---

[10] Noyes was not named as a defendant, nor was she called by either side as a witness at trial.

7

as the "purchaser." Jenkins took for himself $42,000 of the proceeds as a "contract release fee."

On February 28, 2005, Taylor escorted Smith to a second "investment meeting," at the RKelley-Law Offices. There, Smith was induced to sign for a mortgage loan of $437,198.13 for the purchase of a three-family home on West Cottage Street in Boston – ostensibly to be his primary residence. Bertucci again presided at the closing. Smith received $10,000 of the proceeds, while Jenkins paid himself a $41,500 "contract release fee."

Several months after the closings, Smith began receiving phone calls from lenders dunning him for missed mortgage payments. In addition, tenants called to complain that their utility bills had not been paid. Jenkins and Taylor assured Smith that they would deal with the complaints. The calls, however, persisted. It is clear from the evidence presented at trial that Jenkins did nothing to perform his promise to manage the properties. Eventually, the Dighton and Cottage Street properties went into foreclosure.[11]   Jenkins asserted his Fifth Amendment right against self-

---

[11] Jenkins argues that Chapter 93A liability does not attach because there was no evidence that Smith was assessed a deficiency as a result of the foreclosures. The argument is mistaken as a matter of law. Smith testified that as a result of the foreclosures and the ruining of his credit rating and reputation, he suffered extreme emotional and physical distress. *See Hershenow,* 445 Mass. at 799-800 ("*Leardi* [*v. Brown*, 394 Mass. 151 (1985)] established that, in the wake of the 1979 amendment to G.L. c. 93A, § 9, a claim of 'injury' now encompassed 'the invasion of any legally

8

incrimination at trial and refused to answer any questions with respect to his dealings with Smith or any of the defendants or parties to the real estate transactions that he had arranged.[12]

## *NEMC*

Rachel Noyes, the NEMC branch manager with whom Jenkins and Taylor were in league, made numerous statements that she knew or should have known were false regarding Smith's creditworthiness in the loan applications for both properties.[13]   The first of the applications falsely stated that: (1) it had been completed in a face-to-face interview with Smith; (2) that Smith's monthly income was $7,500 (or $90,000 per year); (3) that Smith had two separate bank accounts totaling savings of $18,500; (4) that Smith had   completed fourteen years of school; (5) that Smith had rented his current home for five years; (6) that he had been employed by WMC for four years and

protected interest of another,' *id.* at 159, just as it now encompassed severe emotional stress . . . .").

[12] Unlike in a criminal proceeding, in a civil action an adverse inference may be drawn from the refusal of a party to testify on the grounds of possible self-incrimination. *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996).  The court draws such a negative inference against Jenkins in concluding that his deceptive acts were knowing and willful.

[13] The jury disbelieved the testimony of Philip Goduti, the owner of NEMC, that Noyes was an "independent contractor" over whom he had no supervisory authority.

9

six months; (7) that he had a net worth of $397,037; and finally, (8) that he intended to occupy the Dighton property as his principal residence.

The second mortgage application was even more fanciful. It falsely stated: (1) that it had been prepared in a face-to-face interview; (2) that Smith had completed sixteen years of school; (3) that he had rented his current home for the last two years; (4) that he had been employed in the same occupation for twenty years; (5) that he had an income of $8,516 per month, or $102,912 per year; (6) that he intended to occupy the Cottage Street property as his principal residence; while omitting (7) the mortgages on the Dighton property as among his assets/liabilities.

NEMC argues that because Smith testified at trial that he had never met Noyes nor knew who she was (other than her name appearing on the loan applications), Noyes could not have known the information the applications contained was false. The argument borders on the specious. The applications attested that a face-to-face interview had been conducted in order to verify Smith's background and creditworthiness. The applications were completed weeks apart and contained glaring inconsistencies as to Smith's years of school, his income, his current residence, and his intention to reside at the property in question, inconsistencies that could not have gone unnoticed.

NEMC's argument that Noyes was an independent contractor for whose actions

10

it was not responsible was put to the jury as follows.

