UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12067-RGS


ROBERT SMITH

v.

RKELLEY-LAW, P.C., et. al


FINDINGS OF FACT, RULINGS OF LAW, and ORDER
ON PLAINTIFF'S *RESPONDEAT SUPERIOR* CLAIM
and PETITION FOR ATTORNEYS' FEES

December 8, 2015

STEARNS, D.J.

This is the culminating decision in litigation that has now outlived the mortgage banking crisis that precipitated it.  Enough has been written that the court will confine itself to only those facts and rulings necessary to bring this lingering aspect of the case to an overdue conclusion.  The necessary background, supplemented by the additional credible testimony and exhibits offered at the trial on damages, is as follows.

1.  Robert Smith was duped into becoming the catspaw for a mortgage fraud scheme orchestrated by defendant Dwight Jenkins with the help of real estate brokers and mortgage lender complicitors.  The court has previously provided the following portrait of Smith at the moment Jenkins found him:

1

"[A] Marine veteran and former drug addict, Smith had drifted in and out of the New England Shelter for Homeless Veterans in Boston.  He suffers from schizophrenia, post-traumatic stress disorder, depression, and mental retardation.  [He] graduated from high school in 1978 only with the help of special education courses.  His comprehension, reading, and writing skills are well below those of an average adult."  *Smith v. Jenkins*, 818 F. Supp. 2d 336, 344 (D. Mass. 2011) (*Smith I*), *rev'd on other grounds*, 732 F.3d 51 (1st Cir. 2013) (*Smith II*) (internal quotations omitted).

2.  This court described the gist of the scheme in *Smith I* as follows: "Jenkins trolled the margins of society for the gullible (like Smith) and the greedy . . . whom he recruited as straw 'investors' in shady real estate deals. With the help of louche mortgage brokers and a complicit attorney, the 'investors' were inveigled into taking out 'liar loans' for the purchase of overvalued residential properties.  The 'investors' received a small [stipend], while Jenkins and his cohorts (including the brokers) skimmed fees and commissions from the grossly inflated purchase prices." *Smith I*, 818 F. Supp. 2d at 340.

3.  In early 2005, Jenkins, with the help of an accomplice, Laurice Taylor, convinced Smith to "invest" in a "special program" from which he would earn a guaranteed $10,000 for each investment he made with no

capital contribution required.[1] *Smith II*, 732 F.3d at 59.   After Smith expressed interest, on February 7, 2005, Jenkins instructed him "to attend a meeting at the law office of [defendant] RKelley-Law, P.C. in Quincy, Massachusetts, to sign the documents for his first investment." *Id.* at 60.   At the meeting, "[a]ttorney Louis Bertucci, an associate at RKelley-Law, introduced himself to Smith as the lawyer in charge of the paperwork and assured him that the documents were 'in order.'" *Id.*  The "meeting" was in fact a real estate closing.  A second closing, with Smith and Bertucci again in attendance, occurred at RKelley-Law on February 28, 2005.

4.  At the first closing, Smith signed purchase papers for 2715 Winfield Lane in Dighton, Massachusetts (the Dighton Property), for $400,000, plus $11,964.24 in settlement charges and taxes.   Smith also executed two mortgages on the Dighton Property, one for $320,000, the second for $79,088.64, both of which were financed by defendant Signature Group Holdings, Inc., f/k/a Fremont Investment & Loan (Fremont).

5.  At the second closing, Smith signed papers for the purchase of 27 West Cottage Street in Dorchester, Massachusetts (Dorchester Property), for $429,000, plus $8,198.13 in settlement charges and taxes.   Smith also

---

[1] A more detailed description of the scheme can be found in *Smith II*, 732 F.3d 51.

executed two mortgages on the Dorchester Property, one for $343,200, the second for $85,184.44.  The mortgages were financed by defendant Meritage Mortgage Corporation (Meritage).