> As a general rule, a person who employs an independent contractor is not liable for the contractor's wrongful acts unless he or she retains control over the contractor's work to such a degree that the contractor is not truly independent. A managing real estate broker, as you learned from the testimony of Karen Cahill and others, cannot use the label independent contractor to escape the duty imposed on her by law to supervise the junior brokers in her employ. But it does mean that, consistent with the law of agency, the managing broker is not responsible for the conduct of independent contractors that is not authorized by her, that is done in a different business context, and that falls outside the scope of the duties of a real estate broker.
>
> An agent is only authorized to do that which it is reasonable for him or her to infer that the principal desires him or her to do in the light of the principal's manifestations and the facts as he or she knows, or should know them to be, at the time that he or she acts. An agent is bound to exercise the utmost good faith toward his or her principal in all dealings within the scope of his or her agency. An agent cannot assume any relationship that is inconsistent with the free, earnest and honest advancement of the interests of the principal.
>
> To establish that an agent had actual authority to bind his or her principal to a transaction or contract with a plaintiff, the plaintiff must prove by a preponderance of the evidence that the principal gave the agent the express authority and consent to enter into the alleged transaction or contract and to bind the principal to the agreement. If you do not find that the principal gave its express consent to its agent, then you must find that the agent did not have the actual authority to bind the principal.
>
> If you find that the agent did not have actual authority to enter into a transaction or contract with the plaintiff, you should consider whether the agent was acting with apparent authority. Apparent authority is conferred by conduct of the principal that causes a third person to believe that the supposed agent has authority to perform the act. Apparent authority cannot be established through the words or actions of the purported agent,

11

> but only through those of the principal. Moreover, apparent authority may
> only be found when the third person acted reasonably in believing that, as
> a result of the principal's words or conduct, the purported agent was
> authorized to act on the principal's behalf.

These instructions faithfully reflect the Massachusetts law governing agency.

"[C]onduct of an agent is within the scope of employment [for purposes of vicarious

liability under Chapter 93A] if it is of the kind he is employed to perform, if it occurs

substantially within the authorized time and space limits, and if it is motivated, at least

in part, by a purpose to serve the employer. The fact that the predominant motive of

the agent is to benefit himself does not prevent the act from coming within the scope

of employment as long as the act is otherwise within the purview of his authority."

*Prof'l Servs. Group, Inc. v. Town of Rockland*, 515 F. Supp. 2d 179, 193 (D. Mass.

2007), quoting *Wang Labs., Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859-61

(1986). The jury found that Noyes had acted within the scope of her employment at

NEMC when she submitted the false mortgage loan applications and the court agrees.

NEMC is thus vicariously liable for her fraudulent acts. *See Prof'l Servs. Group, Inc.,*

515 F. Supp. 2d at 196 (although in the Chapter 93A context the judge may reach

different factual conclusions from the jury, "a trial judge has discretion to consider a

jury's findings in making an independent determination of a Chapter 93A claim.").[14]

---

[14] Even apart from the jury's finding, NEMC's direct conduct supports a finding
of liability. Philip Goduti, NEMC's president and owner, testified that he was

12

### *Louis Bertucci*

Bertucci acted as the closing attorney in approximately thirty fraudulent real estate transactions arranged by Jenkins.[15] At the two closings in which Smith participated, he was directed by Bertucci to sign the documents required to effectuate the mortgage loans and complete the purchases. The jury disbelieved Bertucci's testimony that in doing so he simply (and innocently) followed the instructions of the lender-client. Smith testified that at each closing Bertucci introduced himself as the lawyer handling the paperwork for the "investment." Although Bertucci testified that he had no memory of Smith, the jury were warranted from their observations of Smith's demeanor in the belief that it would have been apparent to Bertucci that Smith did not understand the significance of the closings, much less the nature of the real estate "investments" being made in his name. They were also warranted in crediting Smith's

---

suspicious of Noyes' relationship with Fremont with whom she did a disproportionate amount of loan business and yet he made no investigation of her activities and took no remedial action. The looseness with which NEMC managed its affairs formed the basis of a complaint brought by the Attorney General of Massachusetts against NEMC. In response to the Attorney General's findings that abusive loan origination practices at NEMC were routine and pervasive, NEMC entered a cease and desist order and agreed to quit the mortgage business.