6.  Smith received a $10,000 cash payment from Jenkins after each of the closings.

7.  Bertucci, the lawyer who had dealt with Jenkins at both closings, had worked as an associate at RKelley-Law since becoming licensed to practice law in Massachusetts in 2002.  He handled most of the eight to fifteen closings conducted weekly by RKelley-Law.  RKelley-Law received a fee for each closing that it conducted, a portion of which was paid to Bertucci. The closings, including the two involving Smith, took place on the premises of RKelley-Law during normal business hours.

8.  RKelley-Law was identified by the mortgage lenders as the closing agent on the Dighton and Dorchester Property transactions.  Bertucci signed the closing documents on behalf of RKelley-Law.

9.  At the time he purchased the Dighton and Dorchester Properties, Smith was working as a trash hauler for Waste Management, Inc., earning $19.50 per hour.  Because of his learning disabilities, Smith did not fully comprehend the nature of the transactions in which he became involved.

Nor did he understand that he would become personally liable on the mortgage notes that he had executed.

10.   The Court of Appeals takes up the story:  "A number of months after the closings, Smith began receiving calls from the lenders on a daily basis regarding missed mortgage payments. . . . The two properties were eventually foreclosed on."  *Smith II*, 732 F.3d at 61.   Once his personal liability on the mortgages was made clear to him, Smith devoted hours – sometimes five to eight daily – in a stressful and futile attempt to disassociate himself from the loans and restore his credit.  Aug. 17, 2015 Trial Tr. (Tr.) at 20-21.  Over the course of the next two years, Smith continued to be hounded by calls to his cell phone from banks and angry tenants, as well as utilities seeking to collect on unpaid bills. (Smith specifically recalled a $500 water bill, which he paid).  *Id.* at 11-17, 28, 38-39; *see also Smith II*, 732 F.3d at 61. The calls only stopped when Smith obtained counsel.  Smith also personally made complaints to the FBI, the Suffolk District Attorney's Office, the Attorney General's office, the Real Estate Licensing Board, the mortgage companies, and Jenkins, none of which bore fruit.  At one point Jenkins called Smith and threatened Smith's life if he continued to complain.  Tr. at 14.

11.   During these two years Smith was not actively working, but was receiving worker's compensation because of injuries from a work-related fall. The only specific instance that he could recall when his low credit score adversely affected him was having been rejected on a lease on a new apartment.

12. Robert Kelley, Esq., is the sole owner of RKelley-Law. In that capacity, he hired Bertucci and acted as his supervising attorney.  Bertucci received a fixed salary, plus twenty percent of the fees that he generated.

13. RKelley-Law earned $1,750 for its services at the closing on the Dighton Property ($700 in attorney's fees and $1,050 in a title premium fee), and $1,896.05 for the Dorchester Property ($775 in attorney's fees and $1,121.05 in a title premium fee).

14.   Kelley testified that at the beginning of Bertucci's employment at RKelley-Law, he closely supervised Bertucci's legal practice, but as time progressed, allowed Bertucci to work more or less on his own.  Tr. at 47. Kelley also testified that he first learned of the irregularities at the closings involving Smith when he received a Chapter 93A demand letter from Smith's attorneys.

15.  Smith found legal representation in October of 2006 and brought suits in state and federal court alleging claims of fraud and breach of

fiduciary duty against Jenkins, Century 21-Dorchester, various mortgage brokers and lenders, as well as claims of fraud against Bertucci and RKelley-Law, P.C.  On November 1, 2010, a federal jury returned a verdict mostly favorable to Smith on claims of fraud and breach of fiduciary duty.  Although the court eventually upheld the jury's verdict against Bertucci, at the close of Smith's case, it (mistakenly, as it turned out) granted RKelley-Law's motion for judgment as a matter of law, reasoning that Bertucci was acting outside the scope of his employment agreement with RKelley-Law in his dealings with Jenkins (and through Jenkins, Smith).[2]