[15] Bertucci made a proffer to the United States Attorney for the District of Massachusetts in its case against Jenkins in exchange for a grant of immunity.

testimony that Bertucci had led him to believe that he was acting in Smith's best interest as his lawyer. *See Tomaselli v. Beaulieu*, 2010 WL 1460259, at \*14 (D. Mass. Mar. 10, 2010) (although owing no duty to a non-client, an attorney should exercise reasonable care to a third-party if he knows or has reason to know that the non-client is relying on his advice or services); *Kirkland Constr. Co. v. James*, 39 Mass. App. Ct. 559, 561 (1995) (same); *see also* Mass. R. Prof'l Conduct 4.3(a) ("When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."). Moreover, although Bertucci was the lender's attorney, he instructed Smith in the signing of the loan documents. *Cf. Boston Prop. Exch. Transfer Co. v. Iantosca*, 686 F. Supp. 2d 138, 143 (D. Mass. 2010) (no duty of reasonable care owed non-client because plaintiff never sought advice or assistance from the attorney defendants); *see also* Mass. R. Prof'l Conduct 4.3(b) ("During the course of representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client.").

Finally, Bertucci knew that the closings involved the purchase of properties, both of which were being claimed as a principal residence, one of which was located in

14

Dighton, an improbable 44-mile commute from Dorchester where Smith worked. It would also have been apparent, particularly to a real estate attorney, that the two sets of loan documents contained a number of inconsistencies regarding Smith's education, work experience, and income. Equally telling, among the documents that Bertucci had Smith sign were contradictory (and false) owner-occupancy affidavits. Encouraging others, including non-clients, to sign false affidavits is deceptive conduct on an attorney's part even if not specifically proscribed by statute. *See Morris v. BAC Home Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 259 (D. Mass. 2011), quoting *Commonwealth v. Fremont Inv. & Loan*, 452 Mass. 733, 742-743 (2008) ("Violation of a statutory regime is not a necessary basis for a Chapter 93A claim, as Chapter 93A 'creates new substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute.'"); *see also* Mass. R. Prof'l Conduct 4.1(b) (a lawyer may not "fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.").

### *Award of Multiple Damages*

Multiple damages may be awarded if a violation of Chapter 93A was willful or knowing or "the refusal to grant relief upon demand was made in bad faith." Mass. Gen. Laws ch. 93A, § 9(3). Willful and knowing means that one not only knows in fact

that what was represented was not true, but knew that he did not know whether such a representation was true before making it. *Shawmut Cmty Bank, N.A. v. Zagami*, 30 Mass. App. Ct. 371, 375-376 (1991), *rev'd in part on other grounds*, 411 Mass. 807 (1992). *See also Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 627 (1978). "Based on the egregiousness of each defendant's conduct, the trial judge may assess between double and treble damages." *Int'l Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 853 (1983). As Jenkins and Bertucci conspired to enrich themselves by taking advantage of a person who they knew, or should have known, lacked the ability to anticipate, or even identify, the consequences of his actions, an award of treble damages is appropriate. Noyes' conduct was not as egregious as she had no personal knowledge of Smith, but she knew (or should have known) that the financial information about him she had been given was false in several material respects. Thus, in the case of NEMC, the court will award double damages.

### *Request for Attorneys' Fees & Costs*

Reasonable attorneys' fees and costs incurred in connection with the bringing of a Chapter 93A claim must be awarded to a plaintiff if the court finds a violation of section 2. *See* Mass. Gen. Laws. ch. 93A, § 9(4); *Fontaine v. Ebtec Corp.,* 415 Mass. 309, 324 (1993). A reasonable fee for Chapter 93A purposes is calculated using a more flexible approach than that of the customary "lodestar" method. *See Trenwick*

16

*Am. Reinsurance Corp. v. IRC, Inc.,* 2011 WL 2009919, at \*2 (D. Mass. May 23, 2011). "[U]nder Massachusetts law, the determination of reasonable attorney's fees awarded under 93A is largely discretionary, taking into account the following relevant factors: 'the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.'" *Id.* at \*2, quoting *Computer Sys. Eng'g, Inc. v. Qantel Corp.,* 740 F.2d 59, 71 (1st Cir. 1984).