16.  The First Circuit Court of Appeals, *inter alia*, reversed the court's judgment in favor of RKelley-Law.  *Smith II*, 732 F.3d at 51.[3]  Because Bertucci did not appeal, the First Circuit's opinion did not directly address the verdict against him, either in terms of liability or damages.  The First

---

[2] The jury awarded Smith $25,000 in damages on the claim of fraud against Bertucci.  (The court had earlier dismissed the breach of fiduciary duty claim given the lack of any attorney-client relationship between Bertucci and Smith).  The court then trebled the damages award.  It specifically held that because Bertucci "conspired to enrich [himself] by taking advantage of a person who [he] knew, or should have known, lacked the ability to anticipate or even identify, the consequences of his actions, an award of treble damages [under Chapter 93A] is appropriate."  *Smith I*, 818 F. Supp. 2d at 345.

[3] The First Circuit did not reverse the judgment entered for Robert Kelley personally.  *Smith II,* 732 F.3d at 72-73.

Circuit remanded for reconsideration by this court the issue of whether RKelley-Law could be held liable for Bertucci's conduct on a theory of *respondeat superior*. *Id.* at 72-73.

17.   Following the First Circuit's remand, RKelley-Law and Smith filed cross-motions for summary judgment on the issue of vicarious liability, as well as briefing on a potential assessment of damages against RKelley-Law. Dkt. #635, #642.   This court addressed the issues separately.   It held on further consideration that RKelley-Law was in fact liable for Bertucci's conduct under the doctrine of *respondeat superior*.   Dkt. #655 - Sept. 15, 2014 Order at 9.   With respect to damages, Smith argued that the amount the jury found against Bertucci ($25,000) ought to be the amount imputed to RKelley-Law by operation of *res judicata*.   The court held, however, that "[a]s a matter of due process, RKelley-Law must be given the opportunity to retry, not its liability, but the amount of damages that it may owe to Smith because of Bertucci's fraudulent conduct."   Dkt. #665 - Nov. 26, 2014 Order at 6.   The court therefore set the issue of damages for trial.   A bench trial was held on August 17, 2015.

## RULINGS OF LAW

1.   Smith is not entitled to an award of hedonic damages.   *See Smith II*, 732 F.3d at 66 n.4.

2.     Smith is entitled to recover damages for his "ruined credit rating." S*mith II*, 732 F.3d at 68, citing *United States v. Burke*, 504 U.S. 229, 239 (1992).

3.     Smith is also entitled to compensation for the cost of remedying the harm done to his credit rating by defendants.  *See Burke*, 504 U.S. at 239; *Smith II*, 732 F.3d at 68.

## ULTIMATE RULINGS OF FACT AND LAW

1.     RKelley-Law is vicariously liable for Bertucci's conduct under the doctrine of *respondeat superior*.

> To determine whether an employee's conduct is within the scope of his employment for purposes of employer liability under [Mass. Gen. Laws ch.] 93A, we may appropriately be guided by a consideration of the factors relevant to scope of employment determinations bearing on the imposition of vicarious liability on employers for the tortious conduct of their employees.  In that context, conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.  The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority.

*Wang Labs., Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859-860 (1986) (internal citations omitted).

2.     Bertucci's conduct falls squarely within the contours of the *respondeat superior* doctrine as defined in *Wang Labs*.  *See also Smith II*, 732 F.3d at 72-73.