In compliance with the court's request, Smith's counsel have submitted detailed records of the hours expended in litigating this case. *See Trenwick,* 2011 WL 2009919, at \*3, citing *Twin Fires LLC v. Morgan Stanley Dean Witter and Co.*, 445 Mass. 411, 428 (2005) (detailed notes and record keeping are helpful to the court, but in the more flexible Chapter 93A context, the court can make a reasonable reward based on summary submissions of counsel and from its own observations). The records date back to October of 2006 when counsel first began representing Smith, and continue through October of 2010. *See* Ex. 1, Itemization of Time and Expenses (Dkt. #475). Entries reflect the usual and expected attorney duties such as legal research, creation of pleadings, witness interviews and depositions, motion drafting, expert witness preparation, meetings with Smith, and correspondence with opposing counsel.

17

Attorney Baker, who has been in practice since 1985, bills his time at a rate of $450 per hour. The records indicate that he spent 1,902 hours working on Smith's case. Attorney Plaut, a member of the bar since 1987, recorded 1,919 hours of work on Smith's case and billed at a rate of $350 per hour. Attorney Groulx, who passed the bar in 2008, began working on Smith's case in February of 2010 and billed 402 hours at a rate of $150 per hour. At the hourly rates indicated, which I find reasonable given the attorneys' relative experience and the rates charged by lawyers who do comparable work in the Boston area, the total expenditure of attorney time on Smith's case equals $1,587,850. According to the records, out-of-pocket expenses and costs amounted to an additional $42,818. *See* Baker Aff. (Dkt. #475-477). The total claimed in fees and costs is thus $1,630,668.[16]

The court must, however, weigh several adjustments to this figure. Effort expended on unsuccessful common-law claims brought in concert with a successful Chapter 93A claim is not ordinarily compensable. *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 177 (1999). However, where the Chapter 93A and common-law claims

---

[16] The hours counsel spent preparing Smith's case are on the high side of what might reasonably be expected. The court does, however, take into account the extensive investigation undertaken by counsel and the burden involved in responding to the vigorous defenses mounted on behalf of all thirteen defendants, including six summary judgment motions.

18

arise out of a "single chain of events," an apportionment among the claims is not

required. *Twin Fires LLC*, 445 Mass. at 430; *Clamp-All Corp. v. Foresta*, 53 Mass.

App. Ct. 795, 813 (2002). The court may also take into account the fact that counsel

took this case on a contingency basis for a plaintiff who lacked the means to contribute

even nominally to the costs involved. *See Aiello v. Aiello*, 63 Mass. App. Ct. 914, 915

(2005) (the purpose of fee-shifting in Chapter 93A context "reflects a public policy to

allow private parties to pursue claims that otherwise might escape redress.").

Smith argues against any apportionment of fees and costs.[17] He contends that

his common-law claims were mostly based on the same set of transactions that underlie

---

[17] Smith's counsel also argues that attorneys' fees and costs should not be apportioned among the three defendants, but instead should be assessed jointly and severally. Counsel notes that as Jenkins is incarcerated, NEMC is no longer in business, and Bertucci is (apparently) near judgment-proof, it will be difficult to enforce any award. In cases brought under the Federal Civil Rights Act where a plaintiff has prevailed over more than one defendant, the court has discretion to decide whether "the fee award should run jointly and severally against the defendants or, if not, what portion of the award each defendant should bear." *See Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 337 (1st Cir. 2008) (noting that the guiding principle behind apportionment should be equity and the particularities of each individual case). On the other hand, the court is unaware of any Massachusetts case in which defendants were held jointly and severally liable for attorneys' fees and costs in a Chapter 93A context. Although the policy of the statute is to encourage vindicative lawsuits, a collective assessment of attorney's fees is not appropriate where, as here, the level of culpability among defendants and the amounts of the jury awards differ. Moreover, independent liability is the standard applied by the Supreme Judicial Court to the award of multiple damages under Chapter 93A, and the reasoning of the Court would seem to apply equally to the award of attorneys' fees in multiple defendant cases. *See Int'l Fid. Ins. Co.,* 387 Mass. at 857-858.