3.     This court has previously determined that Bertucci's conduct violated Chapter 93A and awarded treble damages against him.  *See Smith I*, 818 F. Supp. 2d at 345.  Under Massachusetts law, RKelley-Law is vicariously liable for the award of multiple damages entered against Bertucci.  As the court previously explained,

> Massachusetts law "routinely [holds] corporations liable for multiple damages because of the knowing and willful acts of their agents." *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 673 (1996). *See Wang Labs., Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 861 (1986) (finding a corporation liable for multiple damages because of the acts of employee and remanding "to the Superior Court for the assessment of up to three, but not less than two, times the amount of . . . actual damages"); *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1378 (D. Mass. 1983), *aff'd*, 740 F.2d 59 (1st Cir. 1984) (granting double damages against a corporate defendant);  *Shaw v. Rodman Ford Truck Ctr., Inc.*, 19 Mass. App. Ct. 709 (1985) (upholding judge's award of double damages against a corporation); *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 305 (1988) (affirming double damages under Chapter 93A against a corporation); *Grand Pac. Fin. Corp. v. Brauer*, 57 Mass. App. Ct. 407, 422 (2003) (judgment entered under Chapter 93A against a law firm and remanded solely to determine whether the "multiplier for the damages should exceed the doubling of damages, provided as matter of law under [Chapter] 93A, § 11.").

Order on the Question of Damages, Dkt. #665 (filed Nov. 26, 2014), at 6 n.3.

4.  The Massachusetts *respondeat superior* standard differs from that

of *Restatement (Second) of Torts* § 909, which requires a higher degree of fault or managerial rank before a corporate entity can be held vicariously liable.  Thus, Robert Kelley's personal lack of knowledge or lack of direct involvement in Bertucci's misconduct does not provide a defense to *respondeat superior*.  *See Kourouvacilis v. Am. Fed'n. of State, Cty., and Mun. Employees*, 65 Mass. App. Ct. 521, 534-535 (2006).

5.   The remaining issue before the court is whether holding RKelley-Law liable for the $25,000 awarded by the jury against Bertucci offends any basic notion of procedural fairness.[4]   I conclude that it does not for the

---

[4] It might be thought that this question is easily answered by the doctrine of *res judicata* (as Smith argues).  I think the issue is more complex. The doctrine "does not apply in circumstances where a party has neither the incentive, nor the opportunity, to raise the claim in an earlier lawsuit." *Longval v. Comm'r of Corr.*, 448 Mass. 412, 417-418 (2007).  Because the court (mistakenly) allowed RKelley-Law's motion for a directed verdict at the close of Smith's case, the court foreclosed any opportunity for RKelley-Law to present its defense to the jury (namely, that Bertucci was on a "frolic and adventure" of his own and not acting within the scope of his employment when he took on Jenkins as a client), the issue of damages warrants a second look.  Nor can it be said that privity draws RKelley-Law as a non-party under the umbrella of *res judicata*.   For purposes of privity, Massachusetts recognizes the doctrine of "virtual representation" in instances where a non-party allows its interests to be subsumed in another party's case, thereby "casting their lot" with the fortunes of the litigating party.  *Bourque v. Cape Southport Assocs., Inc.*, 60 Mass. App. Ct. 271, 275-276 (2004).  By the time of trial, Bertucci was no longer employed at RKelley-Law and had no incentive to represent its interests in offering a defense.

following two reasons.   First:   The employment relationship between Bertucci and RKelley-Law and the client relationship between RKelley Law and Jenkins and the mortgage originators/lenders, became pellucid that any "frolic and adventure" defense was nonviable.  Second:  The $25,000 sum awarded by the jury is eminently reasonable in the following sense.  The compensable damage done to Smith is the cost of restoring his ruined credit rating.  This involved two tasks: (1) persuading prosecutorial authorities that Smith lacked the intent to commit mortgage fraud; and (2) persuading the mortgage noteholders that Smith similarly lacked the capacity to sign the mortgage payment guarantees and therefore was not liable on the notes. Had Smith hired an attorney conversant with the relevant criminal and civil aspects of the law to resolve the matter, it would not be a surprise if he would have incurred legal fees of $25,000 (or more), which is exactly what the jury awarded.[5]

---

[5] I think this formula – the actual costs of obtaining legal relief – a more satisfying measure of damages than the one urged by Smith based on personal compensation (at a sanitation man's hourly wages) for the "five to eight hours a day" he spent over two years dealing with his credit problems. It is not that I necessarily disbelieve his testimony in this regard (although he is not the most reliable of reporters), but there is little or no evidence in the record documenting the number of hours he actually spent on credit-rating, related tasks.