19

the 93A claim. This is true of the three successful claims against Jenkins, Bertucci, and NEMC: common-law fraud, breach of fiduciary duty, and breach of contract. Although Smith did not prevail on the remaining ten counts,[18] they also shared in varying degrees the same nucleus of operative facts. It is reasonable to suppose that much of the work counsel did to investigate Smith's case overlapped among all thirteen counts.

The court therefore will attempt to cull out time spent solely on developing and pursuing legal theories relevant to the related unsuccessful counts with a light hand.[19] The court will however deduct time spent pursuing claims against defendants ultimately deemed not liable. Smith's counsel have conscientiously carved out the time spent on DaSilva's case[20] from their submissions to this court, though time spent advancing legal theories relevant to both the Smith and the DaSilva claims are included in counsel's

---

[18] The thirteen counts include: fraud; violation of Massachusetts Mortgage Broker Regulations, 209 C.M.R. §§ 42.00 et seq.; violations of 15 U.S.C. §§1602 et seq., the federal Truth in Lending Act (TILA); violation of Regulation Z, 12 C.F.R. §§226.1 et seq.; Mass. Gen. Laws. ch. 140, § 1 et. seq., the Massachusetts disclosure statute; Chapter 93A; negligence; breach of contract and the implied covenant of good faith and fair dealing; conversion; unjust enrichment; breach of fiduciary duty; civil conspiracy; and RICO. *See* Pl.'s First Am. Compl. (Dkt. #49).

[19] The exception is with respect to the claims, like the one brought under Regulation Z, that were legally deficient from the onset of the case.

[20] The court directed a verdict against DaSilva after the evidence showed that she was not a true plaintiff, but a willing coconspirator of Jenkins.

20

submissions. *See* Baker Aff. (Dkt. #475-477).[21]

Based on these considerations, the court will award attorneys' fees for a percentage of the hours submitted by Smith's counsel, at the hourly rates that counsel have indicated. The court will use as a fractional guidepost Smith's partial success on three of the eight related claims, set in the context of the original thirteen counts. From the initial percentage of 62% (8/13), the court will deduct an amount that accounts for the effort spent on defendants who were found not liable, while recognizing the portion of that time and effort that necessarily overlapped with establishing the liability of the remaining defendants. The court considers a division of the 62% in half sufficient to achieve a reasonable approximation of a justifiable fee award. Because the costs billed are not excessive and largely fixed regardless of the number of the counts in the Complaint, the court will allow them in their entirety.

## ORDER

For the foregoing reasons, Smith's request for damages pursuant to Mass. Gen. Laws ch. 93A, §9 is ALLOWED. The jury awards for Smith against defendants Jenkins and Bertucci will be trebled. Thus, judgment against Jenkins will enter for $255,000, and against Bertucci for $75,000. Judgment will enter against NEMC for $100,000,

---

[21] With respect to the post-judgment activity relevant to Smith's Chapter 93A claims, counsel have billed only 26 hours of Attorney Groulx's time.

21

which is twice the jury award. Pursuant to Mass. Gen. Laws ch. 93A, § 9(4), Smith's counsel are awarded $492,233 in attorneys' fees and $42,818 in costs.[22] Interest will be applied to the actual damages awarded by the jury at the Massachusetts state rate of 12 percent. *See Trenwick*, 2011 WL 2009919, at *1 ("Prejudgment interest awarded to the prevailing party in a chapter 93A action may only be applied to the actual damages suffered, not to the multiple punitive damage award."). Smith's counsel will submit to the court within fourteen (14) days of the date of this decision a Proposed Form of Final Judgment.

> SO ORDERED.
> /s/ Richard G. Stearns
>
> _____
> UNITED STATES DISTRICT JUDGE

---

[22] While the fees awarded may seem disproportionately large relative to the actual damages obtained for Smith, the court has no reason to question the accounting of hours submitted by Smith's lawyers and defendants have not argued otherwise. *See Twin Fires LLC.*, 445 Mass. at 432 (judge did not abuse discretion in awarding a percentage of the fees requested by plaintiff that greatly exceeded 93A damages where defendant's opposition to fees was stated only in conclusory terms).