6. Finally, having reviewed Smith's most recent submission of attorney billing records (and being familiar with the prior iteration), I am satisfied that an award of an additional $42,000 in attorneys' fees for the prosecution of the post-verdict portion of the case against RKelley-Law is fair and just.[6] *See Yorke Mgmt. v. Castro*, 406 Mass. 17, 19 (1989) (if a violation of Chapter 93A, § 2, is established, a plaintiff *shall* be awarded his reasonable attorney's fees and costs, including any fees incurred on appeal). In so determining, I have considered "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Linthicum v. Archambault*, 379 Mass. 381, 388-389 (1979). Given a long imbued familiarity with the case, I have also considered the bill holistically as well as by its segmented components. *See*

---

[6] While I do not find the billing rates themselves unreasonable, I do not see that three attorneys' full-time services were required for the small aspect of the appeal that involved RKelley-Law, the narrowly focused pre- and post-trial briefing, and the half-day, jury-waived trial. I have adjusted the bill accordingly. The court previously awarded Smith's attorneys $113,865 in fees and costs for the prosecution of the case against Bertucci. *See* Dkt. #527; Dkt. #618.

*Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 431 (2005).[7]

ORDER

Judgment is awarded to Smith against RKelley-Law as follows:

(1) RKelley-Law is vicariously liable to Smith in the amount of $25,000 for actual damages;

(2) that sum is trebled under Chapter 93A to $75,000; and

(3) RKelley-Law is liable to Smith for post-verdict attorneys' fees and costs in the amount of $42,000.  As the prevailing party, Smith will submit a Proposed Form of Final Judgment within ten (10) days of the date of this

---

[7] RKelley-Law argues that its response to Smith's Chapter 93A demand letter was reasonable.  In essence, RKelley-Law "upon being informed of the mortgage scheme immediately offered to meet with Smith and his counsel with representatives of the Attorney General's Office, an offer that was not accepted. The goal of Kelley Law was to report any fraud and/or criminal activity to the appropriate law enforcement officials. So, while no offer of monetary settlement was made, . . .  Kelley Law's response to the 93A demand . . . was appropriate and therefore, the Court should allow that to weigh heavily in its award of attorney fees."  Dkt. #711 at 1-2.  The court agrees that Smith's counsel at times chose the path of greatest resistance over an early resolution of Smith's claims unnecessarily prolonging aspects of the litigation. The court has taken that into account in assessing the reasonableness of the number of hours claimed in the fee petition.

decision.[8]

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[8] RKelley-Law argues that any final judgment must take into account any offsetting sums collected by Smith from other defendants. Massachusetts, as RKelley-Law points out, provides a statutory right of contribution. *See* Mass. Gen. Laws ch. 231B. Contribution, however, is a derivative action in which the party seeking contribution bears the burden of showing that a potential contributor is directly liable to a tort plaintiff. *See Panagakos v. Walsh*, 434 Mass. 353, 354-355 (2001). A claim for contribution also may not be maintained until the underlying "common liability" has been paid. *See* Mass. Gen. Laws ch. 231B, § 3(d)(2); *Spirito v. Hyster New England, Inc.,* 70 Mass. App. Ct. 902, 903 (2007). An award of multiple damages under Chapter 93A is punitive in nature. *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996). A defendant may seek contribution only with regard to the compensatory component of a damages award, and not the punitive element. *See Framingham Union Hosp., Inc. v. Travelers Ins. Co.*, 744 F. Supp. 29, 34 (D. Mass. 1990). Of course there is no right of contribution against Bertucci, although other remedies are available, including an offset.